UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| ROTHE DEVELOPMENT CORPORATION, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No.  SA-98-CV-1011-XR |
| VS. | ) | |
| | ) | |
| THE U.S. DEPARTMENT OF DEFENSE and THE U.S. DEPARTMENT OF AIR FORCE, | ) | |
| | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

ORDER

On this date, the Court considered Plaintiff's motion for summary judgment (Docket No. 301) and Defendants' joint motion for summary judgment (Docket No. 318). For the reasons discussed below, Defendants' joint motion for summary judgment is GRANTED, and Plaintiff's motion for summary judgment is DENIED.   The Clerk is instructed to keep this case open.

The 1207 Program was originally enacted by Congress on November 14, 1986.  It was reauthorized in 1989, 1992, 1999, and 2002, the last reauthorization being January 6, 2006.  The Court finds that the 2006 Reauthorization of the 1207 Program satisfies the requirements of strict scrutiny.  Congress had a compelling interest when it reauthorized the 1207 Program in 2006, and that compelling interest was supported by a strong basis in the evidence.  Furthermore, the Court finds that the 2006 Reauthorization of the 1207 Program is narrowly tailored.

## TABLE OF CONTENTS

### I.  FACTUAL & PROCEDURAL BACKGROUND

A.    Introduction

B.    Facts

C.    Relief requested by Rothe in its motion for summary judgment

D.    The 2006 Reauthorization of the 1207 Program

    1.    The 1207 Program, 10 U.S.C. § 2323

    2.    The 1207 Program cross-references Section 8(a) and 8(d) of the Small Business Act, 15 U.S.C. § 637

    3.    Title 13 of the Code of Federal Regulations, "Business and Credit Assistance"

    4.    Title 48 of the Code of Federal Regulations, "Federal Acquisitions Regulations System"

    5.    Intervening regulatory changes to the 1207 Program

        a.    PEA Regulations

        b.    Economic disadvantage regulations were amended to require an individualized showing of economic disadvantage for all SDB applicants.

        c.    Social disadvantage regulations were amended to lower the burden of proof required for non-minority small businesses to qualify as SDBs.

E.    Procedural History

    1.    Plaintiff's First Amended Complaint

    2.    *Rothe I*, 49 F. Supp. 2d 937 (W.D. Tex. 1999) (Prado, J.)

    3.    *Rothe II*, 194 F.3d 622 (5th Cir. 1999)

    4.    *Rothe III*, 262 F.3d 1306 (Fed. Cir. 2001)

    5.    *Rothe IV*, 324 F. Supp. 2d 840 (W.D. Tex. 2004) (Rodriguez, J.)

6.    *Rothe V*, 413 F.3d 1327 (Fed. Cir. 2005)

7.    Procedural history after the *Rothe V* remand

## II. LEGAL ANALYSIS

A.   Summary Judgment Standard of Review

B.   Little Tucker Act Claim

C.   The Court will not consider the facial constitutionality of the 1999 and 2002 Reauthorizations of the 1207 Program because those claims are moot. Those claims have also been waived on appeal and are outside the scope of remand. Furthermore, consideration of those claims is barred by the law of the case doctrine.

1.    Rothe's claims regarding the constitutionality of the 1999 and 2002 Reauthorizations are moot.

2.    Rothe's claims regarding the constitutionality of the 1999 and 2002 Reauthorizations are outside the scope of remand. Consideration of those claims is barred by the doctrines of waiver and law of the case.

D.   The Eighth, Ninth, and Tenth Circuits have evaluated similar affirmative action programs under *Croson,* and the legal analysis contained in those opinions is relevant to this Court's evaluation of the facial constitutionality of the 2006 Reauthorization to the extent that their holdings do not conflict with the law of the case.

1.    *Concrete Works of Colorado, Inc. v. City and County of Denver,* 36 F.3d 1513 (10th Cir. 1994) ("*Concrete Works II*")

2.    *Concrete Works of Colorado, Inc. v. City and County of Denver,* 321 F.3d 950 (10th Cir. 2003) ("*Concrete Works IV*")

3.    *Adarand Constructors, Inc. v. Slater,* 228 F.3d 1147 (10th Cir. 2000) ("*Adarand VII*"), *cert. denied as improvidently granted,* 534 U.S. 103 (2001)

4.    *Sherbrooke Turf, Inc. v. Minnesota Dep't of Transp.,* 345 F.3d 964 (8th Cir. 2003), *cert. denied* 541 U.S. 1041 (2004).

5.    *Western States Paving Co., Inc. v. Washington State Dep't of Trans.,* 407 F.3d 983 (th Cir. 2005), *cert denied* 126 S. Ct. 1332 (2006)

6.    Inter-circuit conflict regarding strict scrutiny analysis

7.  **Recent Supreme Court Cases:** *Carhart & Parents Involved*

  a.  *Gonzales v. Carhart*, **127 S. Ct. 1610 (April 18, 2007)**

  b.  *Parents Involved in Community Schs. v. Seattle Sch. Dist. No. 1*, **127 S. Ct. 2738 (June 28, 2007)**

E. **Congress had a compelling interest in reauthorizing the 1207 Program in 2006, which was supported by a strong basis in the evidence.**

 1. **Six state and local disparity studies were before Congress prior to the 2006 Reauthorization of the 1207 Program**

 2. **City of New York Disparity Study, Mason Tillman Associates, Ltd. (January 2005)**

  a.  **Availability Analysis**

  b.  **Introduction: Disparity Analysis**

  c.  **Disparity Analysis: Construction Prime Contractors**

  d.  **Disparity Analysis: Architecture and Engineering Prime Contracts**

  e.  **Disparity Analysis: Professional Services Prime Contracts**

  f.  **Disparity Analysis: Standard Services Prime Contracts**

  g.  **Disparity Analysis: Goods Prime Contracts**

  h.  **Disparity Analysis Summary: Prime Construction, Architecture, and Engineering Contracts under $50,000 and Prime Professional Services, Standard Services, and Goods Contracts under $25,000**

  i.  **Disparity Analysis Summary: Subcontracts**

  j.  **Anecdotal evidence**

  k.  **Rothe's rebuttal evidence concerning the New York Study**

 3. **Alameda County Availability Study, Mason Tillman Associates, Ltd. (October 2004)**

       **a.**      **Disparity Analysis: Construction Prime Contracts**

       **b.**      **Disparity Analysis: Architecture and Engineering Prime Contracts**

       **c.**      **Disparity Analysis: Professional Services Prime Contracts**

       **d.**      **Disparity Analysis: Goods and Other Services Prime Contracts**

       **e.**      **Disparity Analysis: Construction Subcontracts**

       **f.**      **Disparity Analysis: Architecture and Engineering Subcontracts**

       **g.**      **Disparity Analysis: Professional Services Subcontracts**

**4.**    **Ohio Multi-Jurisdictional Disparity Studies, Mason Tillman Associates, Ltd. (October 2003)**

       **a.**      **Disparity Analysis: Vertical Construction Prime Contracts under $500,000 and under $15,000**

       **b.**      **Disparity Analysis: Horizontal Construction Prime Contracts under $500,000 and under $15,000**

       **c.**      **Disparity Analysis: Architecture and Engineering Prime Contracts under $500,000 and under $25,000**

       **d.**      **Disparity Analysis: Professional Services Prime Contracts under $500,000 and under $15,000**

       **e.**      **Disparity Analysis: Goods and Other Services Prime Contracts under $500,000 and under $15,000**

       **f.**      **Disparity Analysis: Construction Subcontracting**

**5.**    **City of Dallas Availability and Disparity Study, Mason Tillman Associates, Ltd. (May 2002)**

       **a.**      **Disparity Analysis: Construction Prime Contracts less than $500,000 and less than $15,000**

       **b.**      **Disparity Analysis: Architecture and Engineering Prime Contracts less than $500,000 and less than $15,000**

      c.      **Disparity Analysis: Professional Services Prime Contracts less than $500,000 and less than $15,000**

      d.      **Disparity Analysis: Goods and Other Services Prime Contracts less than $500,000 and less than $15,000**

      e.      **Disparity Analysis: Subcontracts**

**6.**    **City of Cincinnati Disparity Study: Griffin & Strong, P.C. (October 2002)**

      a.      **Anecdotal evidence of discrimination in City contracting**

      b.      **Statistical evidence of discrimination in City contracting**

**7.**    **A Procurement Disparity Study of the Commonwealth of Virginia, MGT of America (January 2004)**

**8.**    **Dissenting Statement of Commissioner Michael Yaki, Federal Procurement after *Adarand*, U.S. Commission on Civil Rights (September 2005)**

**9.**    **Additional evidence before Congress found in Congressional Committee reports and hearing records**

**10.**    **Evidence before Congress concerning the systematic barriers facing small minority businesses**

**11.**    **SBA Reports that were before Congress prior to the 2006 Reauthorization**

      a.      **The Small Business Economy: A Report to the President (2005)**

      b.      **The State of Small Business: A Report to the President (2000)**

      c.      **Yin Lowrey, Ph.D., Office of Advocacy, Dynamics of Minority-Owned Employer Establishments, 1997-2001 (February 2005)**

**12.**    **Because the data contained in the *Appendix*, the Benchmark Study, and the Urban Institute Report is stale, the Court will not consider those reports as evidence of a compelling interest for the 2006 Reauthorization.  Rothe's expert report also raises a genuine issue of material fact as to the reliability of the methodology of the Benchmark Study.**

      a.      **The *Appendix***

  **b.**  **Urban Institute Report**

  **c.**  **Benchmark Study**

  **d.**  **Based on USCCR Briefing Report and the concrete, particularized rebuttal evidence contained in Rothe's expert reports, the Court finds that the data contained in the *Appendix*, the Urban Institute Report, and the Benchmark Study is stale. Rothe has also raised a genuine issue of material fact as to the reliability of the methodology of the Benchmark Study. However, Rothe has failed to raise a genuine issue of material fact as to the reliability of the methodology or the data contained in the six state and local disparity studies.**

 **13.** **Based on the statistical and anecdotal evidence of discrimination before Congress prior to the 2006 Reauthorization, the Court finds that Congress had a compelling interest in reauthorizing the 1207 Program in 2006, which was supported by a strong basis in the evidence.**

**F.** **The 2006 Reauthorization of the 1207 Program, and the present regulations implementing that program, are narrowly tailored.**

 **1.** **Efficacy of race-neutral alternatives**

 **2.** **Relationship between the stated numerical goal of five percent and the relevant market**

 **3.** **Over- and under-inclusiveness**

**G.** **Rothe is not entitled to attorney's fees**

### III.  CONCLUSION

# I. FACTUAL & PROCEDURAL BACKGROUND

**A.     Introduction**

This case concerns the constitutionality of Section 1207 of the National Defense Authorization Act of 1987 (the "1207 Program" or the "Act"), Pub. L. No. 99-661, 100 Stat. 3859, 3973 (1986) (as amended), codified at 10 U.S.C. § 2323, which permits the United States Department of Defense ("DoD") to preferentially select bids submitted by small businesses owned by socially and economically disadvantaged individuals ("SDBs").[1]  In the Act, Congress set a goal that five percent of the total dollar amount of defense contracts for each fiscal year would be awarded to small businesses owned and controlled by socially and economically disadvantaged individuals. 10 U.S.C. § 2323(a)(1)(A) & (b)(1).[2]  In order to achieve that goal, Congress authorized the DoD to adjust bids submitted by non-socially and economically disadvantaged firms by up to ten percent (the "price evaluation adjustment program" or "PEA"). 10 U.S.C. § 2323(e)(3).   There is a presumption that Black Americans, Hispanic Americans, Native Americans, and Asian-Pacific Americans are socially and economically disadvantaged individuals. 15 U.S.C. § 637(d)(3)(C). Plaintiff Rothe Development Corporation ("Rothe") did not qualify as an SDB because it was owned by a Caucasian female.  Although Rothe was technically the lowest bidder on a DoD contract, its bid was adjusted upward by ten percent, and a third party, who qualified as a  SDB, became the "lowest" bidder and was awarded the contract.    Rothe claims that the 1207 Program is facially

---

[1]Although both the United States Department of Defense and the United States Air Force are named Defendants in this action, the Court will refer to Defendants collectively as "DoD" or "the Government" in this Order.

[2]The Court will cite to the 2006 Reauthorization of the statute and the implementing regulations throughout this Order, unless otherwise indicated.

unconstitutional because it takes race into consideration in violation of the equal protection component of the due process clause of the Fifth Amendment. *See Sherbrooke Turf, Inc. v. Minn. Dep't of Transp.*, 345 F.3d 964, 969 (8th Cir.2003) (holding that although the program confers benefits on "socially and economically disadvantaged" individuals, a term which is race-neutral, strict scrutiny applies because the statute presumes minorities are in that class).

## B.    Facts

This civil action was originally filed on November 5, 1998. Rothe is based in San Antonio, Texas, and is owned by Ms. Suzanne Patenaude, a Caucasian female.[3] Since 1987, Rothe had contracted with the Department of the Air Force to maintain, operate, and repair the computer systems of the Switchboard Operations and Network Control Center ("NCC") at Columbus Air Force Base in Mississippi. Korean-Americans David and Kim Sohn of Baltimore, Maryland, own and operate International Computer and Telecommunications, Inc. ("ICT"), a SDB with annual revenues of approximately $13 million. ICT also performs computer maintenance and repair work and was Rothe's "number one competitor."

In an effort to improve contractor accountability and quality, the Air Force decided to consolidate Rothe's Switchboard/NCC contract with a contract for Base Telecommunications Services ("BTS"). On March 6, 1998, the 38th Engineering Installation Wing at Tinker Air Force

---

[3]According to its website, the Rothe Companies is "a consortium of small businesses which provide a diversity of service and support to the federal government and the commercial sector." This consortium of small businesses includes Rothe Development, Inc., which is advertised as a "Women Owned Small Business," Rothe Enterprises, Inc., which is advertised as a "Women Owned HUBZone Small Business," Rothe VTran Services, L.L.C., which is advertised as a "Veteran Owned Small Business," and Rothe Joint Venture, which is advertised as a "Women Owned Small Business." In this case, Rothe does not challenge the preferences it receives from the federal government based on these classifications. *See* http://www.rothe.com/index.htm (last visited July 5, 2007).

Base, Oklahoma, issued Solicitation F34608-98-R-0016 ("Solicitation") for competitive bids on the combined contract, and announced that, unlike predecessor contracts, the proposed contract would be let pursuant to the 1207 Program. The Solicitation required the successful bidder to provide operation and maintenance services for Base Telecommunication System ("BTS") and Network Control Center ("NCC") at Columbus Air Force Base, Mississippi.  The Solicitation required firm fixed price "contract line item numbers" ("CLINs") for monthly operation of the NCC, switchboard operation, and maintenance of the BTS as well as other firm fixed price CLINs for the purchase of equipment, installation, deactivate/reactivate circuits and removal.  The closing date for receipt of proposals was April 20, 1998, and the beginning of the performance period was set (after amendment) for April 1999.  According to the Solicitation, the award was to be made to the bidder with the lowest evaluated price, technically acceptable offer with a positive responsibility determination if the bidder was assessed as having a low performance risk rating.  If the bidder was judged to have a moderate or high performance risk rating, the Air Force reserved the right to award the contract to a bidder other than the one submitting the technically acceptable, lowest evaluated price.

The Solicitation contained DFAR 252.219-7006, a federal acquisition regulation codified at 48 C.F.R. § 252.219-7006 (1997) and entitled "Notice of Evaluation Preference for Small Disadvantaged Concerns."[4] 48 C.F.R. 252.219-7006(b)(1) (1997), entitled "Evaluation Preference,"

_____

[4]Although the Solicitation was issued on March 6, 1998 and awarded to ICT on August 20, 1998, the DFAR regulation containing the "price evaluation adjustment" or "PEA" applied to Rothe's bid in 1998 was located in the 1997 edition of the Code of Federal Regulations ("CFR"). The PEA regulations contained in DFAR 252.219-7006 were repealed and replaced with new PEA regulations in the 1998 edition of the CFR.  These new PEA regulations, which became effective for all DoD solicitations issued on or after October 1, 1998, are pertinent to this case and will be discussed *infra*. *See* 63 FR 35719 (Federal Acquisition Regulation; Reform of Affirmative Action

stated that "Offers will be evaluated by adding a factor of ten percent to the price of all offers." Apparently, the Solicitation required firm fixed price "contract line item numbers" ("CLINs") because the ten percent factor was "applied on a line item by line item basis or to any group of items on which award may be made." *Id.* at 252.219-7006(b)(2) (1997). For purposes of the 1997 DFAR regulation, a "small disadvantaged business concern" was defined as "a small business concern, owned and controlled by individuals who are both socially and economically disadvantaged, as defined by the SBA at 13 CFR part 124, the majority of earnings of which directly accrue to such individuals." *Id.* at 252.219-7000(a) (1997).

Rothe was the incumbent contractor "with an excellent performance record." Five contractors submitted bids. Two bidders were SDBs. Rothe, which was not a SDB, bid $5,573,318.00, and was the lowest bidder. ICT, which was a SDB and thus could participate in the 1207 Program, bid $5,723,495.00. Through application of the 10% price evaluation adjustment in effect at the time, Rothe's bid was increased to $6,130,481.00 for purposes of the bid selection. On August 20, 1998, the Air Force awarded the contract to ICT, the "fictionally" lowest bidder. The parties agree that Rothe lost the bid to ICT only because of application of the PEA regulations in effect at the time of the Solicitation. *Rothe Dev. Corp. v. United States Dep't of Defense,* 49 F. Supp. 2d 937, 941 (1999) ("*Rothe I*").

The contract at issue in this case was scheduled to expire on September 30, 1999; however, the Air Force exercised an option to extend ICT's contract through September 30, 2001. ICT did not perform any work under the disputed contract since April 30, 1999 because the Fifth Circuit and later the Federal Circuit imposed a stay pending resolution of Rothe's initial appeal. Despite numerous

---

in Federal Procurement) (June 30, 1998).

objections by Rothe, the Federal Circuit did not prevent the Government from soliciting and awarding a replacement contract without the price evaluation adjustment. As a consequence, the Air Force issued a new solicitation for the work covered by the disputed contract and awarded the new contract to an entirely different entity than the ones involved in this lawsuit. This new solicitation was not subject to the 1207 Program's PEA.

## C.     Relief requested by Rothe in its motion for summary judgment

Rothe requests the following relief in its motion for summary judgment: (1) a declaration that the 1207 Program is unconstitutional, as reauthorized in 1999, 2002, and 2006; (2) injunctive relief, as requested in its Original and First Amended Complaint; (3) a $10,000 money judgment in satisfaction of its claim for damages under the Little Tucker Act, based upon law of the case finding the 1207 Program unconstitutional as applied to Rothe in 1998; and (4) an award of attorney's fees and costs under the Equal Access to Justice Act ("EAJA"), 28 U.S.C. § 2412. Pl's MSJ, Pgs. 1-2.

## D.     The 2006 Reauthorization of the 1207 Program

Rothe requests a declaration that the 1999 and 2002 Reauthorizations of the 1207 Program were facially unconstitutional. This requested relief is outside the scope of the remand. As will be discussed more fully below, the Court finds that these claims are not justiciable. The claims are moot because a declaratory judgment on the validity of these intervening reauthorizations is "a textbook example of advising what the law would be upon a hypothetical state of facts."[5] *Concrete Works of Colorado, Inc. v. City and County of Denver*, 321 F.3d 950, 954 n.1 (10th Cir. 2003) ("*Concrete Works IV*") (citing *National Advertising Co. v. City and County of Denver*, 912 F.2d 404,

---

[5]In *Rothe III*, the Federal Circuit equated reauthorization with reenactment for purposes of strict scrutiny analysis. 262 F.3d at 1322 n.15.

412 (10th Cir. 1990)).  In addition to the justiciability problem, the Court cannot rule on the

constitutionality of the 1999 and 2002 Reauthorizations based on the doctrines of waiver and law

of the case.  Thus, the Court will only entertain Rothe's facial challenge to the present (*i.e.* 2006)

reauthorization of the 1207 Program, and Rothe's request for prospective injunctive relief relative

to the 2006 Reauthorization.

The present (*i.e.* January 2, 2006) reauthorization of the 1207 Program ("2006

Reauthorization") differs in several fundamental ways from the October 23, 1992 reauthorization

("1992 Reauthorization") that was applied to Rothe in 1998.  Unlike the 1992 Reauthorization, the

2006 Reauthorization: (1) contains a PEA suspension clause; (2) gives the Department of Commerce

discretion to recalculate the size of the PEA based on available data; (3) requires an individualized

determination of economic disadvantage to qualify for SDB status;[6] (4) lowers the standard required

for non-minority firms to qualify for SDB status;[7] (5) allows any interested party to challenge a SDB

certification; and (6) allows the presumption of disability to be overcome with credible evidence to

the contrary.[8]

The 1207 program was initially enacted as a three-year pilot program in 1986. National

Defense Authorization Act of 1987, Pub. L. No. 99-661, § 1207, 100 Stat. 3816, 3973 (Nov. 14,

1986).  In 1989, Congress extended the program from 1990 until 1993.  National Defense

Authorization Act for Fiscal Years 1990 and 1991, Pub. L. No. 101-189, § 831(b), 103 Stat. 1352,

1507 (Nov. 29, 1989).  In 1992, Congress reauthorized the program for seven more years, through

---

[6]*Rothe III*, 262 F.3d at 1332 n.22; *Adarand VII*, 228 F.3d at 1185.

[7]*Adarand VII*, 228 F.3d at 1183.

[8]*Rothe IV*, 324 F. Supp. 2d at 859.

fiscal year 2000. National Defense Authorization Act for Fiscal Year 1993, Pub. L. No. 102-484, §

801(a)(1)(B), 106 Stat. 2315, 2442 (October 23, 1992).  In 1998, Congress amended the 1207

program to require the DoD to suspend the use of the price-evaluation adjustment for one year after

any fiscal year in which the DoD awards more than five percent of its eligible contract dollars to

SDBs. This 1998 legislation added the PEA suspension provision; it did not reauthorize the program.

Strom Thurmond National Defense Authorization Act for Fiscal Year 1999, Pub. L. No. 105-261,

§ 801, 112 Stat.1920, 2080-81 (Oct. 17, 1998).  In 1999, Congress reauthorized the 1207 program

for three more years. National Defense Authorization Act for Fiscal Year 2000, Pub. L. No. 106-65,

§ 808, 113 Stat. 512, 705 (Oct. 5, 1999).  The 1207 Program was reauthorized again in 2002 and

2006, and it is currently set to expire at the end of fiscal year 2009.  Bob Stump National Defense

Authorization Act for Fiscal Year 2003, Pub. L. No. 107-314, § 816, 116 Stat. 2610 (Dec. 2, 2002);

National Defense Authorization Act for Fiscal Year 2006, Pub. L. No. 109-163, § 842, 119 Stat.

3136 (Jan. 6, 2006).

### 1.      The 1207 Program, 10 U.S.C. § 2323

The 1207 Program sets a "goal" that five percent of the total dollar amount obligated for

defense contracts and subcontracts for each fiscal year will be awarded to businesses that (1) are

"small," and (2) are "owned and controlled by" socially and economically disadvantaged individuals

("SDBs").[9] 10 U.S.C. § 2323(a)(1)(A) & (b)(1) (2006). The Act defines the term "socially and

_____

[9]This goal does not apply to the DoD if the Secretary of Defense determines that compelling national security considerations require otherwise. 10 U.S.C. § 2323(d)(1).  The five percent goal is a department-wide goal that is not segmented by industry categories. H.R. Conf. Rep. No. 101-331 at 614, reprinted in 1989 U.S.C.C.A.N. 977, 1071. The bill passed by the House contained a provision mandating that ten percent of each of the amounts appropriated for the DOD in procurement, research, development, test and evaluation, military construction, and operations and maintenance be set-aside for SDBs. H.R. Conf. Rep. No. 99-1001, at 524, reprinted in 1986

economically disadvantaged" in accordance with the Section 8(d) of the Small Business Act, 15 U.S.C. § 637(d), and the regulations issued pursuant to it. *Id.* The Federal Acquisition Regulation ("FAR") must provide procedures for contracting officers to set goals for prime contractors that are required to submit subcontracting plans under Section 8(d)(4)(B) of the Small Business Act, 15 U.S.C. § 637(d)(4)(B), in order to meet that five percent goal. *Id.* at § 2323(a)(3).

To the extent practicable and when necessary to facilitate achievement of the five percent goal, the head of an agency shall: (1) provide technical assistance to SDBs;[10] (2) make advance payments under 10 U.S.C. § 2307 to SDBs;[11] (3) enter into contracts using less than full and open competitive procedures, including awards under section 8(a) of the Small Business Act, and partial set-asides for SDBs, but shall pay a price not exceeding fair market cost by more than ten percent

U.S.C.C.A.N. 6529. The Senate bill, which became law, replaced the mandated ten percent set-aside with a "goal" that five percent of the total combined amount of contracts and subcontracts let by the DOD be awarded to SDBs. *Id.*

[10]*Id.* at § 2323(c)(1). Technical assistance includes information about the program, advice about agency procurement procedures, instruction in preparation of proposals, and other such assistance as the head of the agency considers appropriate. If the resources of the agency are inadequate to provide such assistance, the head of the agency may enter into contracts with minority private sector entities with experience and expertise in the design, development, and delivery of technical assistance services to eligible individuals, business firms and institutions, acquisition agencies, and prime contractors. 10 U.S.C. § 2323(c)(2).

[11]*Id.* at § 2323(e)(2). The head of an agency may make advance, partial, progress or other payments under contracts for property or services made by the agency, and the head of an agency may insert in solicitations for procurement of property or services a provision limiting advance or progress payments to SDBs. 10 U.S.C. § 2307(a). The Secretary of Defense must ensure that any advance or progress payment under a defense contract is commensurate with the work accomplished that meets the standards established under the contract. *Id.* at § 2307(e)(1). Section 2307 advance payments may apply to any contract worth more than $25,000. *Id.* at § 2307(e)(3).

in payment per contract to contractors or subcontractors classified as SDBs ("PEA authorization");[12] (4) prescribe regulations for contracting officers to provide incentives for prime contractors to increase subcontractor awards to SDBs;[13] (5) prescribe regulations requiring that contracting officers emphasize the award of contracts to SDBs, in all industry categories, including those categories in which such entities have not traditionally dominated;[14] and (6) prescribe regulations ensuring that current levels in the number or dollar value of contracts awarded under the program established under Section 8(a) of the Small Business Act, 15 U.S.C. § 637(a), and under the small business set-aside program established under Section 15(a) of the Small Business Act, 15 U.S.C. § 644(a), are maintained and that every effort is made to provide new opportunities for contract awards to eligible entities, in order to meet the five percent goal.[15]

At the beginning of each fiscal year, the Secretary of Defense shall determine, on the basis of the most recent data, whether the DoD achieved the five percent goal. 10 U.S.C. § 2323(e)(3)(B)(ii).  Upon determining that the DoD achieved the goal for the fiscal year, the Secretary of Defense shall issue a suspension, in writing, of the regulations that implement the PEA. *Id.*  Such a suspension shall be in effect for the one-year period beginning 30 days after the date on which the

---

[12]The head of an agency shall adjust the 10% PEA for any industry category if available information clearly indicates that non-disadvantaged small business concerns in such industry category are generally being denied a reasonable opportunity to compete for contracts because of the use of that percentage. *Id.* at § 2323(e))(3)(A).  However, The Secretary of Defense may not increase the 10% PEA if the regulations implementing that authority are suspended under 10 U.S.C. § 2323(e)(3)(B)(ii).

[13]*Id.* at § 2323(e)(5).

[14]*Id.* at § 2323(e)(5)(B).

[15]*Id.* at § 2323(e)(5)(E).

suspension is issued and shall apply with respect to contracts awarded pursuant to solicitations issued during that period.[16] *Id.*

To the maximum extent practicable, the head of the agency shall ensure that no particular industry category bears a disproportionate share of the contracts awarded to attain the five percent goal and ensure that contracts awarded to attain the five percent goal are made across the broadest possible range of industry categories. *Id.* at § 2323(g)(1). Under procedures prescribed by the head of the agency, a person may request the Secretary of Defense to determine whether the use of small disadvantaged business set asides by a contracting activity of the agency has caused a particular industry category to bear a disproportionate share of the contracts awarded to attain the goal established for that contracting activity for the purposes of this section. *Id.* at § 2323(g)(2). Upon making a determination that a particular industry category is bearing a disproportionate share, the head of the agency shall take appropriate actions to limit the contracting program's use of set asides in awarding contracts in that particular industry category. *Id.*

Any entity that misrepresents its status as an SDB in order to secure a prime contract or subcontract under the 1207 Program is subject to a term of imprisonment for not more than one year, a fine under Title 18 of the United States Code, or both. *Id.* at § 2323(f).

**2.     The 1207 Program cross-references Section 8(a) and 8(d) of the Small Business Act, 15 U.S.C. § 637**

The term "socially and economically disadvantaged small business concern" means any small business concern that is at least 51% owned by one or more socially and economically disadvantaged individuals and whose management and daily business operations are controlled by one or more of

---

[16]Most recently, the PEA has been suspended from March 10, 2007 until March 10, 2008. *See* 72 Fed. Reg. 7424 (Feb. 15, 2007).

such individuals.  15 U.S.C. § 637(d)(3)(C) (2006).

Socially disadvantaged individuals are those who have been subjected to racial or ethnic prejudice or cultural bias because of their identity as a member of a group without regard to their individual qualities. 15 U.S.C. § 637(a)(5) (2006).  Economically disadvantaged individuals are those socially disadvantaged individuals whose ability to compete in the free enterprise system has been impaired due to diminished capital and credit opportunities as compared to others in the same business area who are not socially disadvantaged. *Id.* at § 637(a)(6)(A).  In determining the degree of diminished credit and capital opportunities, the SBA shall consider, but not be limited to, the assets and net worth of such socially disadvantaged individual. *Id.*

**3.        Title 13 of the Code of Federal Regulations, "Business Credit and Assistance"**

Title 13 of the Code of Federal Regulations, Part 124, Subpart B, entitled "Eligibility, Certification, and Protests Relating to Federal Small Disadvantaged Business Programs," defines a small disadvantaged business ("SDB") for purposes of the 1207 Program.  *See* 13 C.F.R. § 124.1001(b) (2007) ("Only small firms that are owned and controlled by socially and economically disadvantaged individuals are eligible to participate in Federal SDB price evaluation adjustment, evaluation factor or subfactor, monetary subcontracting incentive, or set-aside programs, or SBA's section 8(d) subcontracting program"); *see also* 13 C.F.R. § 1015(a).  In determining whether a firm qualifies as an SDB, the criteria of social and economic disadvantage and other eligibility requirements established by 13 C.F.R., Part 124, Subpart A apply, including the requirements of ownership and control and disadvantaged status, unless otherwise provided in Subpart B.  13 C.F.R. § 124.1002(a).

An SDB is a concern that: (1) qualifies as small under 13 C.F.R., Part 121 for the size

standard corresponding to the applicable four-digit Standard Industrial Classification ("SIC") code, (2) is at least 51% unconditionally owned by one or more socially and economically disadvantaged individuals as set forth in 13 C.F.R. § 124.105, and (3) has the majority of its earnings accruing directly to the socially and economically disadvantaged individuals. *Id.* at § 124.1002(b).  In assessing the personal financial condition of an individual claiming economic disadvantage, his or her net worth must be less than $750,000 after taking into account the exclusions set forth in 13 C.F.R. § 124.104(c)(2). *Id.* at § 124.1002(c).

There is a rebuttable presumption that the following individuals are socially disadvantaged: Black Americans; Hispanic Americans; Native Americans (American Indians, Eskimos, Aleuts, or Native Hawaiians); Asian Pacific Americans (persons with origins from Burma, Thailand, Malaysia, Indonesia, Singapore, Brunei, Japan, China (including Hong Kong), Taiwan, Laos, Cambodia (Kampuchea), Vietnam, Korea, The Philippines, U.S. Trust Territory of the Pacific Islands (Republic of Palau), Republic of the Marshall Islands, Federated States of Micronesia, the Commonwealth of the Northern Mariana Islands, Guam, Samoa, Macao, Fiji, Tonga, Kiribati, Tuvalu, or Nauru); Subcontinent Asian Americans (persons with origins from India, Pakistan, Bangladesh, Sri Lanka, Bhutan, the Maldives Islands or Nepal); and members of other groups designated from time to time by SBA according to procedures set forth at 13 C.F.R. § 124.103(d). *Id.* at § 124.103(b)(1).  The presumption of social disadvantage may be overcome with credible evidence to the contrary. *Id.* at § 124.103(b)(3).

Representatives of an identifiable group whose members believe that the group has suffered chronic racial or ethnic prejudice or cultural bias may petition the SBA to be included as a presumptively socially disadvantaged group.  13 C.F.R. § 124.103(d)(1).  In determining whether

a group has made an adequate showing that it has suffered chronic racial or ethnic prejudice or cultural bias for the purposes of this section, the SBA must determine that: (1) the group has suffered prejudice, bias, or discriminatory practices; (2) those conditions have resulted in economic deprivation for the group of the type which Congress has found exists for the groups named in the Small Business Act; and (3) those conditions have produced impediments in the business world for members of the group over which they have no control and which are not common to small business owners generally. *Id.* at § 124.103(d)(2).  The SBA must find that a preponderance of the evidence demonstrates that the group has met these standards based on SBA's consideration of the group petition, the comments from the public, and any independent research it performs.  *Id.* at § 124.103(d)(4).

An individual who is not a member of one of the groups presumed to be socially disadvantaged must establish individual social disadvantage by a preponderance of the evidence. *Id.* at § 124.103(c).  Evidence of individual social disadvantage must include the following elements: (1) at least one objective distinguishing feature that has contributed to social disadvantage, such as race, ethnic origin, gender, physical handicap, long-term residence in an environment isolated from the mainstream of American society, or other similar causes not common to individuals who are not socially disadvantaged; (2) personal experiences of substantial and chronic social disadvantage in American society, not in other countries; and (3) negative impact on entry into or advancement in the business world because of the disadvantage.  *Id.* at § 124.103(c)(2).  In every case, the SBA will consider education, employment and business history, where applicable, to see if the totality of circumstances shows disadvantage in entering into or advancing in the business world. *Id.*

Economically disadvantaged individuals are socially disadvantaged individuals whose ability

to compete in the free enterprise system has been impaired due to diminished capital and credit opportunities as compared to others in the same or similar line of business who are not socially disadvantaged.   *Id.* at § 124.104(a).  Those individuals claiming disadvantaged status that are members of the same designated groups that are presumed to be socially disadvantaged for purposes of SBA's 8(a) BD program, 13 C.F.R. § 124.103(b), are presumed to be economically disadvantaged for purposes of SDB certification.[17] *Id.* at § 124.1008(e)(1).  These individuals must represent that they are members of one of the designated groups, that they are identified as a member of one of the designated groups, that their net worth is less than $750,000 after taking into account the exclusions set forth in § 124.104(c)(2), and that they are citizens of the United States.  *Id.*  Absent credible evidence to the contrary, the SBA may accept these representations as true and certify the firm as an SDB.  *Id.*

In order to become certified as an SDB, a firm must apply to SBA or, if directed by SBA, to a Private Certifier. *Id.* at § 124.1008.  The application must include evidence demonstrating that the firm is owned and controlled by one or more individuals claiming disadvantaged status, along with certifications or narratives regarding the disadvantaged status of such individuals. *Id.*  The firm also must submit information necessary for a size determination. *Id.* Current 8(a) BD Participants do not need to submit applications for SDB status.  *Id.*  These concerns automatically qualify as SDBs by virtue of their status as 8(a) BD concerns.  *Id.* An 8(a) Participant's continuing eligibility as an SDB

---

[17]As recently as 2004, the SBA reported that Caucasian owned firms represented 4.8 percent of the businesses participating in the Section 8(a) program, which are thus able to participate in the 1207 Program.  *See* Federal Procurement after *Adarand*, United States Commission on Civil Rights, Pg. 112.  This evidence was before Congress prior to the 2006 Reauthorization of the 1207 Program. 151 Cong. Rec. H12042-04, § 5796 (Dec. 16, 2005) (noting receipt of the report by the House Committee on the Judiciary).

will be reviewed as part of the concern's 8(a) annual review. *Id.*

Each individual claiming disadvantaged status who is not a member of one of the designated groups must submit a statement identifying personally how his or her entry into or advancement in the business world has been impaired because of personally specific factors, 13 C.F.R. § 124.103(c), and how his or her ability to compete in the free enterprise system has been impaired due to diminished capital and credit opportunities, 13 C.F.R. §§ 124.103(c) & 124.104. *Id.* at § 124.1008(e)(2).

Once SBA certifies a firm to be an SDB by placing it on the list of qualified SDBs, the firm will generally remain on the SBA-maintained list of certified SDBs for a period of three years from the date of its certification.[18] *Id.* at § 124.1014(a). To remain on the SDB register after three years, a firm whose status as an SDB has not been upheld in connection with a protest or an SBA-initiated SDB determination, or has not been certified as an eligible 8(a) Participant as part of an annual review, must submit a new application and receive a new certification. *Id.* at § 124.1014(c). For purposes of a particular Federal procurement, the firm must represent that it is both disadvantaged and small at the time it submits its initial offer including price. *Id.* at § 124.1015(b). The firm must also represent that no material change has occurred in its SDB status since its SDB certification, or from the date of its application for SDB certification if its application has not yet been processed, and must specifically represent that the net worth of the disadvantaged individuals upon whom the SDB certification was based still does not exceed $750,000. *Id.*

---

[18]In contrast, a participant in the 8(a) BD program, who is automatically eligible for SDB status, may participate in the 8(a) BD program for nine years. *Id.* at § 124.2. However, a participant in the 8(a) BD program must annually submit information establishing its continuing eligibility for the program. *Id.* at § 124.112(b). The SBA may terminate or early graduate an 8(a) BD program participant who fails to establish continuing eligibility. *Id.* at § 124.112(c), (d).

A firm's status as "disadvantaged" or "small" may be protested, provided the protest contains specific allegations that the firm's circumstances have materially changed since SBA certified it as an SDB, or that the firm's SDB application contained false or misleading information.   *Id.* at §§ 124.1015(c).   SBA may initiate an SDB determination whenever it receives credible information calling in question a firm's eligibility as an SDB, including an adverse determination from a DOT recipient of the firm's status as a DBE. *Id.* at § 124.1016(a).   Upon its completion of an SDB determination, SBA will issue a written decision regarding the SDB status of the questioned firm. *Id.*   The SBA, procuring activity contracting officer, or any losing bidder may protest the disadvantaged status of a successful offeror who received a preference under the 1207 Program.   *Id.* at §§ 124.1017 - 124.1024.

4.      **Title 48 of the Code of Federal Regulations, "Federal Acquisitions Regulations System"**

Title 48 of the Code of Federal Regulations implements the Price Evaluation Adjustment ("PEA") authorized by the 1207 Program.   For purposes of the current reauthorization of the 1207 Program, the size of the PEA is determined by the Secretary of Commerce in accordance with 48 C.F.R. § 19.201(b).   48 C.F.R. § 19.1101.   The Secretary of Defense is instructed to use the PEA in competitive acquisitions in the authorized North American Industry Classification System ("NAICS") industry subsector, except acquisitions that are awarded pursuant to the 8(a) Program, set aside for small business concerns, or set aside for HUBZone small business concerns.   *Id.* at § 19.1102(b), (c).   The PEA as determined by the Department of Commerce is applied to all offers, except those SDBs who have not waived the PEA.   *Id.* at § 19.1103(a).   The factor is applied to a line item or a group of line items on which award may be made.   *Id.* at § 19.1103(b).   The contract

clause listed in 48 C.F.R. § 52.219-23, entitled "Notice of Price Evaluation Adjustment for Small Disadvantaged Business Concerns," is included in all contracts let pursuant to the current reauthorization of the 1207 Program. *Id.* at § 19.1104.   A SDB may waive the PEA preference. *Id.* at § 19.1202-1.

The Department of Commerce will determine on an annual basis, by the NAICS industry subsector, and region, if any, the authorized SDB procurement mechanisms and applicable factors (percentages). 48 C.F.R. § 19.201(b).   The SDB procurement mechanisms are a price evaluation adjustment for SDB concerns, 48 C.F.R., Subpart 19.11, an evaluation factor or subfactor for participation of SDB concerns, 48 C.F.R. § 19.1202, and monetary subcontracting incentive clauses for SDB concerns, 48 C.F.R. § 19.1203.[19] *Id.* The Department of Commerce determination shall also include the applicable factors, by NAICS industry subsector, to be used in the price evaluation adjustment for SDB concerns, 48 C.F.R. § 19.1104.   *Id.* The General Services Administration shall post the PEA authorized by the Department of Commerce determination at http://www.arnet.gov/References/sdbadjustments.htm. *Id.*

### 5.    Intervening regulatory changes to the 1207 Program

Although this Court will only review the facial constitutionality of the 2006 Reauthorization of the 1207 Program, a discussion of intervening regulatory changes to the program will be relevant

---

[19]Under the incentive contracting program, a prime contractor commits itself in its subcontracting plan to try to award certain percentages of total subcontracting dollars to SDBs.  If the prime contractor exceeds its subcontracting goals for SDBs, it will receive up to 10% of the subcontracting dollars in excess of each goal in the plan as a monetary incentive.  48 C.F.R. § 52.219-10 (2006).

to this Court's narrow tailoring analysis.[20]  The following significant regulatory changes to the 1207 Program occurred after Rothe lost its bid to ICT in 1998: (1) the PEA regulations were amended to allow the Department of Commerce to recalculate the PEA on an annual basis based on relevant empirical data; (2) the economic disadvantage regulations were amended to require an individualized showing of economic disadvantage for all SDB applicants; and (3) the burden of proof for non-minority firms to qualify as socially disadvantaged under Section 8(a) regulations was lowered from clear and convincing evidence to preponderance of the evidence, thus making it easier for non-minority firms to qualify for SDB status.

In its briefing, Rothe repeatedly argued that the 1207 Program affords a presumption of social and economic disadvantage to certain racial groups.  *See* Pl's MSJ, Pgs. 1, 6, 7, 34, 45, 37; *See* Pl's Response and Reply, Pg. 13.  However, the present regulations require an individualized showing

---

[20]The Court notes that the 1999 Reauthorization of the 1207 Program occurred on October 15, 1999.  For purposes of the Court's narrow tailoring analysis, all significant regulatory changes to the 1207 Program occurred before the 1999 Reauthorization.  This Court has already held that the 1992 Reauthorization, which was applied to Rothe in 1998, was unconstitutional because Congress did not have a strong basis in evidence for believing that remedial action was necessary in 1992.  *See Rothe IV*, 324 F. Supp. 2d at 854.  That holding is law of the case and cannot be revisited.  This Court concurs with the Tenth Circuit's holding that the old Section 8(d) regulations cross-referenced by the 1992 Reauthorization were not narrowly tailored.  *See Adarand VII*, 228 F.3d at 1147.  The old Section 8(d) regulations, which did not require an individualized showing of economic disadvantage, were not narrowly tailored because they were over-inclusive.  *Id.*  If the old Section 8(d) regulations were reinstated today, they would not be narrowly tailored, as required by *Adarand III*, and would fail the strict scrutiny test.  Because the Court concludes in this Order that the Section 8(d) regulations cross-referenced by the 2006 Reauthorization are narrowly tailored, that necessarily means that the regulations implementing the 1999 and 2002 Reauthorizations were also narrowly tailored because those regulations have remained essentially unchanged since 1999.  Although the Court's narrow tailoring analysis regarding the implementing regulations necessarily applies to the 1999 and 2002 Reauthorizations, the Court will not undertake a separate compelling interest analysis for the 1999 and 2002 Reauthorization because Rothe's claims for declaratory relief concerning those intervening reauthorizations are moot, as discussed *infra.*

of economic disadvantage.[21]  The regulations were amended, effective January 1, 1999, to require

an individualized showing of economic disadvantage for all SDB applicants.  *See Adarand VII*, 228

F.3d at 1185.  In other words, effective January 1, 1999, minority business owners were not entitled

to a presumption of economic disadvantage based solely on their race.   In order to qualify as

economically disadvantaged, all SDB applicants must establish that their net worth is less than

$750,000, after taking into account the exclusions set forth in 13 C.F.R. § 124.104(c)(2).  13 C.F.R.

§§ 124.1002(c) & 124.1008(e)(1).   Because the Federal Circuit directed this Court to evaluate the

constitutionality of the present (*i.e.* 2006) Reauthorization of the 1207 Program, this Court will

examine the implementing regulations in their present form.

   a.  **PEA Regulations**

  The Federal Circuit acknowledged in *Rothe V* that the PEA was the "mechanism most

important in this case."  413 F.3d at 1329.  At the time that the 1207 Program was applied to Rothe's

bid in 1998, the PEA was fixed in the regulations at 10%, which is the maximum amount authorized

by 10 U.S.C. § 2323.   *See* 48 C.F.R. § 252.219-7006 (1997).  Since that time, the regulations

implementing the PEA have been substantially amended.

  On June 20, 1998, an interim rule was announced that amended the PEA regulations.  Federal

Acquisition Regulation, Reform of Affirmative Action in Federal Procurement, 63 Fed. Reg. 35719

(June 30, 1998).  These FAR amendments were "designed to ensure compliance with the

constitutional standards established by the Supreme Court in *Adarand Constructors, Inc. v. Pena*,"

and they were effective for all solicitations issued on or after October 1, 1998, which was after Rothe

---

[21]In making this argument, Rothe only once acknowledged that the present regulations require
an individualized showing of economic disadvantage.  Pl's MSJ, Pg. 5.

lost its bid to ICT. *Id.* at 357719. The interim rule amended 48 C.F.R. § 19.201 to give the Department of Commerce the authority to recalculate the PEA on an annual basis. *Id.* at 35722. At present, 48 C.F.R. § 19.201(b) (2006) states, in relevant part:

> The Department of Commerce will determine on an annual basis, by North American Industry Classification System (NAICS) Industry Subsector, and region, if any, the authorized small disadvantaged business (SDB) procurement mechanisms and applicable factors (percentages) . . . . The Department of Commerce determination shall also include the applicable factors, by NAICS Industry Subsector, to be used in the price evaluation adjustment for SDB concerns (see 19.1104).

On June 30, 1998, a notice of determination concerning price evaluation adjustments was published in the Federal Register. 63 Fed. Reg. 35714 (June 30, 1998). This Department of Commerce memorandum described the methodology used by DoC for determining the price evaluation adjustment, effective October 1, 1998 *Id.* at 35714. To establish the price evaluation adjustment in 1998, the Office of the Chief Economist and the Office of Policy Development in the Economics and Statistics Administration of the DoC conducted an economic analysis to identify industries eligible for price evaluation adjustments to implement the Administration's proposal for reforming affirmative action in Federal procurement programs. *Id.* The DoC is responsible for: (1) developing the methodology for calculating the benchmark limitations; (2) developing the methodology for calculating the size of the price evaluation adjustments that should be employed in a given industry; and (3) determining applicable adjustments. *Id.*

Based on its methodology, the DoC determined that a PEA of 10% should be employed in specific two-digit SIC major industry groups, including SIC 73–Business Services.[22] *Id.* The DoC's methodology is designed to ensure that the price adjustments authorized by the regulatory reforms

---

[22]Both Rothe and ICT fall within this SIC industry group.

are "narrowly tailored to remedy discrimination." *Id.* at 35716.   The methodology includes four steps. First, the DoC identified firms that are "ready and willing" to supply the federal government. *Id.* Second, the DoC calculated the federal government's utilization of each ready and willing firm by reference to the fiscal year 1996 net contract obligations awarded by federal agencies to each firm. *Id.* Third, the DoC estimated the capacity of each ready and willing firm to supply the federal government. *Id.* Finally, DOC compared SDB shares of utilization and capacity held by ready and willing firms in each Contracting Arena and recommended that the price evaluation adjustments be implemented where SDB share of industry utilization falls short of SDB share of industry capacity. *Id.*  The determinations were based on the DoC's benchmark and utilization estimates derived from fiscal year 1996 data.  *Id.*

Based on the DoD's experience with its price evaluation adjustment, the DoC determined that a price evaluation adjustment of ten percent would not raise the SDB share of utilization above the SDB share of capacity held by firms ready and willing to fulfill federal contracts in any industry (and regions, in the case of the construction sector). *Id.* at 35718.  Accordingly, the DoC determined that there were no industries (and regions, in the case of the construction sector) where a price evaluation adjustment greater than 0 percent and less than ten percent would be appropriate. *Id.*

On September 30, 1999, the DoC published a notice in the Federal Register stating that the PEA and the authorized SIC major groups for fiscal year 2000 would be the same as those used in 1999.  64 Fed. Reg. 52806 (Sept. 30, 1999).  In order to develop new benchmarks and utilization estimates for its FY 2001 determination, the DoC planned to collect and analyze fiscal year 1999 data along the lines of the methodology outlined in the June 30, 1998 Notice.  *Id.*  Based on its assessment of the consistency in recent federal procurement patterns, the DoC proposed to develop

new benchmarks and utilization estimates every three years. *Id.* The DoC stated that it would monitor procurement annually to see if benchmarks and utilization estimates should be updated more frequently than every three years. *Id.*

On September 30, 1999, the DoC published a notice in the Federal Register stating that it would update its PEA determinations for fiscal year 2001 on or before November 17, 2000, and until that time, the authorized SIC major groups for fiscal year 2001 would be the same as those used in 2000.[23] The DoC planned to begin the use of the NAICS system in its 2001 PEA update. 65 Fed. Reg. 46055 (July 26, 2000).

Pursuant to the 1998 amendments to the 1207 Program, the PEA has been suspended since February 24, 1999.[24] 64 Fed. Reg. 4847-01 (Feb. 1, 1999); 65 Fed. Reg. 4948-01 (Feb. 2, 2000); 69 Fed. Reg. 7911-02 (Feb. 20, 2004); 70 Fed. Reg. 5969-02 (Feb. 4, 2005); 71 Fed. Reg. 9320-01 (Feb. 23, 2006); 72 Fed. Reg. 7424-01 (Feb. 15. 2007).[25] Apparently, the DoC has not updated its PEA determinations since 1999 because the PEA has been serially suspended since that time.

----

[23]The Department of Commerce has posted this most recent PEA determination at http://www.arnet.gov/References/sdbadjustments.htm. *See* 48 C.F.R. § 19.201(b).

[24]The percentage participation by SDBs in DoD contracts for fiscal years 1999 to 2005 are as follows: FY 1999 = 8.5%, FY 2000 = 8.1%, FY 2001 = 7.8%, FY 2002 = 8.0%, FY 2003 = 8.5%, FY 2004 = 8.3%, FY 2005 = 9.1%. Defs' MSJ, Appx. B.

[25]The Court was unable to locate the PEA suspension notice for 2001, 2002, and 2003 in the Federal Register; however, the Government has stated that the PEA was in fact suspended during those years, and Rothe has not presented persuasive evidence to the contrary. The Government has established that it exceeded the five percent goal during those three years, so suspension of the PEA would have been mandatory under 10 U.S.C. § 2323(e)(3)(B)(ii) ("Upon determining that the Department [of Defense] achieved the goal, . . . the Secretary *shall issue* a suspension . . . ."). Furthermore, the *Federal Procurement After Adarand* Report confirms that the PEA was suspended in 2001, 2002, and 2003. AA Report, Pg. 155.

      **b.**     **Economic disadvantage regulations were amended to require an individualized showing of economic disadvantage for all SDB applicants**

As discussed previously, the 1207 Program cross-references Section 8(d) of the Small Business Act. Prior to 1999, a presumption of economic *and* social disadvantage was given to members of certain racial groups under Section 8(d) without regard to the net worth of the minority business owner.[26] *Adarand VII*, 228 F.3d at 1184. However, the present regulations eliminate the discrepancy between the individualized determination of economic disadvantage characterizing the old Section 8(a) program and the non-individualized presumption of economic disadvantage characterizing the old Section 8(d) program. *See* 13 C.F.R. § 124.1002(a) (2007) (in determining whether a firm qualifies as an SDB, the criteria of social and economic disadvantage established in Section 8(a) regulations apply); *see* 48 C.F.R. § 19.703 (2000) (eliminating the race-based presumption of economic disadvantage of the former Section 8(d) regulation); *compare* 48 C.F.R. 19.703 (1998) ("Individuals who represent that they are members of named [racial] groups . . . may also represent themselves as socially <u>and</u> economically disadvantaged") (emphasis added). The 1998 Edition of the Code of Federal Regulations stated that the presumption of both social and economic disadvantage was effective until January 1, 1999, which was after Rothe lost its bid to ICT. 48 C.F.R. § 19.703 (1998). The present regulations require SDBs to establish that their net worth is less than $750,000, after taking into account the exclusions set forth in 13 C.F.R. § 124.104(c)(2). *See* 13 C.F.R. §§ 124.1002(c) & 124.1008(e)(1). These regulatory changes "were intended to conform [the regulations] to a Department of Justice ("DoJ") proposal to reform affirmative action

---

    [26]In *Adarand VII*, the Tenth Circuit held that the old Section 8(d) regulations were not narrowly tailored because the regulations "obviate[d] an individualized inquiry into economic disadvantage." 228 F.3d at 1184.

in Federal procurement . . . and to comply with the constitutional standards established by the Supreme Court . . . ." 63 Fed. Reg. 35767-01 (June 30, 1998). These new regulations also gave losing non-minority bidders the opportunity to contest a winning bidder's SDB status. *Id.* at 35777.

> ### c. Social disadvantage regulations were amended to lower the burden of proof required for non-minority small businesses to qualify as SDBs.

Current regulations allow non-minority small businesses to prove social disadvantage by a preponderance of the evidence. 13 C.F.R. § 124.103(d)(4) (2007). At the time that Rothe lost its bid to ICT, the standard was clear and convincing evidence. 13 C.F.R. § 124.105(c)(1) (1998). This standard was changed in 1999. *See* 13 C.F.R. § 124.103(c)(1) (1999).

## E.   Procedural History

On November 5, 1998, Rothe brought suit against the DoD and the United States Department of the Air Force (collectively "DoD" or "Defendants"), challenging the constitutionality of the 1207 program both facially and as applied under the equal protection component of the due process clause of the Fifth Amendment.

### 1.   Plaintiff's First Amended Complaint

Plaintiff initiated this case by filing its Original Complaint (Docket No. 1) and its Application for Preliminary Injunction (Docket No. 2) on November 5, 1998. In "Count One" of its Original Complaint, Plaintiff sought a declaratory judgment pursuant to 28 U.S.C. § 2201, holding that "Pub. L. No. 99-661, § 1207, 10 U.S.C. § 2323, as amended" contains racial preferences that "on their face violate the Fifth Amendment to the United States Constitution." In "Count Two," Plaintiff sought (1) a prohibitory injunction forbidding the commencement, prosecution, or performance of any work

under the contract, which was scheduled to commence on December 1, 1998;[27] (2) a mandatory injunction requiring Defendants to award the contract to Plaintiff as the low, technically qualified bidder on the subject Solicitation without employment of the 1207 Program;[28] and (3) a prohibitory injunction prospectively enjoining the DoD from complying with the 1207 Program.[29]  In "Count Three," Plaintiff sought its attorney's fees and costs pursuant to 28 U.S.C. § 2412.

In its Application for Preliminary Injunction, which was filed as a separate document, Plaintiff stated that it was seeking an injunction forbidding the DoD from awarding the contract to ICT and an injunction prospectively enjoining DoD compliance with the 1207 Program because it was unconstitutional.  The Court denied Plaintiff's motion for preliminary injunction on November 25, 1998, which was six days before ICT was scheduled to begin work on the contract.  In its Order denying the Preliminary Injunction, the Court concluded that Rothe had standing to bring this suit based on the Supreme Court's decision in *Adarand Constructors, Inc. v. Pena*.  515 U.S. 200, 212 (1995) ("*Adarand III*").  Ultimately, the Court denied Rothe's motion for preliminary injunction because Rothe did not meet its burden of showing irreparable harm.  *See* Docket No. 12.

The live pleading in this case is Plaintiff's First Amended Complaint, which was filed on February 2, 1999.  *See* Docket No. 38.  Plaintiff's First Amended Complaint sought the same relief requested in the Original Complaint, but in "Count Three," it added a Little Tucker Act Claim, which

---

[27]Original Complaint, ¶ 87.

[28]Original Complaint, ¶ 88.

[29]Original Complaint, ¶ 86.  Although it is less than clear from the language of Paragraph 86 of the Original Complaint that Plaintiff sought a prohibitory injunction prospectively enjoining the DoD from complying with the 1207 Program, this injunctive relief was clearly requested in Plaintiff's Application for Preliminary Injunction and its First Amended Complaint.

sought bid preparation costs from Defendants "in an amount not to exceed $10,000."[30] Furthermore,

Plaintiff clarified that it sought to enjoin the DoD "from discriminating in the future on the basis of

race or national original in the administration of federal government contracting."[31]

On February 26, 1999, the parties filed cross-motions for summary judgment. On April 27,

1999, this Court granted summary judgment in favor of the Government and entered its Judgment.

### 2. *Rothe I*, 49 F. Supp. 2d 937 (W.D. Tex. 1999) (Prado, J.)

The Court noted in the first footnote of its Order granting Defendants' joint motion for

---

[30]The Little Tucker Act provides that a district court has jurisdiction over "[a]ny other civil action or claim against the United States, not exceeding $10,000 in amount, founded either upon the Constitution, or any Act of Congress, or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort . . . ." 28 U.S.C. § 1346(a)(2). The Little Tucker Act is "a jurisdictional statute; it does not create any substantive right enforceable against the United States for money damages." *United States v. Testan*, 424 U.S. 392, 398 (1976). Thus, in order to for the court to have jurisdiction, a plaintiff must identify and plead a separate contractual relationship, constitutional provision, federal statute, and/or agency regulation that provides a substantive right to money damages. *Todd v. United States*, 386 F.3d 1091, 1094 (Fed. Cir. 2004). In addition to these substantive pleading requirements, the complaint must allege that the claim comes within the $10,000 jurisdictional limit. *See Bd. of Governors v. DLG Fin. Corp.*, 29 F.3d 993, 999 (5th Cir.1994). The Court of Federal Claims has exclusive jurisdiction over Tucker Act claims in excess of $10,000. *See Awad v. U.S.*, 301 F.3d 1367, 1372 (Fed. Cir. 2002); 28 U.S.C. § 1491(a)(1). If the amount of the claim is below $10,000, the district court has jurisdiction to entertain claims against the United States for breach of an express or implied-in-fact contract, but not for breach of an implied-in-law contract. *Army and Air Force Exchange Serv. v. Sheehan*, 456 U.S. 728, 738 n.10 (1982); *GAF Corp. v. United States*, 932 F.2d 947, 951 (Fed. Cir. 1991). Under the Tucker Act, an unsuccessful bidder can recover its bid preparation costs from the Government on the theory that failure to evaluate a "bid honestly and fairly" breaches an implied-in-fact contract of fair dealing. *Rothe Dev. Corp. v. United States Dep't of Defense*, 262 F.3d 1306, 1316 (Fed. Cir. 2001) ("*Rothe III*") (citing *Coflexip & Servs., Inc. v. United States*, 961 F.2d 951, 952-53 (Fed. Cir. 1992)). The Federal Circuit has presided over the previous two appeals of this case because the presence of this Little Tucker Act claim gives the Federal Circuit "exclusive jurisdiction over all issues Rothe raises in this appeal." *Rothe III*, 262 F.3d at 1316; *see also Rothe Dev. Corp. v. United States Dep't of Defense*, 194 F.3d 622, 625-26 (5th Cir. 1999) ("*Rothe II*") (transferring appeal to the Federal Circuit for lack of jurisdiction).

[31]Plaintiff's First Amended Complaint is the live pleading in this case; consequently, the Court will refer to this pleading in identifying the scope of relief requested.

summary judgment and denying Plaintiff's motion for summary judgment ("April 27, 1999 Order")
that "many of the relevant regulations [pertaining to the 1207 Program] have been modified or
recodified since that time [the contract at issue was solicited]." 49 F. Supp. 2d at 942 n.1. Although
this observation was only worthy of a footnote in 1999, the intervening regulatory changes to the
1207 Program between the date the contract at issue was solicited in 1998 and the date that this
Order was signed in 2007 are particularly relevant to the issue of whether the present (*i.e.* January
6, 2006) reauthorization of the 1207 Program is narrowly tailored. As will be discussed *infra*, the
Small Disadvantaged Business ("SDB") certification regulations and the Price Evaluation
Adjustment ("PEA") regulations were significantly amended in 1998 in response to the Supreme
Court's holding in *Adarand* that federal government affirmative action programs were subject to
strict scrutiny.

In *Rothe I*, this Court recognized that "the federal government's actions, like those of state
governments, must be subjected to strict scrutiny when those actions seek to favor one race over
another." 49 F. Supp. 2d at 943 (citing *Adarand*, 515 U.S. at 202). Although the Supreme Court
in *Adarand* held that strict scrutiny applies to federal affirmative action programs, this Court noted
in *Rothe I* that the Supreme Court had failed to clearly define the parameters of Congress' powers
to enact remedial, race-based programs that survive strict scrutiny. *Id.*

Due to this lack of guidance from the *Adarand* decision, this Court questioned how Congress,
a national lawmaking body, may justify its remedial, race-based programs in order to maintain their
legitimacy under the strictest judicial scrutiny. 49 F. Supp. 2d at 943. After discussing the Supreme
Court cases of *Fullilove*, *Croson*, and *Adarand*, this Court concluded that the Supreme Court "would
favor some standard that allowed Congress a broader brush than it would allow the states with which

-34-

to design remedial measures for the purpose of addressing nationwide discrimination." *Id.* at 943-44.

To support its "broader brush" conclusion, the Court cited to language from the Supreme Court decision in *Fullilove*, which stated, "It is fundamental that in no organ of government, state or federal, does there repose a more comprehensive remedial power than in Congress, expressly charged by the Constitution with competence and authority to enforce equal protection guarantees." *Id.* at 943 (citing *Fullilove v. Klutznick*, 448 U.S. 448, 483 (1980)). The Court believed that Justice O'Connor "affirmed the Court's deference to federal programs" by stating that "Congress, unlike any State or political subdivision, has a specific constitutional mandate to enforce the dictates of the Fourteenth Amendment." *Id.* at 944 (citing *City of Richmond v. J.A. Croson, Co.*, 488 U.S. 469, 490 (1989)). The Court also seized upon Justice O'Connor's statement that Congress, unlike the states and their political subdivisions, may identify and redress the effects of society-wide discrimination. *Id.* (citing *Croson*, 488 U.S. at 490). Justice O'Connor, writing for a plurality of the Court in *Adarand*, stated that no justice on the Court had repudiated his or her previously expressed views on the scope of Congressional power to enact race-based affirmative action programs under Section Five of the Fourteenth Amendment. *Id.* (citing *Adarand*, 515 U.S. at 231). Based on this statement, the Court concluded that a "simple headcount assures this Court that a majority of the Supreme Court, including Justice O'Connor and the four dissenters in *Adarand*, would favor some standard that allowed Congress a broader brush than it would allow the states with which to design remedial measures for the purpose of addressing nationwide discrimination." *Id.*

Regarding the burden of proof, the Court in *Rothe I* held that the Government bears the burden of producing evidence that the section 1207 program is constitutional, but Rothe bears the ultimate burden of proving that the racial classification is unconstitutional. *Id.* at 945 (citing *Walker*

*v. City of Mesquite*, 169 F.3d 973, 982 (5th Cir. 1999) (citing *Wygant v. Jackson Bd. Of Educ.*, 476 U.S. 267, 277-78 (1986)).  The Court noted that a burden of production is not equivalent to a burden of proof.  *Id.* at 945 n.6

The Court found that "there is sufficient evidence to support remedial action in the form of SBA preferences and the 1207 program and that these programs were designed to address a compelling governmental interest." *Id.* at 946.  To support its "compelling interest" conclusion, the Court found that the Government had produced sufficient evidence indicating that discrimination in government contracting continues to be a problem.[32]  *Id.*  The Court also found that  the Government has presented evidence supporting the enactment of the 1207 program.[33]  *Id.*

The  Court  rejected  Rothe's  argument  that  the  Government  must  make  findings  of discrimination specific to the minority group in question, the industry in question, and the geographic area where the contract is to be performed in order to demonstrate a compelling interest.  *Id.* at 946. Relying on *Croson* and *Adarand*, the Court concluded that Congress may "assess the condition of the nation as a whole and may respond" on a nationwide basis to remedy racial discrimination.  *Id.* Because Congress has a specific constitutional mandate to enforce the dictates of the Fourteenth

---

[32]The Court cited to the following legislative material to support this finding:  H.R. Rep. No. 468, 94th Cong. 1st Sess. 2 (1975) (only three percent of American businesses were owned by minorities,  while  minorities  made  up  sixteen  percent  of  population);  Congressional  Research Service, Minority Enterprise and Public Policy, 52-53 (June 9, 1997) (SBA's success in aiding disadvantaged firms described as "minimal"); Small and Minority Business in the Decade of the 1980s, 97th Cong., 1st Sess. 10, 33-34, 220 (1981); H.R. Rep. No. 460, 100th Cong., 1st Sess. 18 (1987).

[33]The Court cited to the following legislative material to support this finding: 131 Cong. Rec. 17, 445 (1985); 131 Cong. Rec. 21,714 (1986); Small Disadvantaged Business Preauthorization, Hearing Before the Investigative Subcommittee of the House Committee on Armed Services, 102d Cong., 2d Sess. 53 (1992).

Amendment, the Court found that power to "enforce" also includes the power to "define situations which Congress determines threaten principles of equality and to adopt prophylactic rules to deal with those situations." *Id.* The Court noted that Congress made specific findings regarding discrimination against Asian Americans and "post-enactment evidence bolsters those findings." *Id.* (citing 15 U.S.C. § 631(f)(1); *Adarand II*, 965 F. Supp. 1556, 1576-77 (D. Colo. 1997)).

The Court rejected Rothe's objections to the Government's "compelling interest" evidence as being conclusory and unsupported. Rothe offered no affirmative evidence indicating that Asian Americans have not been discriminated against in the award of government contracts. *Id.* at 946. The unchallenged testimony of Mr. Sohn, owner of ICT, constituted probative evidence that he personally has suffered discrimination in this country. *Id.* at 947. Rothe presented no evidence supporting its claim that the list of racial minorities given a preference under the 1207 program is either under- or over-inclusive. *Id.*

The Court also relied on the Benchmark Study, which was published by the Department of Commerce ("DoC") in 1998, to support its finding that the Government satisfied its burden of producing evidence satisfying the compelling interest prong of the strict scrutiny analysis. 49 F. Supp. 2d at 947. This study presents an economic analysis of the federal government's contracts with SDBs in 100 markets. *Id.* The Court noted that the Benchmark Study was conducted in response to the Supreme Court's holding in *Adarand*, and it attempted to review all federal affirmative action programs to assess their constitutionality. *Id.* For purposes of the study, Rothe's and ICT's businesses fell within a two-digit industry, or SIC, code of 73. *Id.* The two-digit SIC codes are broken down into four-digit codes that represent more specific industry groups; for example, Rothe's and ICT's four-digit code is 7378. *Id.* According to the study, among those

-37-

businesses in SIC 73, SDBs had the ability to capture 40.2 percent of the contracting dollars in 1996, but they were awarded only 26.4 percent of those dollars. *Id.* Dr. Ian Ayres, the Government's expert on this study, testified that this discrepancy represented a statistically significant underutilization of SDBs. *Id.* Further, Dr. Ayres testified that the methodology relied upon by the Department of Commerce was reliable. *Id.*

Rothe challenged the study on the grounds that (1) the DoC refused to produce the raw data underlying the Benchmark Study, thus preventing Rothe from objecting to the reliability of that data; and (2) the DoC should have used the more narrowly defined, four-digit SIC industry groups instead of the two-digit industry groups, and/or the DoC should have used the newly developed North American Industry Classification System ("NAICS").  49 F. Supp. 2d at 947.

The Court rejected Rothe's first challenge to the study because Rothe had access to a summary of the underlying data, and the Court refused to lengthen the period of discovery to accommodate Rothe's attempt to defeat the statutory privilege prohibiting the dissemination of census data for non-statistical uses.  *Id.* at 947-48 (citing 13 U.S.C. §§ 8(b), 9(a); *Baldrige v. Shapiro*, 455 U.S. 345, 360-62  (1982)).  More importantly, the Court found that Rothe offered no evidence suggesting that the underlying data should be distrusted.  *Id.* at 948.  Although Rothe alleged that the Benchmark Study was conducted in a partisan atmosphere and the Government's claim of privilege should be rejected, Rothe did not produce any evidence demonstrating that the statistics were flawed, that the disparities were not significant, or that other statistics contradict the study's findings.  *Id.* Furthermore, the Court found that Rothe failed to rebut the testimony of the Government's expert, Dr. Ian Ayres, who stated that the study's methodology was reliable.  *Id.*

Regarding Rothe's argument that the DoC should have utilized the narrower four-digit SIC

classification code for "communications-computer operations and maintenance" instead of the broader two-digit SIC classification code for "business services," the Court concluded that "[i]t is not this Court's province to tell Congress how, or at what level of specificity, to define the various industries with which it enters contracts." 49 F. Supp. 2d at 948. The Court rejected the argument that Congress had to support its race-based remedial legislation with evidence of such exacting specificity in order to survive strict scrutiny analysis. *Id.* The Court also found that the NAICS system advocated by Rothe was not available to the DoC at the time of the Benchmark Study. *Id.* at 949. Thus, the Court refused to strike the Benchmark Study. *Id.*

After concluding that the Government had satisfied the compelling interest prong of the strict scrutiny analysis, the Court next turned to the narrow tailoring prong. Based on the Supreme Court's decision in *United States v. Paradise*, 480 U.S. 149 (1987), the Court specified the factors used in determining whether federal race-based remedial programs are narrowly tailored: 1) the necessity of the relief; (2) the efficacy of alternative, race neutral remedies; (3) the flexibility of the relief, including the inclusion of waiver provisions; (4) the relationship of stated numerical goals to the relevant labor market; and (5) the impact of the relief on the rights of third parties. *Id.* at 949 (citing 480 U.S. at 171). Based on the Court's conclusion that Congress may address society-wide racial discrimination when enacting affirmative action programs, the Court did not believe "that the *Paradise* factors, when applied to federal action, can, or should, be applied in lockstep conformity with *Croson*." *Id.*

Regarding the first *Paradise* factor, the Court found that the Government had a strong basis in evidence for concluding that race-based remedial action was necessary, thus satisfying its burden of production under the compelling interest prong and demonstrating the necessity of relief. *Id.* at

949 n.10.  Regarding the second *Paradise* factor, the Court concluded that the Government had adequately considered the efficacy of race-neutral measures to combat the effects of prior discrimination in government contracting.  *Id.* at 950.  To support this conclusion, the Court cited to the Supreme Court's decision in *Fullilove*, which held that before the adoption of the "minority business enterprise" provision of the Public Works Employment Act of 1977, race-neutral measures had been ineffective at increasing minority contractor participation in local public works projects receiving federal funds.  *Id.* (citing *Fullilove*, 448 U.S. at 466-67).  The Court also cited to the deposition testimony of Pat May, who testified that the DoD conducts informative programs that provide tips and guidance for competitive bidding and are open to any business wishing to contract with the Government.  *Id.*  The Court concurred with the district court's opinion in *Adarand*, which found, based partially on *Fullilove*, that Congress's consideration of race-neutral alternatives was sufficient to satisfy strict scrutiny. *Id.* (citing *Adarand Constructors, Inc. v. Pena*, 965 F. Supp. 1556, 1583 (D. Colo. 1997)).  The Court concluded that "deference should be given to congressional findings that discrimination has continued and must be addressed, as evidenced by the repeated renewal of the preference program at issue here."  *Id.*

Although Rothe argued that the DoD might or would have reached its five-percent contracting goal without applying the 10% PEA, the Court chose not to give "dispositive significance" to this hypothetical.  *Id.*  The 1207 Program authorizes several approaches to reaching the five percent goal, including technical assistance, modification of competitive procedures, advance payments, and contracting with historically minority educational institutions. 10 U.S.C. § 2323(a), (c), (e).  Nothing in the statutory scheme at the time it was applied to Rothe suggested that the five percent goal should be viewed as a "ceiling."  *Id.* (citing *Cortez III Service Corp. v. National*

-40-

*Aeronautics & Space Admin.*, 950 F. Supp. 357, 361 (D. D.C. 1996) (noting that the five percent goal of the Section 8(a) Set-Aside Program is a "minimum")).  Rothe presented no justification for its position that the Government should have been limited to its five percent goal prior to the passage of the PEA suspension legislation,[34] and Rothe did not provide any evidence indicating that the number of Section 1207 contracts awarded with or without the preferences exceeded any constitutional imit that might be placed on Congress.  *Id.*

Regarding the third *Paradise* factor, the Court found the 1207 Program to be limited in duration and flexible in application.  *Id.*  In support of this finding, the Court noted that the program requires the DoD to make annual reports to Congress on its progress towards reaching the five percent goal, the five percent goal is not a "quota," the program was amended to include the PEA suspension provision once the five percent goal was reached, the preferences are available to non-minority small businesses that can demonstrate economic and social disadvantage, the presumption of social and economic disadvantage can be rebutted, and the program contains a sunset provision. *Id.*  at 952.

Regarding the fourth *Paradise* factor, the Court found that the Government demonstrated that the five percent goal is related to the pool of ready, willing, and able minority-owned businesses. *Id.*

---

[34]*See* Strom Thurmond National Defense Authorization Act for Fiscal Year 1999, Pub. L. No. 105-261, § 801, 112 Stat. 1920 (1998), codified at 10 U.S.C. § 2323(e)(3)(B)(ii) (2006) ("Upon determining that the Department achieved the [five percent] goal for the fiscal year to which the data relates, the Secretary [of Defense] shall issue a suspension, in writing, of the regulations that implement the authority under subparagraph (A). Such a suspension shall be in effect for the one-year period beginning 30 days after the date on which the suspension is issued and shall apply with respect to contracts awarded pursuant to solicitations issued during that period").

The Benchmark Study suggested that 40.2% of the relevant market[35] is composed of minority-owned businesses.  *Id.*  Although the Court agreed with Rothe that the 40.2% figure does not necessarily establish the pool of ready, willing, and able SDBs in the relevant industry, the Court concluded that the number of ready, willing, and able SDBs in the pool certainly exceeds five percent, which was the goal established by the DoD.  *Id.*  Importantly, Rothe presented no evidence that the five percent goal is disproportionate to the pool of ready, willing, and able SDBs in Rothe's industry group.  *Id.*  The Court accepted Dr. Ayres' testimony that the methodology used to arrive at the figure was credible and the overall results are valid and conservative. *Id.*

The Court rejected the claim that the 1207 Program contained "random inclusion" of minorities for whom no history of discrimination has been established.  *Id.*  The evidence offered by the Government and by amici curiae demonstrated to the Court that the minority groups given a preference reside in the United States and have been discriminated against in the procurement of government contracts. *Id.*

Finally, regarding the fifth *Paradise* factor, the Court found that the 1207 Program did not place an unfair burden on non-SDBs because the burden was broadly shared and did not fall disproportionately upon a small subgroup of non-minority businesses.  *Id.* at 953.  The Court concluded its analysis by stating that "a thorough examination of the statutory scheme at issue and its application to the contract at issue reveals no illegitimate purpose, no racial prejudice, and no racial stereotyping. Rather, the program is designed to address a societal ill that has been identified by Congress on the basis of extensive evidence, and the program is narrowly tailored to that

---

[35]The 40.2% figure represents the pool of SDBs available in contracts classified under SIC 73 as "business services."

purpose." *Id.*

### 3.     *Rothe II*, 194 F.3d 622 (5th Cir. 1999)

Rothe filed a timely notice of appeal to the Fifth Circuit. *See* Docket No. 76.   The

Government moved to dismiss for lack of subject matter jurisdiction, or alternatively to transfer the

appeal to the Federal Circuit.  *Rothe Dev. Corp. v. United States Dep't of Defense*, 194 F.3d 622 (5th

Cir.1999) ("*Rothe II* ").  On October 27, 1999, the Fifth Circuit granted the Government's motion,

holding that it lacked jurisdiction over the appeal, and transferred it to the Federal Circuit.

The Fifth Circuit concluded that under 28 U.S.C. § 1295(a)(2), it did not have jurisdiction

to consider the appeal because of the presence of the Little Tucker Act claim.  194 F.3d at 624.  The

Fifth Circuit held that the Federal Circuit had "exclusive federal appellate jurisdiction" if the

jurisdiction of the district court was "based, on whole or in part," on the Little Tucker Act.  *Id.* at 625

(citing 28 U.S.C. § 1295(a)(2)).  After observing that the "founded on the constitution" clause of the

Tucker Act has been limited to apply only to the Takings Clause, the Fifth Circuit concluded that

Rothe's Little Tucker Act claim must be premised upon "an implied-in-fact contract to treat a bid

honestly and fairly."  *Id.* at 625-26 (citing *Coflexip & Servs., Inc. v. United States*, 961 F.2d 951,

952-53 (Fed. Cir. 1992)).

### 4.     *Rothe III*, 262 F.3d 1306 (Fed. Cir. 2001)

The Federal Circuit issued its decision in *Rothe III* on August 20, 2001.  Because it

concluded that "the district court improperly applied a deferential legal standard rather than 'strict

scrutiny,' and also impermissibly relied on post-reauthorization evidence to support the [1207]

program's constitutionality as reauthorized," the Federal Circuit vacated the April 27, 1999 judgment

of this Court and remanded for further proceedings.  *Rothe Dev. Corp. v. United States Dep't of*

-43-

*Defense*, 262 F.3d 1306, 1312 (Fed. Cir. 2001) ("*Rothe III* ").

The Federal Circuit concurred with the Fifth Circuit's conclusion that Rothe could recover its bid preparation costs from the Government on the theory that failure to evaluate a bid honestly and fairly breaches an implied-in-fact contract of fair dealing. *Id.* at 1316. Pursuant to 28 U.S.C. § 1295(a)(2), the Federal Circuit held that it had exclusive jurisdiction over all issues that Rothe raised on appeal. *Id.*

Regarding the burden of proof, the Federal Circuit held that the district court correctly placed the burden of proof on Rothe to demonstrate that the 1207 Program was unconstitutional. *Id.* at 1317. According to the Federal Circuit, the Government bears the burden to produce evidence demonstrating that Congress had a "strong basis in evidence" to believe that remedial action based on race was necessary; however, Rothe continues to bear the ultimate burden of persuading the court that the Government's evidence did not support an inference of prior discrimination and thus a remedial purpose, or that the plan instituted on the basis of this evidence was not narrowly tailored. *Id.* (citing *Wygant*, 476 U.S. at 277, 293).

The Federal Circuit held that Congress' authority to enact race-based classifications flows from "either of two distinct sources of congressional power." *Id.* Under Article I of the United States Constitution, Congress can attach race-based conditions when it appropriates for a federal program so long as it does so without violating the equal protection component of the due process clause of the Fifth Amendment. *Id.* (citing *Fullilove*, 448 U.S. at 480). Additionally, Congress can enact remedial racial classifications pursuant to Section 5 of the Fourteenth Amendment, which is a "positive grant of legislative power." *Id.* (citing *Katzenbach v. Morgan*, 384 U.S. 641, 651 (1966)). The Federal Circuit stressed that the Section 5 power is limited to congressional remedial action

against the state and state actors; Congress may not rely on Section 5 to regulate the conduct of private individuals, the federal government, or federal actors. *Id.* (citing *Bd. of Trustees of the Univ. of Ala. v. Garrett*, 531 U.S. 356, 368 (2001)).   The Federal Circuit noted that the justices on the Supreme Court have taken different views on the extent to which courts should defer to Congress' exercise of its Section 5 authority. *Id.* at 1318 (citing *Adarand*, 515 U.S. at 230).

The Federal Circuit concluded that the 1207 Program "was enacted pursuant to Congress' Article I powers to appropriate funds for the Armed Forces, and is a program that affects private firms that submit bids to contract with the DoD." *Id.* at 1318.   Because of the fact that the 1207 Program was enacted pursuant to Congress' Article I spending power, the Federal Circuit held that it did not need to decide the proper analysis for cases involving Congress' power under Section 5. *Id.*

The Federal Circuit characterized the Supreme Court's decision in *Adarand III* as "a case involving the constitutionality of a federal racial classification enacted under Article I."[36]   *Id.* at 1318-19.   Citing to *Croson*, the Court held that "all racial classifications–whether they be enacted by a state, a municipality, or the federal government–are subject to the strictest judicial scrutiny." *Id.* at 1319 (citing 515 U.S. at 224).   Based on the Supreme Court's practice of applying Fourteenth Amendment precedent to Fifth Amendment equal protection cases, the Federal Circuit concluded that the non-deferential *Croson* analysis provides the benchmark for judging the constitutionality of a federal racial classification. *Id.* at 1320.

---

[36]The Federal Circuit noted that the non-minority business in *Adarand* sued the Department of Transportation ("DoT") when it awarded a prime contract for a highway construction program to a general contractor who awarded the guardrail subcontract to a minority-owned construction company. *Id.* at 1318 n.9.

The Federal Circuit criticized this Court for applying a "deferential scrutiny" that did not involve a "*Croson*-like analysis," and it rejected this Court's reliance on Supreme Court authority that discussed Congress' remedial powers under Section 5 of the Fourteenth Amendment because the 1207 Program was enacted pursuant to Congress' Article I powers.  262 F.3d at 1320.  Because the 1207 Program was enacted pursuant to Article I, the Federal Circuit held that "Congress is entitled to no deference in determining whether Congress had a compelling interest in enacting the racial classification, and that the classification was narrowly tailored in fulfillment of that interest."[37] *Id.* at 1321.  The Federal Circuit's remand instructions directed this Court to "undertake the same type of detailed, skeptical, non-deferential analysis undertaken by the *Croson* Court, but specifically account for the factual differences between this program and that at issue in *Croson*."  *Id.*  Although Congress is entitled to no deference in its ultimate conclusion that race-based relief is necessary, "the factfinding process of legislative bodies is generally entitled to a presumption of regularity and deferential review by the judiciary."  *Id.* at 1322 n.14 (citing *Croson*, 488 U.S. at 500).

The Federal Circuit concluded that the pre-reauthorization evidence cited in this Court's April 27, 1999 Order was insufficient to satisfy the "strong basis in evidence" for determining that there was a compelling interest for reauthorization of the 1207 Program.  262 F.3d at 1324.  In assessing the constitutionality of a statute in an equal protection context, the district court may consider all evidence available to Congress pre-dating the most recent reauthorization of the statute of issue.  *Id.* at 1322 n.15.  The Federal Circuit insisted that this Court "set forth detailed findings as to the scope and content of the reports before Congress when it enacted the challenged legislation,

---

[37]The Federal Circuit acknowledged that Congress might be owed deference when it enacts affirmative action programs pursuant to Section 5 of the Fourteenth Amendment, but it declined to discuss that issue because it was not before the court.  262 F.3d at 1321.

and set forth whatever inferences may be drawn as to whether such reports could constitute a 'strong basis in evidence' for remedial action." *Id.* at 1323.  Because a race-based classification may be enacted to remedy only "identified systematic discrimination," the district court may not rely on generalized assertions of legislative purpose or statements generally alleging societal discrimination or an individual's anecdotal accounts of discriminatory conduct. *Id.* at 1323 (citing *Croson*, 488 U.S. at 498).  Statistical evidence is particularly important to justify race-based legislation, and the district court must evaluate whether that statistical evidence is stale or outdated.  *Id.* at 1323-24.

The Federal Circuit found that the pre-reauthorization evidence cited in this Court's April 27, 1999 Order did not show that the 1207 Program "was designed to address a remedial need" and was enacted in response to systematic discrimination against Asian-Americans or its lingering effects. *Id.* at 1323.

Regarding post-enactment evidence, the Federal Circuit held that this Court impermissibly relied on post-enactment evidence to justify its conclusion that Congress acted with a compelling interest when it reauthorized the 1207 Program.  262 F.3d at 1328.  On remand, this Court was instructed to reevaluate the constitutional sufficiency of the 1207 Program as reauthorized by reliance only on the pre-reauthorization evidence before Congress.  *Id.* For purposes of the 1207 Program, pre-reauthorization evidence includes evidence gathered after the initial enactment of the program but before each reauthorization of the program.  *Id.* at 1325.  However, this Court could use post-enactment evidence for other purposes, such as whether the 1207 Program was constitutional as applied. *Id.* at 1328. This Court could also use post-enactment evidence to supplement or "bolster" a constitutionally sufficient pre-reauthorization record. *Id.* at 1328 n.21. "All evidence available to the appropriate legislative body prior to the reauthorization must be considered in assessing the

program's constitutionality," and if the pre-reauthorization evidence is insufficient, the program must be invalidated, regardless of the extent of post-reauthorization evidence. *Id.* at 1327-28.

Because the 1207 Program cannot be constitutional unless it was enacted as a remedial measure, the district court must "define both the scope of the injury and the extent of the remedy necessary to cure its effects." *Id.* at 1329 (citing *Croson*, 488 U.S. at 510). The district court then must determine whether the 1207 Program is a remedy to correct present discrimination, or only counters the lingering effects of past discrimination. *Id.* If this is a "lingering effects" case, the district court must evaluate whether the evidence is still probative, *i.e.*, whether the effects of past discrimination have attenuated over time. *Id.* Finally, the district court must determine whether the Government's involvement in the discrimination or its lingering effects is so pervasive that the Government has become a "passive participant" in perpetuating it. *Id.* (citing Croson, 488 U.S. at 492).

The Federal Circuit concurred with this Court's conclusion that Congress has a "broader brush" than municipalities for remedying discrimination because Congress is a national lawmaking body. 262 F.3d at 1329. Although Congress does not need to have evidence of discrimination in all fifty states in order to justify the 1207 Program, evidence of a few isolated instances of discrimination would be insufficient to uphold a nationwide program. *Id.* at 1330. "Where to draw the line in the first instance is a task for the district court." *Id.*

According to the Federal Circuit, Congress must have identified a pattern of discrimination that broadly affected all the minorities who receive a preference under the 1207 Program, but Congress is not required to make particular findings as to each racial subclass in order to justify the program. *Id.* at 1330. Thus, the district court is charged with determining whether evidence of

discrimination is sufficiently pervasive across racial lines to justify granting a preference to all five purportedly disadvantaged racial groups included under the 1207 Program. *Id.* Furthermore, the district court must determine whether discriminatory conduct or its effects were experienced in the specific industry. *Id.* Although the district court should not "blindly defer" to the Government's definition of the affected industry, the district court has discretion to determine the appropriate specificity of the racial groups and define the relevant industry. *Id.* The district court also has the responsibility to determine whether the evidence is sufficiently timely (*i.e.* not stale) and sufficiently substantive (*i.e.* not merely anecdotal). *Id.*

The Federal Circuit instructed this Court to use six factors in its narrow tailoring analysis: (1) the necessity of relief; (2) the efficacy of alternative, race-neutral remedies; (3) the flexibility of relief, including the availability of waiver provisions; (4) the relationship of the stated numerical goals to the relevant labor market; (5) the impact of relief on the rights of third parties; and (6) the over-inclusiveness or under-inclusiveness of the racial classification. *Id.* at 1331 (citing *Paradise*, 480 U.S. at 171; *Croson*, 488 U.S. at 506). The Federal Circuit held that this Court thoroughly analyzed and correctly concluded that the 1207 program was flexible in application, limited in duration, and that it did not unduly impact on the rights of third parties. *Id.* However, it also held that this Court did not properly analyze three of the other narrow tailoring factors. *Id.*

On remand, this Court was instructed to perform a "probing analysis" of the efficacy of race-neutral alternatives by inquiring into any attempts at the application or success of race-neutral alternatives prior to the reauthorization of the 1207 Program, or alternatively by investigating whether pre-existing anti-discrimination provisions have been enforced unsuccessfully. *Id.* Regarding the relationship between the stated numerical goal of five percent and the relevant market,

this Court was instructed to determine whether there is any pre-reauthorization evidence linking the numerical goal with the appropriate pool of qualified, willing, and able bidders. *Id.* The Court is permitted to use post-reauthorization evidence to determine whether the five percent goal is still proportionate to this pool. *Id.* Finally, regarding over- and under-inclusiveness, this Court was admonished not to defer to Congress' conclusion that the 1207 Program was not over-inclusive; instead, the Court must "strictly scrutinize" whether the 1207 Program was over-inclusive by determining whether each of the five minority groups presumptively included in the 1207 Program suffered from the lingering effects of discrimination so as to justify inclusion in the program. *Id.* at 1332. Moreover, because the 1207 Program incorporates its presumption of social and economic disadvantage from § 8(d), any constitutional defects in enactment of § 8(d) are relevant to the Court's narrow tailoring analysis. *Id.*

> The final remand instructions were as follows:
>
> We remand for a determination of the constitutionality of the 1207 program under a strict scrutiny standard, particularly in accordance with the principles set forth in *Croson* and *Adarand III*. As set forth above, Congress' decision to enact race-based legislation must be reviewed under the same, non-deferential analysis that applies to state or municipal racial classifications. The constitutionality of the 1207 program must be assessed as reauthorized in 1992, as applied to Rothe's bid in 1998, and at present, to the extent that declaratory or injunctive relief is still sought.

262 F.3d at 1329.

After reviewing the appellate briefs related to the *Rothe III* appeal, this Court believes that the Federal Circuit adopted many of the arguments contained in the amicus curiae brief of the Associated General Contractors of America, Inc. ("AGC"), in support of Plaintiff-Appellant Rothe. *See* 1999 WL 33623709 (Sept. 8, 1999). Although this *Amicus* was originally submitted to the Fifth Circuit in the *Rothe II* appeal, it was subsequently transferred to the Federal Circuit in the *Rothe III*

appeal and filed by the Clerk on March 30, 2000. The brief was signed by John G. Roberts, Jr. of Hogan & Hartson, L.L.P, who is now the Chief Justice of the United States Supreme Court.

The four core arguments of the Robert's amicus brief are as follows: (1) the district court wrongly held that racial preferences enacted by the federal government, while subject to strict scrutiny, are nevertheless entitled to deference and not subject to the *Croson* analysis; (2) the same analysis applied in *Croson* to a City's racially discriminatory contracting preference applies to such preferences enacted by the federal government; (3) the Section 1207 Program is not entitled to any deference because of Section 5 of the Fourteenth Amendment or Congress' nationwide jurisdiction; and (4) strict scrutiny of the 1207 Program is warranted.

### 5. *Rothe IV*, 324 F. Supp. 2d 840 (W.D. Tex. 2004) (Rodriguez, J.)[38]

After the *Rothe III* remand, the Government filed a motion to dismiss Plaintiff's claims for mootness. The Court granted in part and denied in part the Government's motion to dismiss on July 5, 2002. *See* Docket No. 98. The Court dismissed as moot Rothe's claim for an injunction preventing any work on the 1998 contract, for an award of the 1998 contract, and for costs of bid preparation and presentation for the 1998 contract.

Despite numerous objections by Rothe, the Federal Circuit refused to prevent the Government from soliciting and awarding a replacement contract, which was accomplished without using the 1207 Program's PEA. Rothe placed a bid on the replacement contract but was not awarded the contract because Rothe's bid was the second highest submitted. Because the 1998 contract was

---

[38]Judge Prado presided over this case when it was originally filed in 1998, and he signed the *Rothe I* Order. Judge Prado was nominated by President George W. Bush on February 6, 2003 to a seat on the United States Court of Appeals for the Fifth Circuit. Confirmed by the Senate on May 1, 2003, Judge Prado received his commission on May 5, 2003. The undersigned inherited this case from Judge Prado and has presided over it since August 2003.

stayed and the replacement contract was solicited without the PEA, the Court concluded that Rothe's request for an injunction preventing any work to be done on the 1998 contract was moot because Rothe was able to bid on the replacement contract without any disadvantage caused by the PEA.

The Court further concluded that Rothe's claim to an equitable award of the 1998 contract was moot because an award of a government contract can be ordered only if it is clear the bidder would have won the contract but for the allegedly unlawful conduct. Although Rothe was the lowest bidder on the 1998 contract prior to application of the PEA, Rothe conceded that the applicability of the PEA affected whether potential bidders would compete for the contract as well as the pricing of the offers submitted. Because the allegedly unlawful conduct was not the only reason that Rothe was not awarded the 1998 contract, the Court concluded that the claim for an equitable award of the 1998 contract was moot and appropriately dismissed.

The Court dismissed Rothe's Little Tucker Act claim as moot because the Government offered Rothe $10,000, which is the maximum amount of damages recoverable from the federal government on the Little Tucker Act claim heard in federal district court. The Court held that the Government's tender of the $10,000 rendered this claim moot.

The Court rejected the Government's argument that the statutory yearly suspension of the PEA rendered moot Rothe's claim for a declaratory judgment on the equal protection challenge. The Court concluded that the harm to Rothe caused by the PEA was capable of repetition yet evading review. Consequently, the Court allowed Rothe's as-applied and facial equal protection challenges to proceed.

This Court issued its ruling on the parties' cross-motions for summary judgment on July 2, 2004 ("July 2, 2004 Order"). After it reaffirmed its prior mootness holding regarding Rothe's claim

for an injunction preventing any work on the 1998 contract, for an award of the 1998 contract, and for costs of bid preparation and presentation for the 1998 contract, the Court referenced the directive from *Rothe III*: "[t]he constitutionality of the 1207 Program must be assessed as reauthorized in 1992, as applied to Rothe's bid in 1998, and at present, to the extent that declaratory or injunctive relief is still sought." *Rothe Dev. Corp. v. United States Dep't of Defense*, 324 F. Supp. 2d 840, 845 (W.D. Tex. 2004) ("*Rothe IV*") (citing *Rothe III*, 262 F.3d at 1329). The Court recited the burden of proof standard enunciated by the Federal Circuit in Rothe III. *Id.* Once the Government demonstrates a compelling interest, supported by a strong basis in the evidence, Rothe must produce "credible, particularized evidence to rebut the government's initial showing of the existence of a compelling interest" or show that the remedial program created is not narrowly tailored. *Id.* (citing *Adarand Constructors, Inc. v. Slater*, 228 F.3d 1147, 1175 (10th Cir. 2000) ("*Adarand VII*")).

Before embarking on its analysis, the Court began with a few initial observations. Citing to *Croson*, the Court observed that Congress has a "compelling interest in assuring that public dollars, drawn from the tax contributions of all citizens, do not service to finance the evils of private prejudice." 324 F. Supp. 2d at 846 (citing *Croson*, 488 U.S. at 492; *Sherbrooke Turf, Inc. v. Minnesota Dep't of Transp.*, 345 F.3d 964, 969 (8th Cir. 2003); *Contractors Assoc. of E. Pa., Inc. v. The City of Philidelphia*, 6 F.3d 990, 1002 (3d Cir.1993); *Assoc. Gen. Contractors of Ca., Inc. v. Coalition for Economic Equity*, 950 F.2d 1401, 1413 (9th Cir.1991)). The Court embraced the "passive participant" compelling interest theory recognized in *Croson* and *Rothe III* and rejected Rothe's contention that the federal government can only act to remedy its own discrimination. Based on the fact that Congress has a "broader brush" to address nationwide discrimination, the Court rejected Rothe's argument that it must examine the racial subclass of Korean-Americans, as opposed

to the statutory class of Asian-Americans, in performing its compelling interest analysis.  324 F. Supp. 2d at 847.  The Court also rejected Rothe's argument that it must examine the narrow industry classification of "computer maintenance and repair services in the defense industry," as opposed to the broader industry classification of "business services."  *Id.*  The Court believed that the Federal Circuit had approved these holdings in *Rothe III*.  Because the Federal Circuit affirmed the Court's analysis regarding three of the six "narrow tailoring" factors, the Court only considered the three remaining narrow tailoring factors in its July 2, 2004 Order.  *Id.*

Based on the *Rothe III* remand, the Court concluded that it would (1) rule on Rothe's claim for declaratory relief regarding its as-applied equal protection challenge to the 1992 reauthorization of the 1207 Program; and (2) rule on Rothe's claim for prospective declaratory and injunctive relief regarding its facial equal protection challenge to the then-present (*i.e.* 2002) reauthorization of the 1207 Program.  For purposes of the facial challenge, the Court held that the ultimate burden of persuasion rests with Rothe to demonstrate that "under no set of circumstances could the law be constitutionally applied."  *Id.* at 849 (citing *U.S. v. Salerno*, 481 U.S. 739, 745 (1987)).

Rothe's as-applied challenge sought a declaration that the 1207 Program, as enacted in 1992 and as applied to its bid in 1998, was unconstitutional.  *Id.* at 849.  After examining the evidence Congress compiled *before* 1992, the Court concluded that the Government failed to demonstrate that Congress had a strong basis in evidence for believing that 1207 Program was necessary in 1992.  *Id.* at 850.  Although the Court found that the Government provided valid and persuasive anecdotal evidence and evidence of private discrimination, the Court found that the lack of pre-1992 statistical evidence required judgment in Rothe's favor on the as-applied challenge.  *Id.*  Regarding the 1992 Reauthorization, the Government failed to articulate a compelling interest through reference to a

-54-

strong basis in evidence because "generalized assertions of legislative purpose or statement[s] alleging societal discrimination" do not satisfy the Government's initial burden of production under strict scrutiny. *Id.* at 851.

The Court was troubled by the fact that it was applying a strict scrutiny standard enunciated by the Supreme Court in 1996 to the actions of Congress in 1992. *Id.* at 850. Although it concluded that the Government failed to produce the "substantial statistical evidence" necessary to satisfy this strict scrutiny test, the Court still discussed the evidence that was before Congress regarding the 1992 reauthorization. At the time of the 1992 Reauthorization, Congress was motivated by strong anecdotal evidence and limited statistical evidence indicating that the DoD actively discriminated against small minority businesses and was a passive participant in perpetuating private discrimination. For example, Congress was well aware that unions overtly discriminated against minority members and that despite numerous court cases, this private discrimination prevented minorities from learning certain skills needed to complete for public contracts. *Id.* at 850 (citing *U.S. v. Ironworkers, Local 86*, 443 F.2d 544 (9th Cir.1971)); *Local 53 of the Intern'l Ass'n of Heat and Frost Insulators and Asbestos Workers v. Vogler*, 407 F.2d 1047 (5th Cir.1969)). Based on this knowledge of private discrimination, the Court believed that Congress should be able to rely on cases where federal agencies have found pervasive private discrimination because this type of evidence would support a congressional finding that the government acts as a passive participant in perpetuating private discrimination. *Id.*

The Court rejected Rothe's argument that the Court may not consider anecdotal statements made during committee meetings, legislative meetings, and floor debates because of the "partisan political nature of members of Congress." *Id.* at 851. After discussing Rothe's self-contradictory

habit of dismissing legislative materials that hurt its case while simultaneously highlighting those materials that help it, the Court held that "anecdotal evidence may bring cold numbers convincingly to life," and this type of evidence is relevant to the Court's compelling interest analysis. *Id.* (citing *Concrete Works of Colo., Inc. v. City and County of Denver*, 36 F.3d 1513, 1521 (10th Cir. 1994) ("*Concrete Works II*")).    Indeed, periodic legislative debate about the need to remedy identified discrimination assures all citizens that the deviation from the norm of equal treatment of all racial and ethnic groups is a temporary matter, a measure taken in the service of the goal of equality itself. *Id.* (citing *Croson,* 488 U.S. at 510; *Sherbrooke*, 345 F.3d at 972).

In response to Rothe's argument that all evidence proffered by the Government prior to 1990 was "stale," the Court held that Congress "cannot be expected to work in a vacuum" and "must have some sense of institutional memory," such that Congress may rely on evidence that was developed in previous years in support of its compelling interest. *Id.* at 851 n.8.

The Court cited to anecdotal testimony from hearings before the House Committee on Small Business and the House Committee on Armed Services suggesting that small minority owned businesses are subject to discrimination in both the private and public sector, including contracting with the DoD. *Id.* at 852 (citing *Hearing before Committee on Small Business, House of Representatives*, 102nd Cong. 102-25 (1991) (statement by Rep. Smith) (private discrimination); *Hearing before Committee on Armed Services, House of Representatives*, 102nd Cong., 1st Sess., 20 (1991) (statement by Mr. Parren Mitchell), reprinted in 92 CIS H 20122 (public discrimination); 131 Cong. Rec. 17,447 (1985) (statement by Rep. Conyers) (affirmative action needed to break down "buddy-buddy contracting" at the Defense Department, "which has the largest procurement program in the Federal Government"); *id.* (statement of Rep. Schroeder) (an "old boy's club" in Defense

Department contracting excludes many minorities from business opportunities)).  Because Congress must act with a remedial purpose in enacting race-based legislation, the Court believed that the testimony of House and Senate members is the best evidence of this purpose.  *Id*. at 852.

The Court also referenced the limited statistical evidence that was before Congress prior to the 1992 Reauthorization of the 1207 Program.  *Id.* at 853 (citing Small Disadvantaged Business Reauthorization Hearing, 102nd Cong. 24 (1992)). In 1988, the percentage of subcontracting awards to small disadvantaged businesses was 1.9 percent. *Id.* In 1989, it rose to 2.3 percent, then to 2.9 percent in 1990. *Id.* By 1992, SDB captured 3.6 percent of the subcontracting awards, but the Committee reauthorized the goal of five percent based on these dismal numbers. *Id.* Although unclear from that report, by comparing these numbers to an older census report, it became apparent that minority firms were unable to participate at a national procurement level. *Id.*  For instance, the Census Bureau in 1987 stated that although minorities made up 20 percent of the population, minority firms made up only 8.9 percent of all firms and were only receiving 3.9 percent of all sales and receipts. *Id.*  By 1997, minority firms made up 14.6 percent of all firms but were now only receiving 3.2 percent of all sales and receipts. *Id.*

The Court interpreted these numbers as illustrating that SDBs represented a significant portion of small businesses, but were unable to compete or receive a significant proportion of the federal dollars available.  *Id.*  Nevertheless, the Court concluded that the above-cited evidence did not constitute a "strong basis in the evidence" for concluding that a race-based remedial program was necessary "because of the lack of statistical evidence of discrimination against Asian Americans in this particular industry." *Id.*  Because Rothe's other claims concerning the 1998 contract were moot, the Court concluded that the only remaining remedy for Rothe's as-applied challenge to the 1207

Program was declaratory relief, so the Court issued a declaratory judgment that the 1207 Program, as reauthorized in 1992 and as-applied to Rothe in 1998, was unconstitutional.  *Id.* at 854.

At the time that the Court decided *Rothe IV*, the most current reauthorization of the 1207 Program was the 2002 reauthorization.  *See* Bob Stump National Defense Authorization Act for Fiscal Year 2003, Pub. L. No. 107-314, § 816, 116 Stat. 2458, 2610 (2002).  Although the Court held that the 1207 Program, as reauthorized in 1992 and as-applied to Rothe in 1998, was unconstitutional, it held that the then-present (*i.e.* 2002) reauthorization was facially constitutional. 324 F. Supp. 2d at 860.   The Court held that Rothe bore the ultimate burden of proof for the facial challenge. *Id.* at 854.  Because a facial challenge to a legislative act is the most difficult challenge to mount successfully, Rothe was required to establish that no set of circumstances exist under which the Act would be valid.  *Id.* (citing *Salerno*, 481 U.S. at 745).  Although the *Salerno* standard for facial challenges had been criticized in subsequent Supreme Court opinions, the Court concluded that it had not been disavowed.  *Id.*

The Court again rejected Rothe's argument that "Congress must make findings of discrimination in each specific industry category and for each specific racial group" because it conflicted with the Federal Circuit's statements in *Rothe III*.  *Id.* at 855.  The Court concluded that the DoD could legitimately find that it was a "passive participant" in perpetuating discrimination in both public and private contracting "even if the evidence did not come from or apply to every state or locale in the nation."  *Id.* (citing *Sherbrooke*, 345 F.3d at 970).  The Court believed that the PEA component of the 1207 Program is an example of a federal plan designed to ensure that "federal funds [are not] distributed in a manner which reinforce[s] prior patterns of discrimination."  *Id.* (citing *Croson*, 488 U.S. at 504).

The Court began its facial challenge analysis by observing that the Eighth Circuit and the Tenth Circuit had recently rejected strict scrutiny equal protection challenges to federally enacted race-based preferences in public highway contracting. *Id.* at 855 (citing *Sherbrooke*, 345 F.3d at 970; *Adarand VII*, 228 F.3d at 1167). The Court found that "most of the evidence that was sufficient for the Tenth Circuit [in *Adarand VII*], also satisfies this Court's [compelling interest] inquiry." *Id.*

Based on the Eighth Circuit's opinion in *Sherbrooke* and the Tenth Circuit's opinion in *Adarand VII*, the Court accepted the *Appendix* as part of the evidence that was before Congress when it reenacted the 1207 Program in 2002. *Id.* at 856. The *Appendix* is a Department of Justice summary of more than fifty documents and thirty congressional hearings on minority-owned businesses prepared in response to the Supreme Court's *Adarand* decision. *Id.* The *Appendix* contains both anecdotal evidence and statistical evidence documenting discrimination against minority-owned businesses. *Id.* The Court relied on the *Appendix* to demonstrate that non-race-based programs had been unsuccessful at reducing discrimination in government contracting prior to the passage of the 1207 Program. *Id.* at 857.

The Court also relied on the Department of Commerce's Benchmark Study, which was published in 1998. *Id.* The Court largely relied on the Benchmark Study to justify the five percent goal of the 1207 Program. In that report, Congress was made aware that SDBs in business services, the industry at issue in this case, had the ability to capture 40.2% of the contracting dollars in 1996, but were only awarded 26.4% of those dollars. *Id.* Thus, the pool of ready, willing, and able businesses outstripped the goal set for the Department of Defense by eight fold. *Id.* Although this 40.2% does not establish a percentage of contractors capable of competing on this particular contract, the Court found that this type of statistical evidence supported Congress' finding that the five percent

goal was appropriate, particularly in light of Congress's belief that the Department of Defense was a passive participant in discrimination. *Id.* Furthermore, the Court found that the five percent goal was not an unconstitutional quota. *Id.* at 858 (citing *Northern Contracting, Inc. v. the State of Illinois*, No. 00 C 4515, 2004 WL 422704, at *28 n.39 (N.D. Ill. March. 3, 2004); *Grutter v. Bollinger*, 539 U.S. 306, 335 (2003); *Croson*, 488 U.S. at 496; *see also Statement of Rep. Richardson, Hearing before Committee on Armed Services*, 102nd Cong., 1st Sess., 13 (1991), reprinted in 92 CIS H 20122. ("When Congress passed section 1207 4 years ago, it certainly expected more than a 1-percent improvement by 1990 . . . . For this reason, I tried unsuccessfully to offer an Amendment to the 1992 Defense Authorization bill, as I have in past years, to establish a 5-percent mandate, not goal, for SDB's in both prime contract and subcontract awards.")).

Citing to the Code of Federal Regulations, the Court found that the Government "designed regulations to identify and eliminate individuals who were not disadvantaged and should no longer qualify" for SDB status. *Id.* at 858. The Court noted that the regulations limited participation in the 1207 Program, placed net worth caps on participating minorities, allowed for the presumption of disadvantage to be rebutted, and allowed interested parties to protest the SDB status of a minority firm. *Id.*

Finally, the Court referenced the Urban Institute Report, which analyzed 59 statistical studies completed by state and local governments in response to *Croson*. Id. at 859. The Urban Institute report concluded, in part, that "minority owned businesses receive on average only 59 cents of state and local expenditures that those firms would be expected to receive, based on their availability. The median disparities vary from 39 cents on the dollar for firms owned by Native Americans to 60 cents on the dollar for firms owned by Asian-Americans." *Id.* The Court held that 59 statistical studies

-60-

from across the nation succinctly demonstrated that Congress was reacting with a strong basis in the evidence, and this evidence presented enough statistical disparity to conclusively demonstrate that Asian-Americans, as well as other minorities, were not competing at a national level because of discrimination. *Id.*

Based on the *Appendix*, the Benchmark Study, and the Urban Institute Report, the Court rejected Rothe's facial challenge and held that the 1207 Program, as reauthorized in 2002, was constitutional. *Id.* at 860. Rothe timely filed a notice of appeal on July 9, 2004. *See* Docket No. 167.

On August 8, 2004, Rothe filed a motion for attorney's fees and expenses in the amount of $1,098,003.12. *See* Docket No. 168. Rothe argued that the Government was liable for attorney's fees pursuant to the Equal Access to Justice Act ("EAJA"), 28 U.S.C. § 2412(d). The Court denied the motion because it determined that the Government's position in the litigation was substantially justified. *See* Docket No. 171. According to the Court, the Government's position was substantially justified on the basis that a reasonable argument could be made in defense of the constitutionality of the statute. Furthermore, the Court concluded that Rothe was not a "prevailing party" within the meaning of the EAJA because the declaratory relief they received did not affect the legal relationship between the parties. Finally, the Court held that Rothe is precluded from claiming prevailing party status because there had been no "final judgment" in the case, as that term is defined in the EAJA. Because Rothe appealed that part of the Court's July 2, 2004 Order holding that the 2002 reauthorization was facially constitutional, the judgment is not final because the EAJA defines "final judgment" as "a judgment that is final and *not appealable*." 28 U.S.C. § 2412(d)(2)(G) (emphasis added). The Court concluded by noting that the thirty day deadline for requesting attorney's fees

-61-

under the EAJA is jurisdictional, and Rothe's motion for attorney's fees was filed more than 30 days after the July 2, 2004 Order was signed and judgment was entered.

**6.    *Rothe V*, 413 F.3d 1327 (Fed. Cir. 2005)**

On June 28, 2005, the Federal Circuit vacated and remanded the Court's *Rothe IV* decision "for necessary development of the evidentiary record" regarding "the facial constitutionality of the present reauthorization of section 1207." *Rothe Dev. Corp. v. United States Dep't of Defense*, 413 F.3d 1327, 1329 (Fed. Cir. 2005) ("*Rothe V*"). Because the Government did not appeal the Court's decision as to the facial unconstitutionality of the 1992 reauthorization, which was applied to Rothe in 1998, the Federal Circuit only considered this Court's ruling that the 2002 reauthorization was facially constitutional. *Id.* at 1330.

Regarding Rothe's Little Tucker Act claim, the Federal Circuit acknowledged that "tender of the entire amount of damages claimed by a plaintiff moots the damages claim." *Id.* at 1331 (citing *A.A. Allen Revivals, Inc. v. Campbell*, 353 F.2d 89, 90 (5th Cir.1965) (per curiam); *Holstein v. City of Chicago*, 29 F.3d 1145, 1147 (7th Cir.1994)). Furthermore, "a plaintiff may not prolong a case merely by refusing to accept a valid tender." *Id.* (citing *Holstein,* 29 F.3d at 1147). Thus, the only issue was whether the Government made a valid tender of the maximum amount of money damages claimed by Rothe in its First Amended Complaint. *Id.* According to the Federal Circuit, "[t]he essential characteristics of a valid tender are an unconditional offer to tender, coupled with a manifested ability to carry out the offer, and production of the subject-matter of the tender." *Id.* (citing *Riley-Stabler Constr. Co. v. Westinghouse Elec. Corp.*, 396 F.2d 274, 278 (5th Cir.1968)).

Based on the valid tender standard of *Riley-Stabler*, the Federal Circuit held that the Government's factual contentions, even if accepted as true, merely demonstrate "an offer to tender,"

-62-

and a "mere offer to perform" does not suffice to establish a valid tender.  *Id.*  "Because the [G]overnment has provided no evidence that it produced the subject matter of the tender, *e.g.,* by providing Rothe with a $10,000 check or depositing such check with the [District] [C]ourt, the [G]overnment has failed to demonstrate it made a valid tender."  *Id.* at 1331-32.  Thus, the Federal Circuit vacated this Court's holding that the Little Tucker Act Claim was moot.  *Id.* at 1332.

The Federal Circuit affirmed this Court's dismissal of Rothe's claim to an equitable award of the 1998 contract, but for different reasons than those given by this Court.  *Id.*  The Federal Circuit concluded that this Court had inappropriately dismissed this claim on the merits, rather than for mootness, because the dismissal was based on the Court's determination that Rothe failed to meet its burden of proving that it would have been awarded the contract but for the allegedly unlawful action.  *Id.*  Although this finding was effectively a partial summary judgment Order that resolved a genuine issue of material fact, the Federal Circuit concluded that the error was harmless because the claim was moot for a different reason.  *Id.*  Because the contract at issue expired in 2001 at the latest, this Court could not provide Rothe with any present or future relief regarding this claim, so it was moot.  *Id.*

The Federal Circuit affirmed this Court's holding that Rothe's claim regarding the facial constitutionality of the present reauthorization of Section 1207 is not moot.  Because the PEA is suspended, not repealed, whether the PEA will be applied in the future depends upon whether the Government will continue to meet its five percent goal.  *Id.* at 1333.  Thus, the Government failed to demonstrate that it was "absolutely clear" that the PEA will not come into effect at some time in the future.  *Id.*

The Federal Circuit also concluded that Rothe had standing to assert its claim that the present

reauthorization of Section 1207 is facially unconstitutional. *Id.* at 1334. At the time Rothe's suit was filed, the PEA was in full effect, and the Federal Circuit held that the PEA suspension mechanism did not make Rothe's injury so "conjectural and hypothetical" that it lacked standing. *Id.* Furthermore, the claim is ripe because the issue of whether the present reauthorization is facially unconstitutional "is a purely legal issue that is neither abstract nor hypothetical." *Id.* at 1335.

Regarding the merits of Rothe's claim that the present reauthorization is facially unconstitutional, the Federal Circuit held that remand is required for this Court to develop the factual record and perform the required analysis. The Federal Circuit believed this Court narrowed the issues on remand through a series of three discovery rulings to exclude the evaluation of the present reauthorization of Section 1207.[39] *Id.* at 1335-36. Because it concluded that this Court's discovery

---

[39]The three discovery Orders were signed on January 27, June 10, and September 26, 2003. *Rothe V*, 413 F.3d at 1337 n.4. The January 27, 2003 Order denied Plaintiff's request for leave to re-depose nine individuals concerning the 1999 Reauthorization. The Court believed that these depositions would be redundant and that the 1999 Reauthorization was not covered by the remand. Other language in that Order, however, indicated that the 1992 Reauthorization and the then-present (*i.e.* 2002) Reauthorization were covered by the remand. The first quote cited by the Federal Circuit in *Rothe V* can be found in the Court's June 10, 2003 Order, which simply reiterated that the Court previously denied Rothe's motion for leave to re-depose the nine individuals regarding the 1999 Reauthorization. Although the June 10, 2003 Order stated that the Court was focused on the 1992 Reauthorization, the Order did not unequivocally state that the then-present (*i.e.* 2002) Reauthorization should not be considered. Finally, the "final discovery order [that] most clearly identifie[d] the district court's restriction of the issues," which was dated September 26, 2003, did state that the issue before this Court is the 1992 Reauthorization, but the exact same Order states that the parties' dispositive motions "should address all matters considered by the Federal Circuit" in *Rothe III*. Neither party filed a motion for clarification prior to filing their motions for summary judgment on October 3, 2003. The Court acknowledges that taken out of context, some loose language in those three discovery orders could be construed to limit the issues on remand; however, the language from *Rothe V* suggests that this Court clearly and unequivocally limited the issues to the 1992 Reauthorization and defied the *Rothe III* remand instructions. A district court's discovery orders should not be construed to implicitly disregard remand instructions of the court of appeals. The parties were under an obligation to follow the *Rothe III* remand instructions, and if necessary, obtain a definitive ruling if they believed that the Court had inappropriately limited the issues. For the parties to wait until their (second) appeal to complain about an issue that could have been

orders limited the issues on remand, the Federal Circuit held that this Court's ruling on this claim was an "unwarned and sua sponte" grant of summary judgment, which unfairly deprived both sides of the opportunity to introduce their evidence and arguments regarding that claim. *Id.* at 1336. After reminding this Court of its obligation to follow remand instructions and highlighting the Government's failure to proffer the evidence it would have submitted, the Federal Circuit vacated the Court's judgment that then-present (*i.e.* 2002) Reauthorization of the 1207 Program was facially constitutional, and remanded with instructions the parties be given an opportunity to take discovery on this claim. *Id.* at 1337 & n.4.

The Federal Circuit addressed three arguments made by Rothe concerning the facial challenge to the current reauthorization. First, because the strict scrutiny doctrine sets forth the test for determining facial unconstitutionality in this case, the *Salerno* standard is of limited relevance in this case because, at most, it describes "a conclusion that could result from the application of the strict scrutiny test." *Id.* at 1337. Additionally, although this Court recited the *Salerno* standard in *Rothe IV*, it did not identify one or more constitutionally valid applications of Section 1207 as would be required under *Salerno*. *Id.* Second, "to be relevant in the strict scrutiny analysis, the evidence must be proven to have been before Congress prior to the enactment of the racial classification." *Id.* at 1338. Third, this Court cannot rely on an "institutional memory" argument to reject Rothe's staleness argument; the focus must be on whether the data itself is outdated, not whether Congress was aware of the data. *Id.* Finally, the Federal Circuit held that Rothe failed to preserve the attorney's fees issue on appeal. *Id.* at 1339.

---

resolved in a one-page motion for clarification is disappointing. Based on the 337 docket entries in this case as of April 24, 2007, one would assume that the parties do not have a problem bringing important legal issues to the attention of the Court in a timely manner.

### 7.       Procedural history after the *Rothe V* remand

After the *Rothe V* remand, Rothe filed a motion for preliminary injunction on July 28, 2005

seeking to enjoin the Government from using or applying any race-based program for procurement

of Government contracts.  *See* Docket No. 180.  The Court denied the motion because it concluded

that Rothe could not demonstrate irreparable injury.  *See* Docket No. 181.  On September 12, 2005,

when it denied Rothe's motion for reconsideration, the Court recognized that Rothe was objecting

to all preferences afforded to SDBs by the 1207 Program, not just the PEA.  In particular, Rothe

objects to the following elements of the 1207 Program: (1) subcontracting incentive programs;[40] (2)

awards using less than full and open competition/set asides to the designated groups of 10 U.S.C.

2323(a) with no competition, to include awards under section 8(a) of the Small Business Act; (3)

advance payments;[41] (4) assistance as provided in 10 U.S.C. § 2323(c);[42] (5) the price evaluation

adjustment; and (6) the provision of SDB status to historically black colleges and universities.  Prior

to the filing of the motion for reconsideration, this Court had always construed Plaintiff's First

---

[40]Section 2323(e)(5) states, in part, as follows: "Each head of an agency shall prescribe regulations which provide for the following: (A) Procedures or guidance for contracting officers to provide incentives for prime contractors referred to in subsection(a)(3) to increase subcontractor awards to entities described in subsection (a)(l)." *See also* §§ (a)(3) & (h)(2).

[41]Section 2323(e)(2) states: "To the extent practicable and when necessary to facilitate achievement of the five percent goal described in subsection (a), the head of an agency shall make advance payments under section 2307 of this title to contractors described in subsection (a). The Federal Acquisition Regulation shall provide guidance to contracting officers for making advance payments to entities described in subsection (a)(l) under such section."

[42]Section 2323(c) provides that to attain a goal of five percent of funds obligated for DoD contracts be awarded to socially and economically disadvantaged individuals, agency heads "shall provide technical assistance" to such individuals. "Technical assistance provided under this section shall include information about the program, advice about agency procurement procedures, instruction in preparation of proposals, and other such assistance as the head of the agency considers appropriate."

Amended Complaint as objecting only to the PEA.[43]  Even the Federal Circuit acknowledged in *Rothe V* that the PEA was the "mechanism most important in this case."  413 F.3d at 1329. Nevertheless, the Court stated that it would consider Rothe's challenge to the entire 1207 Program as coming within the parameters of the current complaint.  In its November 10, 2005 Order, the Court reasserted that it would consider Rothe's challenge to all preferences contained in the 1207 Program, but it would not consider any challenge to the Small Business Act's Section 8(a) contract set-aside program.  *See* Docket No. 218.

In its Orders of September 21, 2005 and November 10, 2005, the Court allowed Rothe to send duces tecum requests for production of documents to representatives of the Commerce Department, Justice Department, Defense Department and the SBA for the limited purpose of discovering what, if any, documents these agencies sent to Congress as part of the 2002 and 2006 reauthorization processes. Further, the Court allowed Rothe to seek discovery as to whether any of the documents sent contained stale data. The Court also allowed Rothe to re-depose a representative of the Urban Institute regarding its report titled "Do Minority-Owned Business Get a Fair Share of Government Contracts?" The Court also allowed Rothe to seek discovery from the Urban Institute as to what, if any, documents it sent to Congress as part of the 2002 and 2006 reauthorization process. Further, the Court allowed Rothe to seek discovery as to whether any of the documents sent contained stale data.

The Court issued its final discovery Order on July 24, 2006.  *See* Docket No. 296.  The Court

---

[43]"The aforementioned preference [price evaluation adjustment] which was applied to the solicitation bid . . . was based solely upon the race of the owner . . . ." Plaintiffs First Amended Complaint, ¶ 47. "The putative manner in which a 10% evaluation preference was added to the Rothe bid will deny Rothe the opportunity to establish a past performance record . . . ." *Id.* at ¶ 54.

refused to grant Rothe's request to exclude all "stale" evidence based on the U.S. Commission on Civil Rights May 2006 Briefing Report.  In that report the U.S. Commission on Civil Rights, an independent, bipartisan agency established by Congress, concluded that "three national studies of disparities–the Department of Justice's 1996 appendix to its guidance, the Urban Institute's meta-analysis, and the Department of Commerce's Benchmark Studies–are outdated and inappropriate now to serve as a basis for federal policy or agency action."[44]  The Commission further found that the "Department of Justice's guidance on affirmative action in federal contracting, including its appendix surveying research that establishes a compelling interest for race-conscious programs is now a decade old . . . .  Requirements for narrowly tailoring race-conscious programs dictate that federal officials must justify preferences using current information, not evidence of discrimination that is now outdated."[45]  The Commission further recommended that federal "officials . . . discard disparity studies conducted using data more than five years old. To justify the award of contracts, the government must use current data, not outdated results."[46]  The Court decided that it would address Rothe's staleness arguments at the summary judgment stage.  Rothe was allowed to engage in further limited discovery from the DoD and DoAF as to whether there still exists a compelling need for the section 1207 program, and it was allowed to engage in further limited discovery from the DoD and DoAF as to whether the section 1207 program is still narrowly tailored.

Rothe filed its motion for summary judgment on September 8, 2006 (Docket No. 301), and

---

[44]U.S. Commission on Civil Rights, "Disparity Studies as Evidence of Discrimination in Federal Contracting", National Disparity Studies Finding 3 at p. 79.

[45]*Id.* at p. 81.

[46]*Id.* at p. 79.

Defendants filed their joint motion for summary judgment on November 6, 2006 (Docket No. 318). Those cross-motions for summary judgment are currently pending before the Court and will be addressed in this Order.

## II. LEGAL ANALYSIS

### A.   Summary Judgment Standard of Review

The parties have filed cross-motions for summary judgment.  Rule 56(c) provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). The party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  Once a proper motion has been made, the nonmoving party may not rest upon mere allegations or denials in the pleadings but must present affirmative evidence, setting forth specific facts, to show the existence of a genuine issue for trial. *See Celotex Corp.*, 477 U.S. at 322-23; *Anderson*, 477 U.S. at 257; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986).  All the evidence must be construed "in the light most favorable to the non-moving party without weighing the evidence, assessing its probative value, or resolving any factual disputes." *Williams v. Time Warner Operation, Inc.*, 98 F.3d 179, 181 (5th Cir.1996).

Only reasonable inferences can be drawn from the evidence in favor of the nonmoving party.

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 469 n. 14 (1992).  The nonmovant's burden is not satisfied by "some metaphysical doubt as to material facts," conclusory allegations, unsubstantiated assertions, speculation, the mere existence of some alleged factual dispute, or "only a scintilla of evidence."  *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1429 (5th Cir.1996) (citing *Forsyth v. Barr*, 19 F.3d 1527, 1533 (5th Cir.), *cert. denied*, 513 U.S. 871 (1994)); *State Farm Life Ins. Co. v. Gutterman*, 896 F.2d 116, 118 (5th Cir.1990) (citing *Anderson*, 477 U.S. at 247-48).

Summary judgment is mandated if the nonmovant fails to make a showing sufficient to establish the existence of an element essential to her case on which she bears the burden of proof at trial. *See Nebraska v. Wyoming*, 507 U.S. 584, 590 (1993); *Celotex Corp.*, 477 U.S. at 322.  In such a situation, there can be 'no genuine issue as to any material fact' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp.*, 477 U.S. at 322-23.

**B.       Little Tucker Act Claim**

Rothe seeks a $10,000 money judgment in satisfaction of its claim for damages under the Little Tucker Act, based upon law of the case finding the 1207 Program unconstitutional as applied to Rothe in 1998.  Based on its review of the correspondence between the parties regarding settlement of the Little Tucker Act Claim after the *Rothe V* remand, the Court finds that what started as a bona fide dispute over the language of a release has culminated in Rothe's inappropriate, categorical refusal to accept the $10,000 under any condition.

*Rothe V* was decided on June 28, 2005.  On September 30, 2005, the Government emailed Rothe a first draft release related to the Little Tucker Act Claim.  The Government informed Rothe

that Treasury Department officials require that a release must accompany any request for payment made through the Judgment Fund.  In consideration for Rothe's acceptance of $10,000, the first draft release purported to discharge Defendants from all liability "arising out of the facts alleged or which could have been alleged in the Complaint filed in that civil action relating to the payment of the $10,000 under the Tucker Act."   Rothe rejected the first draft release as being unacceptable.  Initially, Rothe proposed giving the Government "a receipt" for the money and a "release of judgment of the Tucker Act Claim, only."  In an effort to assuage Rothe's concern that the language of the first draft release might prejudice Rothe's non-Tucker Act claims, the Government proposed a second draft release, which stated that "[t]his release does not include any valid claim not related or not involving the payment of and acceptance of the $10,000 in full resolution of the Tucker Act claim."  In response to this second draft release, Rothe stated that "[t]here is nothing which requires Rothe to settle the Little Tucker Act portion of the claim and the offer to settle the monetary portion of the claim will not moot Rothe's Little Tucker Act claim.  Rothe will not settle the Little Tucker Act claim nor any of the claims it has made unless such a settlement is agreeable to Rothe.  Rothe has made a previous offer of settlement.  It hereby renews its agreement to settle the entire case for the amount of $5,300,000.00 (Five Million, Three Hundred Thousand Dollars)."  Thus, Rothe insinuated that it would not settle the $10,000 Little Tucker Act Claim unless the Government agreed to settle the whole case for $5.3 Million.

In response to this letter, the Government informed Rothe that a "receipt for payment" is not an acceptable release for the Treasury Department.  The Government reiterated that the second draft release "releases only Rothe's claim for payment of $10,000 under the Little Tucker Act."  The Government reminded Rothe that it had informed this Court at two separate hearings that it would

accept payment of $10,000 in full satisfaction of the Little Tucker Act Claim after it received acceptable release language.

On March 13, 2006, Rothe proposed that the Government "should explore depositing the money into the registry of the court" because it feared that the Government would use the release in an attempt to compromise other aspects of Rothe's case not related to the Little Tucker Act Claim. On November 6, 2006, after the cross-motions for summary judgment were filed, Rothe stated that it "will not accept payment of the Tucker Act cash at this time under any condition."[47]

In *Rothe V*, the Federal Circuit held that the Government could make a valid tender by depositing $10,000 in the registry of the Court, which is the full amount of damages recoverable under the Little Tucker Act. *Rothe V*, 413 F.3d at 1331-32. If the Government tenders the full amount of damages, then Rothe may not refuse to accept this valid tender. *See id.* at 1331 ("Rothe's claimed non-acceptance of a tender is irrelevant because a plaintiff may not prolong a case merely by refusing to accept a valid tender") (citing *Hosltein*, 29 F.3d at 1147). In particular, Rothe cannot refuse to accept a valid tender by conditioning settlement of the Little Tucker Act Claim on settlement of all remaining claims in the case. In other words, Rothe cannot demand a package deal. Because Rothe may not prolong this case merely by refusing to accept a valid tender, the Court ORDERS Defendants to deposit $10,000 into the registry of the Court on or before **September 10, 2007.** It is unnecessary for the Court to render a judgment on the merits of Rothe's Little Tucker Act Claim because the claim will become moot after the Government deposits $10,000 into the registry of the Court. *See id.* ("[T]ender of the entire amount of damages claimed by a plaintiff moots the

---

[47]Rothe argues that this statement pertains solely to the conditions imposed on the settlement by Defendants, and is not a waiver. Pl's Response and Reply, Pg. 4.

damages claim")  ((citing *A.A. Allen Revivals, Inc. v. Campbell*, 353 F.2d 89, 90 (5th Cir.1965) (per

curiam); *Holstein v. City of Chicago*, 29 F.3d 1145, 1147 (7th Cir.1994))).  Because mootness relates

to this Court's subject matter jurisdiction, this Court should not rule on the merits of Rothe's Little

Tucker Act claim if the Government is ready, willing, and able to make a valid tender of $10,000

in satisfaction of that claim.  *See Rothe V*, 413 F.3d at 1331 (stating that a claim must be dismissed

as moot when the issues presented are no longer live or the parties lack a legally cognizable interest

in the outcome).  Rothe may request disbursement of the $10,000 any time after it is deposited by

filing an application with this Court.  By depositing the $10,000 into the registry of the Court, the

Government will have made a valid tender of the full amount of damages available under the Little

Tucker Act.   The Court will not enter Judgment in this case until the Government deposits the

$10,000 in the registry of the Court.

Regarding the dispute over the language of the release, the Government's valid tender of

$10,000 is made in satisfaction of Rothe's Little Tucker Act Claim only.  Rothe's acceptance of this

valid tender will not affect, impair, prejudice, or relate to any other claim that Rothe has asserted in

this case.

**C.     The Court will not consider the facial constitutionality of the 1999 and 2002 Reauthorizations of the 1207 Program because those claims are moot.  Those claims have also been waived on appeal and are outside of the scope of the remand. Furthermore, consideration of those claims is barred by the "law of the case" doctrine.**

In *Rothe V*, the Federal Circuit gave the following explicit remand instruction: "[W]e

conclude that the matter must be remanded to allow both sides a fair opportunity to obtain and

present evidence and arguments on the facial constitutionality of the present reauthorization of

section 1207."  413 F.3d at 1337.  Regarding jurisdiction, the Federal Circuit stated that "the district

court properly held that jurisdiction lies as to Rothe's claim that the present reauthorization of section 1207 is facially unconstitutional." *Id.* at 1335.  Regarding the scope of argument on appeal, the Federal Circuit summarized Rothe's argument by stating that "Rothe contends that the district court's findings and legal analysis do not support a holding that the present reauthorization of section 1207 is facially constitutional." *Id.*  Regarding discovery, the Federal Circuit directed this Court to allow "an opportunity to take discovery on the facial unconstitutionality of the present reauthorization of section 1207." *Id.* at 1337 n.4.  Finally, the Federal Circuit ended its opinion by noting "that jurisdiction over the claim that the present reauthorization of section 1207 is facially unconstitutional is proper.  On the merits, we vacate the district court's judgment as to the damages claim and the present facial unconstitutionality claim and remand for development of the record." *Id.* at 1339.

At the time that the *Rothe V* appeal was decided on June 28, 2005, the "present reauthorization of section 1207" was the 2002 Reauthorization.  *Id.* at 1330.  Currently, the "present reauthorization of section 1207" is the 2006 Reauthorization.  Despite explicit remand instructions directing this Court to address only the facial constitutionality of the present reauthorization of the 1207 Program, Rothe insists that this Court issue declaratory judgments as to the facial constitutionality of two intervening reauthorizations of the 1207 Program–the 1999 and 2002 Reauthorizations.

**1.      Rothe's claims regarding the constitutionality of the 1999 and 2002 Reauthorizations are moot.**

Although Defendants did not address whether Rothe's equal protection claims regarding the 1999 and 2002 Reauthorizations are moot, this Court may raise the issue of mootness *sua sponte*

because it relates to the Court's subject matter jurisdiction. *Bridgmon v. Array Systems Corp.*, 325 F.3d 572, 575 (5th Cir. 2003); *see Sannon v. United States*, 631 F.2d 1247, 1250 (5th Cir. 1980) ("Striking at the very heart of federal subject matter jurisdiction, a mootness issue quite clearly can be raised *sua sponte* if not addressed by the parties") (citing *State of Alabama ex rel. Baxley v. Woody*, 473 F.2d 10, 12-13 (5th Cir. 1973)).

The Court believes that the Tenth Circuit's opinion in *Concrete Works of Colorado, Inc. v. City and County of Denver* is dispositive of the mootness issue. 321 F.3d 950, 954 n.1 (10th Cir. 2003) ("*Concrete Works IV*"). In *Concrete Works*, a non-minority owned construction firm ("CWC") challenged the constitutionality of an affirmative action ordinance enacted by the City and County of Denver. *Id.* at 954. The ordinance established participation goals for racial minorities and women on certain City construction and professional design projects. *Id.* The ordinance was originally passed in 1990, and it was subsequently amended in 1996 and 1998. *Id.* at 954 n.1. Regarding the amendments to the ordinance, the Tenth Circuit stated that the affirmative action plan "remain[ed] essentially unchanged for purposes of this case [addressing the constitutionality of the ordinance]." *Id.* at 954. After the initial remand in *Concrete Works II*, a bench trial was held and the district court entered judgment in favor of CWC on its claims for injunctive and declaratory relief. *Id.* (citing *Concrete Works III*, 86 F. Supp. 2d 1042, 1079 (D. Colo. 2000)). In particular, the district court enjoined Denver from enforcing the 1990 Ordinance, and 1996 Ordinance, and the 1998 Ordinance. *Id.* at 954 n.1. The Tenth Circuit held that "CWC's claims for prospective injunctive relief relating to the 1990 and 1996 Ordinances . . . became moot as each was amended and ultimately replaced by the 1998 Ordinance," so it vacated the district court's order enjoining Denver from enforcing the 1990 and 1996 ordinances as "meaningless." *Id.*

Regarding the 1996 Ordinance, the Tenth Circuit noted that CWC "has made no claim for damages arising from the application of the 1996 Ordinance and that ordinance has been superseded by the 1998 Ordinance. *Id.* at 954 n.1. The Tenth Circuit held that the viability of CWC's claims under the 1996 Ordinance is controlled by *National Advertising Co. v. City and County of Denver*, 912 F.2d 405, 412 (10th Cir. 1990). *Id.* In *National Advertising*, the Tenth Circuit held that "[a] declaratory judgment on the validity of a repealed ordinance is a textbook example of advising what the law would be upon a hypothetical state of facts." 912 F.2d at 412 (internal citations omitted). Based on *National Advertising*, the Tenth Circuit concluded that "CWC's challenge to the constitutionality of the 1996 Ordinance is moot and we vacate that portion of the district court's order declaring the 1996 Ordinance unconstitutional." 231 F.3d at 954 n.1. After applying the strict scrutiny test set forth in *Croson*, the Tenth Circuit held that the 1990 Ordinance, which was applied to CWC, and the current (*i.e.* 1998 Ordinance) were constitutional. *Id.* at 994. The judgment of the district court enjoining Denver from enforcing the 1998 Ordinance and declaring the 1990 and 1998 Ordinance unconstitutional were reversed, and the case was remanded with instructions for the district court to enter judgment in favor of Denver. *Id.* Thus, the Tenth Circuit limited its analysis to the constitutionality of the then-present (*i.e.* 1998) Ordinance and the 1990 Ordinance, which was applied to CWC and was the basis of CWC's damages claim against Denver.

Based on the Tenth Circuit's holding in *Concrete Works IV*, the Court finds that Rothe's claims for declaratory judgments regarding the constitutionality of the 1999 and 2002 Reauthorizations are moot. The facts of *Concrete Works IV* are similar to the facts of this case. Similar to the plaintiff in *Concrete Works IV*, Rothe has only made a Little Tucker Act damages claim based on the 1992 Reauthorization, which was applied to Rothe in 1998. Rothe has asserted

no cognizable damages claims related to the 1999 or 2002 Reauthorization. *See Memphis Light, Bas and Water Division v. Kraft*, 436 U.S. 1, 8 (1978) (a claim for monetary damages saves from mootness a plaintiff's claim that a repealed statute was unconstitutional as applied to it); *see also Naturist Society, Inc. v. Fillyaw*, 958 F.2d 1515, 1519 (11th Cir. 1992) (same). Rothe only seeks advisory opinions that the 1999 and 2002 Reauthorizations were facially unconstitutional in the abstract. *See Church of Scientology of California v. U.S.*, 506 U.S. 9, 12 (1992) ("It has long been settled that a federal court has no authority 'to give opinions upon moot questions or abstract propositions, or to declare principles or rules of law which cannot affect the matter in issue in the case before it.'") (citing *Mills v. Green*, 159 U.S. 651, 652 (1895)). Like the Tenth Circuit in *Concrete Works IV*, this Court has already ruled on the constitutionality of the 1992 Reauthorization that was applied to Rothe in 1998 and was the basis of Rothe's damages claim under the Little Tucker Act. Like the Tenth Circuit in *Concrete Works IV*, this Court will rule on the facial constitutionality of the present (*i.e.* 2006) Reauthorization and determine whether Rothe is entitled to an injunction prospectively enjoining enforcement of the program. However, the Court will not rule on the facial constitutionality of the 1999 and 2002 Reauthorizations because those claims are moot. The Court cannot award Rothe any injunctive relief relative to these intervening reauthorizations, and Rothe has not asserted a cognizable damages claim relative to these reauthorizations such that retrospective declaratory relief would be appropriate. At every stage in the proceedings, the court must "stop, look, and listen" to determine the impact of changes in the law on the case before it. *Kremens v. Bartley*, 431 U.S. 119, 135 (1977). This Court must evaluate Rothe's claims "in light of [the] law as it now stands," not as it stood in 1999 or 2002. *Diffenderfer v. Central Baptist Church*, 404 U.S. 412, 414 (1972). As an Article III court, this Court must ensure

that the case or controversy requirement must "be satisfied at each and every stage of the litigation," and a claim must be dismissed as moot when the issue presented is no longer live or when the parties lack a legally cognizable interest in the outcome. *Maher v. Hyde*, 272 F.3d 83, 86 (1st Cir. 2001); U.S. Const., art. III, § 2, cl. 1; *see also Baccus v. Parrish*, 45 F.3d 958, 961 (5th Cir. 1995).

In *Rothe III*, the Federal Circuit stated that "for the purpose of considering congressional motivation, the process of reauthorization is equivalent to simultaneously allowing a statute to lapse and re-enacting it." 262 F.3d at 1322 n.15. Thus, in a strict scrutiny context, the text of the statute might not change at all when it is reauthorized, but the reviewing Court must consider "all evidence available to Congress pre-dating the most recent reauthorization of the statute at issue." *Id.* Because the universe of evidence supporting the constitutionality of race-based legislation changes with each reauthorization, a reauthorized statute is not the same as a prior reauthorization in the strict scrutiny context. If the 2006 Reauthorization is constitutional under strict scrutiny, then Rothe cannot obtain injunctive relief relative to the prior reauthorizations. *Concrete Works IV*, 321 F.3d at 954; *Fillyaw,* 958 F.2d at 1520; *see Johnson v. State*, 586 F.2d 387, 388 (5th Cir. 1978) ("We adhere to the rule that the enactment of a superseding statute which satisfies all the principles sought in an attack on the prior statute simply moots the case."). If Rothe's claim for injunctive relief fails because the 2006 Reauthorization is constitutional, Rothe cannot seek a declaratory judgment that prior reauthorizations of the same statute are unconstitutional because those claims are moot.

Without citing to any authority, Rothe makes the following argument regarding this issue:

Defendants imply that Congress can moot any claim for declaratory and prospective injunctive relief merely by amending or reauthorizing the statute. If Defendants were correct, a Court could incorrectly declare a party's rights under a statute, the party could appeal that declaration, and if Congress amended the statute prior to the disposition of the appeal, the case would be moot, the declaration would be

> effectively unreviewable, and the party would never be able to pursue its claims for
> prospective injunctive relief filed under the prior version of the statute–even if the
> reauthorized statute was exactly the same, as it is here.

Pl's Response and Reply, Pg. 7.  First, Rothe fails to appreciate the fact that this Court cannot enjoin the enforcement of the 1999 and 2002 Reauthorizations because they are no longer in effect.[48] Second, for purposes of strict scrutiny, the 2006 Reauthorization is not "exactly the same" as the 1999 and 2002 Reauthorizations because the evidence before Congress is different for each reauthorization.  Third, Congress can always moot a claim for declaratory and prospective injunctive relief filed under the prior version of a statute if it replaces that statute with a new statute that is constitutional.

For example, in *Johnson*, the Fifth Circuit was asked to review the constitutionality of a Mississippi statute that provided free transportation to students living more than one mile from their school, with the exception that students residing within the corporate limits of a municipality were not entitled to free transportation regardless of their distance from the school.  586 F.2d at 387.  The district court ruled that the statute was unconstitutional both on its face and as applied under the Fourteenth Amendment, and enjoined its enforcement.[49] *Id.*  After the appeal was filed with the Fifth Circuit, the Mississippi legislature responded to the decision by amending the statute to provide free transportation for all students living more than one mile from their school.  *Id.* at 387.  Because this legislative action eliminated the alleged unconstitutionality of the statue, the Fifth Circuit dismissed the appeal as moot.  *Id.*  If Rothe's argument were correct, then the *Johnson* appeal would not have

---

[48]Of course, this Court has the power to prospectively enjoin the enforcement of the 2006 Reauthorization of the 1207 Program, which is allegedly injuring Rothe on an on-going basis.

[49]The Court notes that the plaintiff in *Johnson* did not assert a damages claim in connection with the pre-amended statute.

been moot because the plaintiff could have insisted that the Fifth Circuit issue a declaratory judgment concerning the constitutionality of the repealed statute, despite the fact that the plaintiff had not asserted a damages claim in connection with the pre-amended statute.

Because Rothe seeks declaratory and prospective injunctive relief concerning the facial constitutionality of the 1999 and 2002 Reauthorizations without asserting any associated claim for damages, those claims are moot because Congress reauthorized the 1207 Program in 2006. In addition to *Johnson*, the Court believes that the Fifth Circuit opinion in *de la O v. Housing Authority of the City of El Paso, Texas* supports its conclusion that Rothe's claims concerning the facial constitutionality of the intervening reauthorizations are moot.

In *de la O*, the plaintiffs[50] challenged regulations issued by the Housing Authority of the City of El Paso ("HACEP"), claiming that certain non-resident trespass and distribution regulations infringed on their First Amendment rights by restricting political campaigning in HACEP-operated housing facilities. 417 F.3d 495, 497 (5th Cir. 2005). The district court held that the challenged regulations were unconstitutional, and a panel of the Fifth Circuit affirmed. *Id.* at 498. The case was then voted en banc, and after briefing and argument had concluded, the plaintiff Jesus de la O died. *Id.* Because the remaining non-resident plaintiff had not filed an appeal, the Fifth Circuit dismissed the appeal as moot. *Id.* After this dismissal, in 2002, de la O's widow, Rosalina de la O, and Maria Christina Rivera brought suit again challenging the trespass and distribution regulations. *Id.* The district court granted summary judgment for HACEP, and appeal was taken to the Fifth Circuit. *Id.* After this second appeal to the Fifth Circuit was filed, HACEP voluntarily amended its regulations

---

[50]The first plaintiff, Jesus de la O, was a resident of the public housing facility, and the second plaintiff, a non-resident, was a candidate for political office in El Paso. 417 F.3d at 497.

to allow non-residents to enter its facilities and engage in political and religious activities door-to-door, which was not permitted under the old regulations.  *Id.*

In *de la O*, the Fifth Circuit first addressed whether the plaintiffs' constitutional challenge to the old regulations was moot.  Regarding the standard for mootness, the Fifth Circuit stated that "[t]he requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness)." *Id.* at 499 (citing *United States Parole Comm'n v. Geraghty*, 445 U.S. 388, 397 (1980)).  The Fifth Circuit then engaged in the following mootness analysis, which is relevant to this case:

> [A] request for injunctive relief remains live only so long as there is some present harm left to enjoin. HACEP contends that its amendment to the regulations renders de la O's claims moot.
>
> This logic is valid only insofar as it pertains to the claims for injunctive relief. It is well-established that "[c]laims for damages or other monetary relief automatically avoid mootness," so long as the underlying claim remains valid on its merits.  <u>If, on the other hand, the defendants were immune from a damages award, it would be unnecessary for us to consider the constitutionality of the un-amended regulations.</u> Although such a result would allow us to avoid a constitutional question, HACEP, the sole defendant, is an entity comprised wholly of members appointed by the mayor of El Paso. As an arm of local government, not an instrument of the state, it is not entitled to sovereign immunity under the Eleventh Amendment.  The doctrine of qualified immunity, furthermore, is applicable only to government officials, not municipal entities.  The pleading of a colorable claim for damages thus precludes a finding of mootness.

*Id.* (internal citations omitted) (emphasis added).  The Fifth Circuit proceeded to evaluate the constitutionality of the old regulations for purposes of the plaintiffs' damages claim and the new regulations for purposes of plaintiffs' claim for prospective injunctive relief.[51]  *Id.* at 507.

─────────────────

[51]The Fifth Circuit reviewed the constitutionality of the new regulations, even though the district court only had an opportunity to rule on the constitutionality of the old regulations, because it was certain that the district court would find the new, less-restrictive regulations constitutional and to avoid the possibility that the defendant could continually amend its regulations on appeal in an

In *de la O*, the Fifth Circuit stated in dicta that the plaintiffs' claim regarding the constitutionality of the old regulations would have been moot if the plaintiffs had not asserted a viable damages claim against HACEP.  Based on *De La O*, *Johnson*, and *Concrete Works IV*, the Court finds that Rothe's claims regarding the constitutionality of the intervening reauthorizations of the 1207 Program are moot because Rothe has not asserted viable damages claims in connection with those reauthorizations.[52]  Rothe's only damages claim, premised on the Little Tucker Act, relates to the 1992 Reauthorization, and Rothe's only live claim for injunctive relief relates to the 2006 Reauthorization.[53]

_____

effort to indefinitely evade review.   417 F.3d at 500.

[52]Although this Court held that the 2002 Reauthorization was facially constitutional in *Rothe IV*, the 2002 Reauthorization was the "present reauthorization" of the 1207 Program at the time that *Rothe IV* was decided.   Rothe currently has a claim for injunctive relief regarding the 2006 Reauthorization, and Rothe formerly had a claim for injunctive relief regarding the 2002 Reauthorization at the time that *Rothe IV* was decided.  This Court's holding in *Rothe IV* regarding the facial constitutionality of the 2002 Reauthorization was vacated in *Rothe V*, and the Court expresses no opinion on the constitutionality of the 2002 Reauthorization in this Order.

[53]Rothe has alleged that it was injured by the 1207 Program, and it will continue to be injured by the program so long as it remains in operation.  Thus, Rothe certainly has alleged a present injury stemming from the 2006 Reauthorization of the 1207 Program sufficient to confer standing, and Rothe may seek an injunction prospectively forbidding its enforcement.  However, *de la O* reinforces the proposition that if a governmental entity is immune from money damages, then a plaintiff cannot seek a declaratory judgment on the constitutionality of a repealed or pre-amended statute enacted by that governmental entity.  In this case, the federal government has sovereign immunity to money damages claims.  The Little Tucker Act is a limited waiver of the Government's sovereign immunity, but Rothe has not asserted a Little Tucker Act claim relative to the 1999 and 2002 Reauthorizations.  Because Rothe has not asserted a money damages claims relative to those intervening reauthorizations, Rothe's constitutional claims related to those reauuthorizations are not saved from mootness.

2.     **Rothe's claims regarding the constitutionality of the 1999 and 2002 Reauthorizations are outside the scope of the remand.  Consideration of those claims is barred by the doctrines of waiver and law of the case.**

Defendants argue that Rothe's claims regarding the constitutionality of the 1999 and 2002 Reauthorizations are outside the scope of the *Rothe V* remand.  The Court agrees.   "On remand, a lower court may decide matters left open only insofar as they reflect proceedings consistent with the appellate court's mandate." *Milinary v. Powell Mt. Coal. Co.*, 173  F.3d 920, 923 (4th Cir. 1999); *see also U.S. v. Wilson*, 322 F.3d 353, 359-360 (5th Cir. 2003); *Brunet v. City of Columbus*, 58 F.3d 251, 254–255 (6th Cir. 1995); *Laborers' Int'l Union v. Foster Wheeler Energy Corp.*, 26 F.3d 375, 396-97 n.24 (3d Cir. 1994), *cert. denied,* 513 U.S. 946 (1994); *U.S. v. M.C.C.*, 967 F.2d 1559, 1562-1563 (11th Cir. 1992); *Day v. Moscow*, 955 F.2d 807, 812 (2d Cir. 1992), *cert. denied*, 506 U.S. 821 (1992).  The Federal Circuit's remand in *Rothe V* unequivocally stated that this Court must review the "facial constitutionality of the present reauthorization of section 1207."  The Court finds that the Federal Circuit's instruction to review the facial constitutionality of the "present reauthorization of section 1207," rather than the 2002 Reauthorization,[54] was intentional; it was motivated by the Federal Circuit's desire that this Court avoid ruling on a moot claim.

The Court also finds that Rothe's requests for declaratory relief concerning the constitutionality of intervening reauthorizations of the 1207 program were waived on appeal.  "The district court is without jurisdiction to alter the mandate of this [appellate] court on the basis of matters included or includable in defendants' prior appeal."  *Seese v. Volkswagenwerk, A.G.*, 679 F.2d 336, 337 (3d Cir. 1982).   When this Court decided *Rothe IV*, it did not rule on the

---

[54]The 2002 Reauthorization was the "present reauthorization" at the time *Rothe V* was decided.

constitutionality of the 1999 Reauthorization; it only ruled on the constitutionality of the 1992 Reauthorization, which was applied to Rothe in 1998 and was the basis of Rothe's damages claim under the Little Tucker Act, and the 2002 Reauthorization, which was the "present reauthorization" of the 1207 Program at the time.  On appeal in *Rothe V*, Rothe failed to argue that this Court erred when it declined to rule on the constitutionality of the intervening reauthorization, which at the time was the 1999 Reauthorization.  If Rothe had successfully argued that this Court erred in not considering the intervening (*i.e.* 1999) Reauthorization in *Rothe IV*, then the Federal Circuit's mandate in *Rothe V* would have instructed this Court to issue a declaratory judgment concerning the constitutionality of all intervening reauthorizations enacted between the 1992 Reauthorization and the "present reauthorization."  If Rothe had raised its intervening reauthorization argument on appeal in *Rothe V*, the Federal Circuit could have ruled on the mootness issue addressed above. *See Capps v. Sullivan*, 13 F.3d 350, 353 (10th Cir.1993) ("[A] legal decision made at one stage of litigation, unchallenged in a subsequent appeal when the opportunity to do so existed, becomes the law of the case for future stages of the same litigation, and the parties are deemed to have waived the right to challenge that decision at a later time").  Because this argument was "a matter includable in [a] prior appeal," Rothe's request for a declaratory judgment concerning the constitutionality of the intervening reauthorizations of the 1207 Program is waived.

Finally, under the "law of the case" doctrine, an issue of law or fact decided on appeal may not be reexamined either by the district court on remand. *Ill. Cent. Gulf R.R. v. Int'l Paper Co.*, 889 F.2d 536, 539 (5th Cir. 1989) (citing *Todd Shipyards Corp. v. Auto Transportation*, 763 F.2d 745, 750 (5th Cir.1985)).  The Federal Circuit has ruled that this Court must only consider the constitutionality of the "present reauthorization of the 1207 Program," and this Court does not have

authority to reexamine this instruction on remand, especially considering the fact that Rothe waived

the issue on appeal and the claims are moot, which is a jurisdictional defect. *See Laffey v. Northwest*

*Airlines, Inc.*, 740 F.2d 1071, 1089 (D.C. Cir.1984) (holding that the waiver doctrine ensures that

a party who fails to challenge a ruling in a first appeal does not "stand better as regards the law of

the case than one who had argued and lost").  Rothe failed to appeal this Court's failure to rule on

the constitutionality of the intervening (*i.e.* 1999) Reauthorization in *Rothe V*.    Rothe's claims

concerning the constitutionality of the 1999 and 2002 Reauthorizations of the 1207 Program are

DISMISSED.

**D.    The Eighth, Ninth, and Tenth Circuits have evaluated similar affirmative action programs under *Croson*, and the legal analysis contained in those opinions is relevant to this Court's evaluation of the facial constitutionality of the 2006 Reauthorization to the extent their holdings do not directly conflict with the law of the case.**

Before engaging in its strict scrutiny analysis, the Court needs to clarify the law to be applied

in this case.  The Court believes that Rothe has made six legal arguments regarding strict scrutiny

review that have been rejected by the Eight, Ninth, Tenth, and/or Federal Circuits.  The Court rejects

the following legal arguments made by Rothe: (1) the Government must establish that it has

discriminated against minority-owned businesses in order to satisfy its burden of production;[55] (2)

the Court must reject anecdotal and statistical evidence of discrimination unless those claims were

actually "adjudicated" and the discrimination was proven to have occurred;[56] (3) all evidence

---

[55]*See* Pl's MSJ, Pgs.15 n.21, 26, 28, 31 & 33; Pl's Response and Reply, Pgs. 10 & 11.  The Tenth Circuit has explicitly rejected this argument on several occasions.  *Concrete Works II*, 36 F.3d at 1529; *Concrete Works IV*, 321 F.3d at 958, 973, 974; *Adarand VII*, 228 F.3d at 1176; *see also* footnote 67, *infra*.  Rothe does not acknowledge or distinguish this adverse precedent.

[56]*See* Pl's MSJ, Pgs. 18 & 20.  The Tenth Circuit has explicitly rejected the argument that past or present discrimination must be conclusively "proven" by the governmental entity defending the program.  *Concrete Works IV*, 321 F.3d at 958.  Rothe does not acknowledge or distinguish this

contained in Congressional Committee Reports, hearing records, and floor statements must be

rejected on procedural grounds because that evidence is hearsay and it is unreliable due to "the

political nature of Congress;"[57] (4) the Government must prove discrimination as to every racial sub-

class identified in the regulations;[58] (5) the relevant industry sector for purposes of strict scrutiny

review is the "computer maintenance and repair" sub-sector, not the "business services" sector;[59] and

_____

adverse precedent.

[57]*See* Pl's MSJ, Pgs. 22 & 24.  In light of the fact that the Federal Circuit explicitly directed this Court to review these legislative materials, the Court finds this argument disingenuous.  *See Rothe III*, 262 F.3d at 1322 ("In order for us to undertake meaningful appellate review, it is essential that the district Court set forth detailed findings as to the scope and content of the reports before Congress when it enacted the challenged legislation . . . .); *See Rothe V*, 413 F.3d at 1337 ("Since that evidence [before Congress] necessarily is published, for example, in Congressional Committee reports and hearing records, it could easily have been cited").  If it believed that every piece of evidence before Congress was inadmissible in this case because it was hearsay or because Congress was a political institution, then the Federal Circuit could have rendered judgment for Rothe six years ago.  Furthermore, if a reviewing court is precluded from reviewing Congressional evidence in the first instance based on these objections, then Justice O'Connor's statement that strict scrutiny is not "fatal in fact" is rendered completely meaningless. The Eighth, Ninth, and Tenth Circuit's refused to entertain similar objections regarding evidentiary support for the DoT's MBE program.

[58]*See* Pl's MSJ, Pg. 39.  The Court finds this argument disingenuous because the Federal Circuit explicitly rejected it in *Rothe III*.  *See* 262 F.3d at 1330 ("Rather than identify instances of discrimination against each particular Asian subgroup (i.e. Korean-Americans, Chinese-Americans), the district court might properly determine that Congress had before it evidence of discrimination against Asian-Pacific Americans in general."); *see Adarand VII*, 228 F.3d at 1176 n.18 (rejecting contention that "Congress must make specific findings regarding discrimination against every single sub-category of individuals within the broad racial and ethnic categories designated by statute and addressed by the relevant legislative findings."). Rothe does not acknowledge that this argument is contrary to the law of the case.  To the extent that Rothe relies on the February 28, 1999 expert report of George La Noue (Pl's Exhibit 28) to argue that certain racial subgroups were inappropriately given a presumption of social disadvantage by the SBA, the Court rejects that argument because the Government has satisfied its burden of producing evidence of discrimination against African Americans, Asian Americans, Hispanic Americans, and Native Americans in the relevant industry sectors.

[59]*See* Pl's MSJ, Pg. 8.  Rothe cites to no strict scrutiny case requiring the Government to define the relevant industry sub-sectors so narrowly.  Additionally, requiring the narrowest definition

(6) only evidence of discrimination in DoD procurement is admissible; evidence of state and local discrimination in contracting is irrelevant because "there is no private or state or local defense industry."[60]   For the reasons discussed below, the Court finds that all six arguments have no merit. Furthermore, the Court finds that two of the six objections have been explicitly rejected by the Federal Circuit.

The Court will briefly address Rothe's sixth argument.  Rothe is arguing that the Government cannot rely on evidence of state and local discrimination in contracting because "there is no private or state or local defense industry."  In other words, because only the DoD buys missiles, fighter jets, and aircraft carriers, the Court should only evaluate evidence of discrimination in DoD procurement when engaging in its compelling interest analysis.  This sixth argument is related to Rothe's first argument that the Government can only rely on evidence of its own discrimination in order to satisfy its burden of production under strict scrutiny.  *See* footnote 61.  Rothe's argument completely fails

---

of industry  sub-sector conflicts with the Federal Circuit's holding that the Government need not identify instances of discrimination against each racial sub-group.  The Federal Circuit delegated this Court the responsibility of defining the relevant industry.  *See Rothe III*, 262 F.3d at 1306 ("We decline to define the relevant industry, because we think that it is incumbent for the district court to review the evidence on which it relies and make findings as to (1) what the relevant industry is; and (2) whether there was sufficient evidence of discrimination . . . in that industry . . . .").

[60]*See* Pl's MSJ, Pg. 31 ("In federal defense contracting, there is no private or state or local defense industry.  In the procurement activities overseen by Defendants, the federal government is always the *only* direct contractor.  State, local and private entities are not direct defense contractors; all direct defense contracting is federal, and the federal government is the sole participant in the 'defense' market . . . .  Therefore the relevant market and sector for the 1207 program . . . is nationwide federal defense contracting and all sector industries that service it.  However, the government has no evidence of any discrimination by Defendants as that sole direct contractor.").  The Court finds that this sixth objection is a paraphrase of Rothe's first objection, which has been rejected by the Tenth Circuit.  *See, e.g., Adarand VII*, 228 F.3d at 1176.  In making its first and sixth objections, Rothe ignores the "passive participant" doctrine, which the Federal Circuit acknowledged in *Rothe III*.  262 F.3d at 1329.

to acknowledge the fact that the DoD is one of the largest buyers of goods and services in the world, and many of the goods and services it purchases are bought from state and local industries that suffer from racial discrimination.  Although the DoD undoubtedly purchases missiles, fighter jets, and aircraft carriers, it also purchases construction services, architectural and engineering services, professional services, and non-military goods from state and local contractors throughout the United States.  As will be discussed below, the DoD procured approximately $268 billion of goods and services in fiscal year 2005, with much of that money being distributed to state and local contractors.  The Court finds that the DoD is a "passive participant" in a system of racial exclusion practiced by elements of various state and local contracting sectors because the Government has compiled evidence of marketplace discrimination and linked its spending practices to that private or public discrimination.  *Concrete Works IV*, 321 F.3d at 976.

In *Adarand VII* (2000), the Tenth Circuit held that "Congress has a compelling interest in eradicating the economic roots of racial discrimination in highway transportation programs funded by federal monies."  228 F.3d at 1176.  In that case, the Tenth Circuit concluded that "the evidence cited by the government and its amici, particularly that contained in *The Compelling Interest* [*a.k.a.* the *Appendix*], more than satisfies the government's burden of production regarding the compelling interest for a race-conscious remedy."  *Id.*  Because it was cross-referenced in the *Appendix*, the Tenth Circuit also relied on the Urban Institute Report, which presented the Urban Institute's analysis of thirty-nine state and local disparity studies, in support of its compelling interest holding. *Id.* at 1172.

In *Concrete Works IV* (2003), the Tenth Circuit held that Denver had a compelling interest in passing an affirmative action ordinance to address racial discrimination in the Denver construction

-88-

industry. 321 F.3d at 993.  In order to establish that it had a strong basis in evidence for concluding that remedial action was necessary, Denver relied heavily on statistical information contained in disparity studies that it had commissioned prior to the passage of the ordinances. *Id.* at 974.   The Tenth Circuit held that these disparity studies, which "examined the Denver construction industry from the 1970s through 1997," revealed significant statistical disparities and satisfied Denver's burden of production under strict scrutiny.  Id. at 984.   Furthermore, the Tenth Circuit held that Plaintiffs' experts failed to raise a genuine issue of material fact as to the reliability of those disparity studies.  *Id.* at 984.

In *Sherbrooke Turf* (2003), addressing the constitutionality of the same federal affirmative action program evaluated in *Adarand VII*, the Eighth Circuit held that "Congress has a strong basis in the evidence to support its conclusion that race-based measures were necessary for the reasons stated by the Tenth Circuit in *Adarand [VII]*." 345 F.3d at 970.

In *Western States* (2005), the Ninth Circuit addressed the constitutionality of the same federal affirmative action program evaluated in *Adarand VII* and *Sherbrooke Turf*.   The Ninth Circuit held that Congress had a compelling interest in enacting the program, which was supported by a strong basis in the evidence.  407 F.3d at 993.  In support of this conclusion, the Ninth Circuit stated that Congress "explicitly relied upon" the *Appendix*, which "documented the discriminatory hurdles that minorities must overcome to secure federally funded contracts." *Id.* at 992.  Thus, in 2005, the Ninth Circuit relied almost exclusively on the *Appendix*, which was published in the Federal Register in 1996, in support of its compelling interest holding.

*Adarand VII*, *Concrete Works IV*, *Sherbrooke Turf*, and *Western States* demonstrate that while the federal government must carry a heavy burden in order to prevail on a strict scrutiny

challenge, that hurdle is not insurmountable.  In *Croson*, Justice O'Connor wished "to dispel the notion that strict scrutiny is strict in theory, but fatal in fact." 515 U.S. at 237.  The above-cited cases demonstrate that "[t]he unhappy persistence of both the practice and the lingering effects of racial discrimination against minority groups in this country is an unfortunate reality, and the government is not disqualified from acting in response to it."  *Id.*

 1. ***Concrete Works of Colorado, Inc. v. City and County of Denver***, 36 F.3d 1513 (10th Cir. 1994) ("*Concrete Works II*")

In 1994, the Tenth Circuit applied the strict scrutiny analysis set forth in *Croson* when it evaluated the constitutionality of the 1990 Ordinance promulgated by Denver, which enabled certified minority business enterprises ("MBEs") and women-owned business enterprises ("WBEs") to participate in public works projects to an extent approximating the level of their availability and capacity.  36 F.3d at 1515.   Because *Concrete Works II* and *Concrete Works IV* evaluated the constitutionality of an Ordinance promulgated by a municipality under the non-deferential version of strict scrutiny set forth in *Croson*, this Court believes that the Tenth Circuit's legal analysis also applies to strict scrutiny review of affirmative action programs enacted by Congress pursuant to Article I of the United States Constitution, such as the 1207 Program.

The Court finds that *Concrete Works II* establishes the following legal principles that are relevant to this Court's strict scrutiny analysis and were not fully addressed by the Federal Circuit in *Rothe III* and *Rothe V.  See Colby v. J.C. Penney Co.*, 811 F.2d 1119, 1123 (7th Cir. 1987) ("Bearing in mind the interest in maintaining a reasonable uniformity of federal law and in sparing the Supreme Court the burden of taking cases merely to resolve conflicts between circuits," district courts should "give most respectful consideration to the decisions of the other courts of appeals and

follow them whenever [they] can").

First, Rothe has standing to challenge the facial constitutionality of the 2006 Reauthorization because it is "able and ready to bid" on contracts let pursuant to the 1207 Program, and the requisite "injury in fact" under Article III arises from Rothe's inability to "complete [with minority contractors] on an equal footing" due to the 1207 Program's allegedly discriminatory policy. 36 F.3d at 1518 (citing *Northeastern Fla. Chapter of the Associated Gen. Contractors of America v. Jacksonville*, 508 U.S. 656, 666 (1993)). Second, the federal government has a compelling interest to prevent itself from acting as a passive participant in a system of racial exclusion by allowing public tax dollars to finance the evils of private prejudice.[61]  *Id.* at 1519.  Third, the Government is not limited to remedying only its own past or present discrimination in the defense contracting industry because it may design the 1207 Program to prevent public tax dollars from financing the evils of private prejudice.[62]  *Id* at 1529.  Fourth, anecdotal evidence of public and private race

----

[61]The Government can demonstrate that it is a "passive participant" in a system of racial exclusion practiced by elements of the relevant industry by compiling evidence of marketplace discrimination and then linking its spending practices to the private discrimination. *Concrete Works IV*, 321 F.3d at 976.

[62]The Court rejects Rothe's argument to the contrary.  *See* Pl's MSJ, Pg. 15 n.21.  The Court takes judicial notice of the fact that the federal government is the single largest consumer of goods and services in the world. 108th Congress–Small Business Record, Report to the House Small Business Committee, Pg. 9 (October 2004).  In 2003, the government set a new record in purchasing at $285 billion. *Id.* If contracts performed overseas are included, this figure rises to more than $300 billion–an increase of nearly 30 percent in government buying in one year, and an increase of nearly $100 billion since 2000. *Id.* The federal government now contracts more than 77 percent of its work with just 3 percent of businesses. *Id.* The top ten largest DoD contractors–the biggest buying agency – now receive 50 percent of all DoD contracts. *Id.* The DoD traditionally has been the largest source of government contracting.  In 2005, the DoD reported federal contracts and actions in the amount of $268 billion, which was 70.1 percent of the federal government's $378 billion in reported contracts and actions by federal executive department and agencies.  Federal Procurement Data System–Next Generation, Federal Contract Actions and Dollars by Executive Department and Agency, Actions Reported–Fiscal Year 2005 through Fourth Quarter,

discrimination contained in Congressional hearings, floor debate, and reports considered by Congress are appropriate supplementary evidence in this Court's strict scrutiny analysis.[63] *Id.* at 1521. Fifth, Rothe's conclusory objections to the Government's empirical evidence do not raise a genuine issue of material fact.[64] *Id.* at 1524, 1527. Sixth, Rothe's expert testimony attacking the Government's empirical evidence based on the reliability of underlying data, the methodology of the study, and/or the interpretation of the study's results can raise a genuine issue of material fact. *Id.* at 1525. Seventh, the Government may rely on disparity indices contained in empirical reports in order to meet its burden of production. *Id.* at 1526. Eighth, although *Croson* does not require that a governmental entity identify an exact linkage between its award of public contracts and private discrimination, such evidence would enhance the governmental entity's factual predicate for a race-

---

http://www.fpdsng.com/downloads/FPR_Reports/2005_fpr_section_I_total_federal_views.pdf (last visited August 2, 2007). In this case, if the Government has a strong basis in evidence for concluding that pervasive and systematic public and private discrimination in various contracting sectors exists throughout the United States, then it is difficult to argue that the DoD's infusion of $268 billion into these various contracting sectors does not make the federal government a passive participant in a system of racial exclusion by allowing public tax dollars to finance the evils of private and public sector prejudice.

[63]Of course, anecdotal evidence standing alone does not satisfy the Government's burden of establishing a strong basis in the evidence for believing that remedial race-based legislation was necessary. The Court overrules Rothe's hearsay and "political nature of Congress" objections to the anecdotal evidence that was before Congress. Congress is not a court, its deliberations are not subject to the Federal Rules of Evidence, and its factfinding is entitled to a presumption of regularity and deferential review. To sustain Rothe's hearsay objection would be to abdicate this Court's responsibility to strictly scrutinize all the evidence that was before Congress prior to the 2006 Reauthorization of the 1207 Program. The Court concludes that the "deference to Congressional factfinding" standard enunciated in *Rothe III* requires this Court to evaluate all evidence, both anecdotal and empirical, that was before Congress prior to the present reauthorization. The Court also finds that all evidence before Congress is admissible pursuant to Fed. R. Evid. 803(8) & 803(6).

[64]General criticism of disparity studies, as opposed to particular evidence undermining the reliability of the particular study, is of little persuasive value. *Concrete Works IV*, 321 F.3d at 979; *see also Adarand VII*, 228 F.3d at n.14.

conscious program. *Id.* at 1529. The Court rejects all of Rothe's arguments to the contrary.

2.    ***Concrete Works of Colorado, Inc. v. City and County of Denver*, 321 F.3d 950 (10th Cir. 2003) ("*Concrete Works IV*")**

*Concrete Works IV* establishes the following legal principles that are relevant to this Court's strict scrutiny analysis and were not fully addressed by the Federal Circuit in *Rothe III* and *Rothe V*. First, as discussed previously, Rothe's claims for a declaratory judgment on the facial constitutionality of the 1999 and 2002 Reauthorizations are moot. 321 F.3d at 954 n.1. Second, the Government can meet its burden of production without conclusively proving the existence of past or present racial discrimination. *Id.* at 958. Third, the Government may establish its own compelling interest by presenting evidence of its own direct participation in racial discrimination or its passive participation in private discrimination.[65] *Id.* at 958. Fourth, once the Government meets its burden of production, Rothe must introduce "credible, particularized" evidence to rebut the Government's initial showing of the existence of a compelling interest. *Id.* at 959. Fifth, Rothe may rebut the Government's statistical evidence by: (1) giving a race-neutral explanation for the statistical disparities; (2) showing that the statistics are flawed; (3) demonstrating that the disparities shown

_____

[65]The Tenth Circuit explained that the Government's burden is "to introduce evidence which raised an inference of discriminatory exclusion in the . . . industry and link[] [the Government's] spending to that discrimination." 321 F.3d at 971. The Government is not required to demonstrate that it is "guilty of prohibited discrimination" to meet its initial burden of production. *Id.* at 973. Furthermore, the disparity studies do not have to demonstrate discrimination by the Government itself. *Id.* at 974. To satisfy its burden, the Government must identify the discrimination, *public or private*, with some specificity, and have a strong basis in evidence to conclude that remedial action is necessary. *Id.* at 976 (emphasis in original). In *Concrete Works IV*, the Tenth Circuit found that Denver was a passive participant in discrimination because it contracted with firms that discriminated against minorities. *Id.* at 976-77; *see also Adarand VII*, 228 F.3d at 1176 ("The Constitution does not obligate Congress to stand idly by and continue to pour money into an industry so shaped by the effects of discrimination that the profits to be derived from congressional appropriations accrue exclusively to the beneficiaries, however personally innocent, of the effects of racial prejudice.").

are not significant or actionable; or (4) presenting contrasting statistical data. *Id.* Sixth, the Government may rely on disparity studies to support its compelling interest, and those studies may control for the effect that pre-existing affirmative action programs have on the statistical analysis.[66] *Id.* at 962-68.

Based on *Concrete Works IV*, this Court will not require the Government to conclusively prove that there is pervasive discrimination in the relevant market,[67] that each presumptively disadvantaged group suffered equally from discrimination,[68] or that private firms intentionally and purposefully discriminated against minorities.[69] Because the inference of discriminatory exclusion can arise from statistical disparities, this Court cannot require the Government "to introduce additional evidence to show discriminatory motive or intent on the part of private construction firms," and the Court cannot require the Government to identify a practice or policy whose purpose was to disadvantage minorities because this burden would eviscerate any reliance that the Government could place on statistical studies and anecdotal evidence.  321 F.3d at 972.  If the Government produces empirical evidence of discrimination in the relevant industry, it is immaterial for constitutional purposes whether the industry discrimination springs from widespread discriminatory attitudes shared by society or is the product of policies, practices, and attitudes unique

---

[66]Disparity studies may not be discounted because they fail to specifically identify those individuals or firms responsible for the discrimination.  *Id.* at 974.  The Tenth Circuit also held that data on minority firm utilization on government contracts not subject to affirmative action programs is a better indicator of discrimination in government contracting.  *Id.* at 985.

[67]321 F.3d at 970-71.

[68]*Id.* at 971.

[69]*Id.*

in the industry.  *Id.*  Regarding narrow tailoring, affirmative action plans do not have to be tailored

to place the burden of compliance only on those firms accountable for the discrimination.[70]  *Id.*

Evidence of discriminatory barriers to the formation of businesses by minorities is sufficient

to show a "strong link" between a Government's disbursement of public funds and the channeling

of those funds due to private discrimination.  *Id.* at 977.  Evidence of private discrimination that

results in barriers to business formation is relevant because it demonstrates that SDBs are precluded

at the outset from competing for public contracts, and evidence of barriers to fair competition is

relevant because it demonstrates that existing SDBs are precluded from competing.  *Id.*

When evaluating Denver's disparity studies, the Tenth Circuit rejected the arguments of

CWC's expert, George La Noue, whom Rothe has retained as an expert in this case.[71]  La Noue

argued that the Denver disparity studies do not control for firm size and experience, thus resulting

in overly inflated availability figures. Id. at 980.  The Tenth Circuit accepted Denver's argument that

experience and size are not race-neutral variables, and MBE firms are generally smaller and less

experienced because of marketplace and industry discrimination.  *Id.* at 981.  Furthermore, because

CWC did not conduct its own disparity study using marketplace data that controlled for size and

experience, this objection was deemed insufficient to meet CWC's burden of rebutting this empirical

evidence.  *Id.*

The Tenth Circuit also rejected La Noue's argument that Denver's disparity studies were

unreliable because they did not measure only those firms actually bidding on City construction

---

[70]Sharing of the burden by innocent parties is not impermissible so long as that burden is not "too intrusive" or "unacceptable."  *Id.* at 973.

[71]The Tenth Circuit stated that CWC's expert testimony "merely nip[ped] at the edges of Denver's evidence and [is] insufficient to undermine the reliability of the studies."  *Id.* at 991.

projects.  In rejecting La Noue's contention that availability should be equated with actual bidding, the Tenth Circuit held that the disparity studies needed to determine whether the firms are capable of undertaking prime or subcontracting work within the relevant industry in making availability assumptions.  *Id.* at 983-84.  The Tenth Circuit also rejected CWC's assertion that Denver's disparity studies had to use "flow data," which shows changes that occur in the industry over time, instead of "stock data," which provides information about an industry at a discrete point in time.  *Id.* at 984.

Finally, regarding anecdotal evidence, the Tenth Circuit approved of the district court's decision to allow hearsay testimony at the bench trial and apply a liberal standard of relevance.  *Id.* at 989.

### 3.    *Adarand Constructors, Inc. v. Slater*, 228 F.3d 1147 (10th Cir. 2000) ("*Adarand VII*"), *cert. denied as improvidently granted*, 534 U.S. 103 (2001)

In *Adarand VII*, the Tenth Circuit began its analysis by reaffirming the position that strict scrutiny is not "fatal in fact."  228 F.3d at 1157.  Congress may rely on nationwide evidence in establishing its strong basis in the evidence.  *Id.* at 1165.  Congress may rely on evidence of discriminatory barriers to the formation of SDBs due to private discrimination, barriers to fair competition for public construction contacts, and local disparity studies to establish a strong basis in the evidence.  *Id.* at 1168.  Congress is not required to make specific findings regarding discrimination against every single sub-category of individual within the broad racial and ethnic categories designated in the challenged statute and regulations.  *Id.* at 1176 n.18.  Regarding narrow tailoring, the availability of a waiver is of particular importance,[72] a rigid numerical quota is unlikely

---

[72]*Adarand VII*, 228 F.3d at 1177.

to be narrowly tailored,[73] and some burden on innocent third-parties is permissible.[74]

### 4. *Sherbrooke Turf, Inc. v. Minnesota Dep't of Transp.*, 345 F.3d 964 (8th Cir. 2003), *cert. denied* 541 U.S. 1041 (2004).

In *Sherbrooke Turf*, the Eighth Circuit held that strict scrutiny analysis is the same regardless of whether Congress enacted the law pursuant to Article I or Section 5 of the Fourteenth Amendment. 345 F.3d at 969 n.3. Absent binding authority to the contrary, this Court will assume, without deciding, that all Congressional race-based legislation is subject to the same strict scrutiny standard described in *Rothe III* and *Rothe V*. This Court is bound by law of the case holding that the 1207 Program was enacted pursuant to Congress' spending power under Article I. Again, this Court wants to emphasize that it is NOT relying on a "deferential version" of strict scrutiny based on Congress' Section 5 powers.

The Eight Circuit also held that a sunset provision and periodic congressional reauthorization are relevant to the narrow tailoring analysis.[75] *Id.* at 972.

### 5. *Western States Paving Co., Inc. v. Washington State Dep't of Transp.*, 407 F.3d 983 (9th Cir. 2005), *cert. denied* 126 S. Ct. 1332 (2006)

In *Western States*, the Ninth Circuit reiterated that "the federal government has a compelling interest in ensuring that its funding is not distributed in a manner that perpetuates the effects of either public or private discrimination within the [relevant] industry." 407 F.3d at 991.

### 6. Inter-Circuit Conflict regarding strict scrutiny analysis

The details of the strict scrutiny standard enunciated by the Federal Circuit in *Rothe III* and

---

[73]*Id.*

[74]*Id.*

[75]*See also Western States*, 407 F.3d at 994.

*Rothe V* conflict to some degree with the Tenth Circuit's analysis in *Concrete Works IV* and *Adarand VII*, the Eighth Circuit's analysis in *Sherbrooke Turf*, and the Ninth Circuit's analysis in *Western States*.  In particular, the opinions appear to diverge on the following topics: (1) the acceptable use of post-enactment evidence;[76] (2) the standard for evaluating whether evidence was "before Congress;"[77] (3) the standard for determining whether evidence is "stale;"[78] (4) the appropriate role of institutional memory in strict scrutiny analysis;[79] and (5) the significance of the *Salerno* standard to review of facial constitutionality under strict scrutiny.[80]  The Court believes that these conflicts are reconcilable to a large extent because the Federal Circuit did not enunciate bright-line, definitive standards for certain issues.  For example, this Court was delegated the responsibility for determining whether evidence was "before Congress" and whether evidence was "stale."  Although the Eighth and Ninth Circuits repeated the *Salerno* standard in their strict scrutiny analysis, it does not appear that the recitation of this standard significantly affected their legal analysis.  Although the Tenth

[76]*Concrete Works II*, 35 F.3d at 1521; *Adarand VII*, 228 F.3d at 1166 (regarding post-enactment evidence).

[77]*Adarand VII*, 228 F.3d at 1172; *Sherbrooke Turf*, 345 F.3d at 970; *Western States*, 407 F.3d at 992; *Northern Contracting, Inc. v. State of Ill.*, No. 00 C 4515, 2004 WL 422704, at *27 (N.D. Ill. March 3, 2004) (circuit courts assumed that the *Appendix–The Compelling Interest for Affirmative Action in Federal Procurement: A Preliminary Survey*, 61 Fed. Reg. 26042-01, 26050 *et seq.* (1996), was before Congress, and they considered the *Urban Institute Report* because it was cross-referenced in the *Appendix*).

[78]*Adarand VII*, 228 F.3d at 1172; *Sherbrooke Turf*, 345 F.3d at 970; *Western States*, 407 F.3d at 992; *Northern Contracting,* 2004 WL 422704, at *27 (no staleness analysis applied to data in the *Appendix* or *Urban Institute Report*).

[79]*Adarand VII*, 228 F.3d at 1178; *Northern Contracting*, 2004 WL 422704, at *36 (regarding narrow tailoring and race-neutral alternatives)

[80]*Sherbrooke Turf*, 345 F.3d at 971; *Northern Contracting*, 2004 WL 422704, at *35; *Western States*, 407 F.3d at 991 (regarding *Salerno*).

Circuit and a district court in the Seventh Circuit arguably relied on an institutional memory argument in their narrow tailoring analysis regarding Congressional consideration of race-neutral alternatives, this analysis appears limited to this single factor.  Furthermore, in *Rothe V*, the Federal Circuit held that the "institutional memory" argument was "insufficient to reject Rothe's staleness argument," not Rothe's narrow tailoring argument, and consideration of race-neutral alternatives will necessarily entail a review of Congressional activity significantly pre-dating the passage of the 1207 Program.  *Rothe V*, 413 F.3d at 1338.  Although the Federal Circuit's position on post-enactment evidence appears to conflict with the Tenth Circuit's position, that consideration is not particularly relevant in this case because the Court is only considering the 2006 Reauthorization of the 1207 Program.

### 7.    Recent Supreme Court Cases: *Carhart & Parents Involved*

The Court finds that two recent Supreme Court opinions simply reiterate established principles governing strict scrutiny review.  Because the facts of *Carhart* and *Parents Involved* differ significantly from the facts of this case, these two opinions provide limited assistance in this Court's fact-intensive, strict scrutiny review of the 2006 Reauthorization of the 1207 Program.

### a.    *Gonzales v. Carhart*, 127 S. Ct. 1610 (April 18, 2007)

On April 18, 2007, the Supreme Court decided *Gonzales v. Carhart*, 127 S. Ct. 1610.  In *Carhart*, the Supreme Court held that the Partial-Birth Abortion Ban Act of 2003 ("the Act"), a federal statute regulating abortion procedures, was facially constitutional.  *Id.* at 1619.  The plaintiffs–doctors who performed second-trimester abortions–challenged the constitutionality of the act and sought a permanent injunction against its enforcement.  *Id.*  The Act banned a particular form of second trimester abortion referred to as "intact D & E."  *Id.* at 1621.  In upholding the facial

constitutionality of the statute, the Supreme Court briefly addressed the issue of deference to Congressional fact finding.

When it passed the Act, Congress made certain factual findings, including that "[a] moral, medical, and ethical consensus exists that the practice of performing a partial-birth abortion . . . is a gruesome and inhumane procedure that is never medically necessary and should be prohibited." *Id.* at 1623.  It was necessary to address these Congressional fact findings in *Carhart* because under Supreme court precedent, the "Act has the effect of imposing an unconstitutional burden on the abortion right" when the "use of the barred procedure is necessary, in appropriate medical judgment, for the preservation of the health of the mother."  *Id.* at 1635.  The Supreme Court noted that "whether the Act creates significant health risks for women has been a contested factual question. The evidence presented in the trial courts and before Congress demonstrates both sides have medical support for their position."  *Id.* at 1635.  Based on testimony by doctors at trial and before Congress, the Supreme Court found that "[t]here is documented medical disagreement whether the Act's prohibition would ever impose significant health risks on women."  *Id.* at 1636.

Because "state and federal legislatures [have] wide discretion to pass legislation in areas where there is medical and scientific uncertainty," the Supreme Court held that this medical uncertainty "does not foreclose the exercise of legislative power in the abortion context any more than it does in other contexts."  *Id.* at 1636-37.  In reaching this conclusion, the Supreme Court addressed the federal government's argument that it should "uphold the Act on the basis of the congressional findings alone."  *Id.* at 1637.   In rejecting this argument, the Supreme Court stated, in pertinent part:

The Court retains an independent constitutional duty to review factual findings where

constitutional rights are at stake . . . . As respondents have noted, and the District Courts recognized, some recitations in the Act are factually incorrect. Whether or not accurate at the time, some of the important findings have been superseded. Two examples suffice. Congress determined no medical schools provide instruction on the prohibited procedure. The testimony in the District Courts, however, demonstrated intact D & E is taught at medical schools. Congress also found there existed a medical consensus that the prohibited procedure is never medically necessary. The evidence presented in the District Courts contradicts that conclusion. Uncritical deference to Congress' factual findings in these cases is inappropriate.

127 S. Ct. at 1637-38 (internal citations omitted). The Supreme Court concluded that "[t]he Act is not invalid on its face where there is uncertainty over whether the barred procedure is ever necessary to preserve a woman's health, given the availability of other abortion procedures that are considered to be safe alternatives." *Id.* at 1638.

Based on *Carhart*, Rothe argues that "[e]ven in cases applying lesser standards than strict scrutiny [*i.e.* abortion cases], uncritical deference to Congress' factual findings is inappropriate." Pl's Advisory to the Court, Docket No. 334, Pg. 2. The Court agrees. This legal principle is already law of the case. *See Rothe III*, 262 F.3d at 1321("Congress is entitled to no deference in determining whether Congress had a compelling interest in enacting the racial classification and that the classification was narrowly tailored in fulfillment of that interest"). This Court has been instructed to "undertake the same type of detailed, skeptical, non-deferential analysis undertaken by the *Croson* Court;" therefore, the Court's analysis of the facial constitutionality of the 1207 Program will not afford "uncritical deference" to Congressional fact finding. However, the Court finds that the Government more than satisfied its burden of production in this case. This Court will not afford uncritical deference to Rothe's conclusory objections to the six disparity studies that were before Congress prior to the 2006 Reauthorization. Conclusory objections to disparity studies, which are unsupported by "concrete, particularized" evidence, fail to raise a genuine issue of material fact

sufficient to survive summary judgment.

      **b.**    ***Parents Involved in Community Schools v. Seattle Sch. Dist. No. 1*, 127 S. Ct. 2738 (June 28, 2007)**

On June 28, 2007, the Supreme Court decided *Parents Involved in Community Schools v. Seattle Sch. Dist. No. 1*, 127 S. Ct. 2738. In *Parents Involved*, the Supreme Court struck down two student assignment plans that relied on racial classifications to allocate slots in oversubscribed primary and secondary public schools. For purposes of this case, *Parents Involved* reinforces the principle that "racial balancing" is not a compelling interest. *Id.* at 2757 (citing *Croson*, at 488 U.S. at 498). Furthermore, narrow tailoring requires "serious, good faith consideration of workable race-neutral alternatives." *Id.* at 2760 (citing *Grutter*, 539 U.S. at 339). Although the Supreme Court repeated the strict scrutiny standard[81] and warned of the dangers inherent in race-based legislation,[82] the Court does not believe that the *Parents Involved* decision fundamentally changes the strict scrutiny analysis applicable to this case.

**E.**    **Congress had a compelling interest in reauthorizing the 1207 Program in 2006, which was supported by a strong basis in the evidence.**

    **1.**    **Six state and local disparity studies were before Congress prior to the 2006 Reauthorization of the 1207 Program.**

In *Rothe V*, the Federal Circuit remanded this case for further development of the evidentiary record, noting specifically that such evidence could be found "in Congressional Committee reports and hearing records." 413 F.3d at 1337. The 2006 Reauthorization of the 1207 Program occurred on January 6, 2006. On November 10, 2005, Senator Ted Kennedy of Massachusetts spoke before

---

[81] 127 S. Ct. at 2751-52.

[82] 127 S. Ct. at 2767.

the Senate concerning the 2006 Reauthorization of the 1207 Program.  151 Cong. Rec. S12668-01,

2005 WL 3018127 (Nov. 10, 2005).  Kennedy supported the extension of the 1207 Program through

2009 to ensure that the DoD's "[f]ederal contracting process in no way supports or subsidizes the

discrimination that has long been a problem in the contracting business."  *Id.* at *S12673.  After

observing that federal government contracting "has long been dominated by 'old-boy' networks that

make it very difficult for African Americans, Latinos, Asians, and Native Americans to participate

fairly," Kennedy stated that "[y]ears of Congressional hearings have shown that minorities

historically have been excluded from both public and private construction contracts in general, and

from Federal defense contracts in particular."  *Id.*  Kennedy believed that the 1207 Program "has

helped level the playing field for minority contractors," but he insisted that "there is still more to do"

because "additional information we have received since the program was last reauthorized makes

[that] clear."  *Id.*

According to Kennedy, the DoD's decision to award a growing number of defense contracts

noncompetitively has had the unfortunate effect of excluding minority-owned businesses from a

significant number of contracting opportunities. *Id.* Although no-bid contracts also hurt white-owned

businesses, Kennedy claimed that they disadvantaged minority-owned firms in particular.  *Id.*

Kennedy then stated the following:

These problems affect a wide variety of areas in which the Department offers
contracts, and the problems are detailed in many recent disparity studies, including:
City of Dallas Availability and Disparity Study, Mason Tillman Associates, Ltd.
(2002); City of Cincinnati Disparity Study, Griffin & Strong, P.C. (2002); Ohio
Multi-Jurisdictional Disparity Studies, Mason Tillman Associates, Ltd. (2003);
Procurement Disparity Study of the Commonwealth of Virginia, MGT of America,
Inc. (2004); Alameda County Availability Study, Mason Tillman Associates (2004);
City of New York Disparity Study, Mason Tillman Associates, Ltd. (2005).

We are also mindful that the data contained in the Department of Commerce benchmark study supports the need for efforts to improve contracting opportunities for minority-owned businesses.

The 1207 Program helps to correct these problems of discrimination without imposing an undue burden on White-owned businesses. Small businesses owned by White contractors are eligible to receive the benefits of the program if they are socially or economically disadvantaged.

*Id.*

On December 13, 2005, Representative Cynthia McKinney of Georgia spoke before the House of Representatives concerning the 2006 Reauthorization of the 1207 Program. 151 Cong. Rec. E2514-02, 2005 WL 3407708 (Dec. 13, 2005). McKinney's speech was almost identical in substance to Kennedy's speech, and she cited the same six disparity studies that Kennedy cited: City of Dallas Availability and Disparity Study, Mason Tillman Associates, Ltd. (2002); City of Cincinnati Disparity Study, Griffin & Strong, P.C. (2002); Ohio Multi-Jurisdictional Disparity Studies, Mason Tillman Associates, Ltd. (2003); Procurement Disparity Study of the Commonwealth of Virginia, MGT of America, Inc. (2004); Alameda County Availability Study, Mason Tillman Associates (2004); City of New York Disparity Study, Mason Tillman Associates, Ltd. (2005). *Id.*

On December 20, 2005, Kennedy again spoke before the Senate in support of the 2006 Reauthorization of the 1207 Program. 151 Cong. Rec. S14170-01, 2005 WL 3478026 (Dec. 20, 2005). Kennedy stated the following regarding the Urban Institute Report:

In 1996, the Urban Institute released a report documenting minority firms received only 57 cents in government contracts for every dollar they should have received based upon their eligibility.

For specific racial groups and women, the disparities were even greater. African-American owned firms received only 49 cents on the dollar; Latino-owned firms, 44 cents; Asian-American owned firms, 39 cents; Native American-owned firms, 18 cents.

These statistics are particularly troubling, because they exist despite affirmative action programs in many jurisdictions. Without such programs, the problem would be worse. The Urban Institute report found that disparities for minority and women-owned firms were greatest in the areas where no affirmative action program was in place. For African Americans, the percentage dropped from 49 percent to 22 percent, for Latinos from 44 percent to 26 percent, for Asians from 39 percent to 13 percent, and for Native Americans from 18 percent to 4 percent. These figures show that affirmative action is not only effective, but still urgently needed.

*Id.* at *S14171. After reciting this finding from the Urban Institute Report, Kennedy discussed the findings of four disparity studies to which he referred during his November 10, 2005 speech before the Senate. *Id.* Kennedy summarized some of the findings of those four disparity studies as follows:

A 2002 Dallas study found that minority business enterprises were significantly disadvantaged in obtaining contract work. Evidence in that report also suggests that discrimination takes place in subtle ways, such as by making unrealistic demands on minority contractors, or refusing to pay them on time. A Hispanic-American contractor noted that on several occasions, he and other minority contractors were not informed of bid opportunities with government agencies, even though they performed services in the field. A Native American contractor in goods and other services noted that some customers visit his company and walk out, once they see the owner is not a white man. Many minority firms reported being consistently underestimated by white prime contractors who assume they are not capable of doing the work because they are minority-owned. Minority firms expressed concern that they will never become large enough to compete for larger contracts if they are denied a chance to prove themselves on smaller contracts.

In Cincinnati, a 2002 study found that "bid shopping" by prime contractors continues to harm minority firms. The firms also reported numerous obstacles in seeking work in the city, such as denial of opportunities to bid, lack of response to minority presentations for bidding, limited financing, problems obtaining bonds, slow pay, predatory business practices, and stereotypical attitudes that minorities are incapable of performing good work.

A 2003 study of contracting in Ohio found racial prejudice in both the public and private sectors. A State inspector was alleged to have expressed hatred for African Americans in ugly terms. An African-American professional service contractor said that his prime contractor deliberately sabotaged his work by breaking his equipment. A state inspector conceded to an African-American contractor that he was requiring

him to do more expensive work than he would have required of a large white-owned contractor doing an identical job nearby. Banks and unions sometimes contribute to the obstacles by discriminating against minorities in awarding financing.

A 2004 study in Alameda, CA, also found significant underutilization of minority-owned firms.

*Id.* Kennedy stated that "[o]ne of the purposes of this program is to ensure that [federal] government contracting does not subsidize–even indirectly–private discrimination." *Id.* at *S14172. Furthermore, "[b]ecause discrimination affects contracting by private firms as well as State and local governments, and all contractors bid in for these contracts as well as for Federal defense contracts, it is important to ensure a level playing field in Federal contracting." *Id.* Kennedy concluded his remarks by stating that "the data in the Department of Commerce benchmark study supports the need to improve contracting opportunities for minority-owned businesses." *Id.*

In *Rothe III*, this Court was instructed to "set forth detailed findings as to the scope and content of the reports before Congress when it enacted the challenged legislation, and set forth whatever inferences may be drawn as to whether such reports could constitute a 'strong basis in evidence' for remedial action." 262 F.3d at 1323. In *Rothe V*, the Federal Circuit stated that "to be relevant in the strict scrutiny analysis, the evidence must be proven to have been before Congress prior to enactment of the racial classification." 413 F.3d at 1338. The Federal Circuit explained that "[w]ithout a finding that these studies were put before Congress prior to the date of the present reauthorization in relation to section 1207 and to ground its enactment, it was error for the district court to rely on the studies." *Id.*

Based on content of the floor debate discussed above, the Court finds that the City of Dallas Availability and Disparity Study, Mason Tillman Associates, Ltd. (2002); the City of Cincinnati

Disparity Study, Griffin & Strong, P.C. (2002); the Ohio Multi-Jurisdictional Disparity Studies, Mason Tillman Associates, Ltd. (2003); the Procurement Disparity Study of the Commonwealth of Virginia, MGT of America, Inc. (2004); the Alameda County Availability Study, Mason Tillman Associates (2004); and the City of New York Disparity Study, Mason Tillman Associates, Ltd. (2005) were "put before Congress prior to the date of the present reauthorization in relation to section 1207 and to ground its enactment."[83]   Congress can take remedial action to combat nationwide discrimination. *See Adarand VII*, 228 F.3d at 1165 ("The geographic scope of Congress' reach in this regard is 'society-wide' and therefore nationwide").   These six state and local disparity studies[84] analyze evidence of discrimination from a diverse cross-section of jurisdictions across the United States, and they constitute prima facie evidence of a nation-wide pattern or practice of discrimination in public and private contracting.[85]   "Statistical evidence is particularly important to

---

[83]Although the full text of these six disparity studies was not printed in the Congressional Record, the Court finds that the repeated reference to these studies in Congressional hearings and floor debates indicates that these studies were before Congress. "[U]nder the Constitution, Congress has broad discretion in determining what must be published in the official record." *American Federation of Government Employees v. United States*, 330 F.3d 513, 522 (D.C. Cir. 2003). The Court also notes that full text of these six disparity studies is over 2,000 pages.

[84]The Court notes that Rothe's own expert, George La Noue, testified before the House Committee on the Judiciary, Subcommittee on the Constitution, on October 19, 1995. AA Report, Pg. 89. During that testimony, La Noue stated that "[a] federal disparity study would face formidable challenges in data gathering and analysis." In light of this statement, the Court finds that the Government's reliance on state and local disparity studies to support its compelling interest finding is appropriate.

[85]Rothe cites to the United States Commission on Civil Rights Report on Disparity Studies (May 2006) ("USCCR Report"), which found that the data contained in the Urban Institute Report is now outdated and inappropriate to serve as a basis for federal action. Although this report might raise a genuine issue of material fact as to whether the Urban Institute Report, standing alone, would constitute a strong basis in the evidence for concluding that the 2006 Reauthorization is necessary, the report does not attack the data, methodology, or conclusions of the six state and local disparity studies discussed in this Order. Any generalized criticism of disparity studies contained in the

justify race-based legislation." *Rothe III*, 262 F.3d at 1323.  This Court accepts the reasoning of the *Appendix*, which stated that "[f]or the most part . . . the federal government does business in the same contracting markets as state and local governments. Therefore, the evidence in state and local studies of the impact of discriminatory barriers to minority opportunity in contracting markets throughout the country is relevant to the question whether the federal government has a compelling interest to take remedial action in its own procurement activities."  61 Feg. Reg. 26042-01, *26061 (1996) (justifying Congressional reliance on the Urban Institute Report, which analyzed 39 state and local disparity studies).

        Importantly, the Court finds that the data used in these six disparity studies is not "stale" for purposes of strict scrutiny review.  The New York study covered City contracts awarded between July 1, 1997 and June 30, 2002.  The Alameda County study covered County contracts awarded between July 1, 2000 to June 30, 2003.   The Coyahoga County, Ohio study covered County contracts awarded between January 1, 1998 to December 31, 2000. The Dallas study covered City contracts awarded between October 1, 1997 and September 30, 2000.  The Cincinnati study covered City contracts awarded between FY 1995 through FY 2001. The Virginia study covered state awarded over a five-year period from July 1, 1997 through June 30, 2002.  Rothe argues that all of this data is stale.  The Court disagrees because this data was the most current data available at the time that these studies were performed.  If strict scrutiny is not "fatal in fact," then a plaintiff lodging a strict scrutiny challenge cannot demand that disparity studies rely on data that has not been

---

USCCR Report is insufficient to raise a genuine issue of material fact as the reliability of these six disparity studies. Furthermore, the Court notes that other federal courts around the country have relied upon state and local disparity studies when engaging in strict scrutiny review.  Indeed, the USCCR Report bolsters the credibility of the six disparity studies because those studies relied on the most recent data available to the jurisdictions that commissioned the studies.

compiled yet. Although a governmental entity resisting a strict scrutiny challenge cannot rely on old statistical data when newer statistical data is available, it should be able to rely on the most recently available data so long as that data is reasonably up-to-date.[86]

In support of its conclusion that the data relied upon in the six disparity studies is not stale, the Court takes judicial notice of a document entitled "Kerry Urges Quick Release of Minority Business Data," dated June 30, 2005.[87] In a letter to the U.S. Census Bureau, Senator Kerry asked Director Charles Kincannon for assistance in expediting the release of minority business Census data from a 2002 survey. As of 2005, the most recently available data was obtained by the Census Bureau in 1997. Data collected by the U.S. Census Bureau is used by the SBA and other federal agencies to analyze and monitor the growth of minority firms. The Court also takes judicial notice of a document entitled "Kerry Opening Statement on Minority Entrepreneurship Hearing," dated May 22, 2007.[88] In his opening statement, Kerry stated that as of 2007, the most recent minority business census data was from 2002[89]. The Court believes that its staleness analysis must realistically focus

_____

[86]The Court declines to adopt a bright-line rule for determining staleness. However, the Court rejects the bright-line rule proposed by the USCCR Briefing Report that all statistical evidence over 5 years old should be considered stale. The Court notes that in 2005, the Ninth Circuit relied on the *Appendix*, which was compiled in 1996, when it affirmed the constitutionality of the DoT's MBE program. The Eighth Circuit relied on the *Appendix* to affirm the constitutionality of the same program in 2003. The six disparity studies relied on data from contracts awarded between 1995 and 2003. Considering the fact that the 1207 Program was reauthorized on January 6, 2006, the Court finds that this data was not stale at the time of the 2006 Reauthorization.

[87]Available at http://sbc.senate.gov/record.cfm?id=239989 (last visited Aug. 2, 2007).

[88]Available at http://sbc.senate.gov/record.cfm?id=274847 (last visited Aug. 2, 2007).

[89]If the Court adopted the 5 year bright-line rule advocated in the USCCR Briefing Report, then all census data regarding minority businesses would be stale as soon as it was released. This would be an absurd result, and it would fundamentally undermine Justice O'Connor's reassurance in *Adarand III* that strict scrutiny is not "fatal in fact."

on the availability of current data.   According to Senator Kerry, the most recent minority business census data available today is five years old.  Considering the fact that the most recent data from the six disparity studies discussed below was only three years old at the time of the 2006 Reauthorization, the Court is confident in its conclusion that this data is reasonably up-to-date and not stale for purposes of strict scrutiny analysis.

> **2.     City of New York Disparity Study, Mason Tillman Associates, Ltd. (January 2005)**

 In January 2005, Mason Tillman Associates, Ltd. submitted a 293-page disparity study to the City of New York ("New York Study").  US05133 - US05426.  The study period covered City of New York contracts awarded between July 1, 1997 to June 30, 2002.  US05195.  Chapter 1 of the study, entitled "Legal Analysis," consists of an extensive overview of case law applying the strict scrutiny standard to federal, state, and local affirmative action programs.  *See* US05149 - US05183. A review of Chapter 1 indicates that Mason Tillman attempted to conduct the New York Study in accordance with *Croson*'s strict scrutiny requirements.  The industries analyzed were construction, architecture and engineering, professional services,[90] standard services,[91] and goods.[92]  US05134. Both Rothe's and ICT's businesses would fall within the category of professional services.  The New York Study included Asian Americans in its statistical analysis.

---

[90]Professional services included any work that required specialized education or training. Accountants, doctors, computer programmers, managers, consultants, and counselors were specialists classified under professional services.  US05195.

[91]Standard services included services which can be performed without a professional license or specialized education.  US05196.

[92]Goods included procurement of tangible products such as computer equipment, construction supplies, and office supplies.  US05196.

### a.      Availability Analysis

In Chapter 6, the New York Study employed statistical analysis to determine the availability of minority and non-minority business enterprises who are willing and able to perform local government contracts.  US05244 (citing *Croson*, 488 U.S. at 509).  The New York Study defined "willing" as a firm's interest in doing business with the local government, and it defined "able" as the firm's ability or capacity to provide specific goods or services.  *Id.*  Separate availability lists were compiled for prime contractors and subcontractors by industry.  *Id.*  The determination of availability was made from within the City's jurisdictional boundaries.  *Id.*  The compiled list of available prime contractors includes minority, Caucasian Female, and Caucasian male-owned businesses in the areas of construction, architecture and engineering, professional services, standard services, and goods. *Id.*  The list of available subcontractors was limited to the three industries where subcontractor utilization was analyzed: construction, architecture and engineering, and professional services.  *Id.*

Companies identified from City and other governmental agency sources were categorized as willing to perform on public contracts. US05248.  These businesses had either bid on City projects, sought government contracts, secured government certification, or responded to the outreach campaign conducted in conjunction with the New York Study. *Id.*

Four approaches were employed in the New York Study to compile the list of "able" firms that had the ability or capacity to provide specific goods or services. US05255.  Most importantly, the size of the City's awarded prime contracts were analyzed to determine the capacity needed to perform an average awarded contract for the City.  *Id.*  The City's prime contracts were analyzed to determine the capacity required to perform the contracts and the capacity demonstrated by prime

contractors in regard to race and gender groups. US05256. Based on the contract size distribution, the Study concluded that limited capacity is needed to perform the overwhelming majority of the City's contracts, meaning that most minority firms had the capacity to perform these contracts. *Id.*

The City's prime construction contracts valued under $25,000 were 46.27 percent; those under $50,000 were 57.09 percent; those under $100,000 were 62.21 percent; those under $500,000 were 77.45 percent; and those under $1,000,000 were 86.28 percent. Only 13.73 percent of the construction contracts were valued at $1,000,000 and over. *Id.*

The City's prime architecture and engineering contracts valued under $25,000 were 23.56 percent; those under $50,000 were 31.9 percent; those under $100,000 were 36.07 percent; those under $500,000 were 54.72 percent; and those under $1,000,000 were 69.81 percent. 30.19 percent of the architecture and engineering contracts were valued at $1,000,000 and over. *Id.*

The City's prime professional services contracts valued under $25,000 were 80.16 percent; those under $50,000 were 86.9 percent; those under $100,000 were 90.75 percent; and those under $500,000 were 95.35 percent. Only 4.65 percent of the professional services contracts were valued at $500,000 and over. US05256 - US05257.

The City's prime standard services valued under $25,000 were 91.81 percent; those under $50,000 were 94.29 percent; those under $100,000 were 95.87 percent; and those under $500,000 were 98.45 percent. Only 1.55 percent of the standard services contracts were valued at $500,000 and over. US05257.

The City's prime goods contracts valued under $25,000 were 95.08 percent; those under $50,000 were 96.74 percent; those under $100,000 were 97.90 percent; and those under $500,000 were 99.21 percent. Only 0.79 percent of the goods contracts were valued at $500,000 and over.

US05257.

Based on these statistics, the New York Study found that the vast majority of City prime contracts were small, and minority firms were both willing and able to perform those contracts. The P-value of <0.001 in the Study's analysis indicated a statistically significant difference in the size of all categories of prime contracts across race/gender groups. US052566 - US05257. The Study found that the capacity needed to perform on most contracts is limited. US05264. Furthermore, the awards the City had made to minority firms demonstrated that the capacity of willing firms is considerably greater than what is needed to bid on large contracts in each of the industries studied. *Id.*

b.      **Introduction: Disparity Analysis**

In Chapter 7, the New York Study performed its "Prime Contractor Disparity Analysis." US05281. The Study posited that the proportion of contract dollars awarded to minority firms should be approximate to the proportion of willing and able firms in the relevant market area.[93] *Id.* According to the Study, the first step in conducting a statistical test of disparity is to calculate the contract value that each race/gender group is expected to receive, based on each group's respective availability in the market area. *Id.* This value shall be referred to as the expected contract amount. *Id.* The next step is to compute the difference between the expected contract amount of a given race/gender group and the actual contract amount received by that group. *Id.* A disparity ratio less

---

[93] *See Associated General Contractors of Ohio, Inc. v. Drabik*, 214 F.3d 730, 736 (6th Cir. 2000) (holding that state of Ohio failed to satisfy the strict scrutiny standard when it relied on statistical evidence that did not account for which firms were qualified, willing and able to perform the contracts).

than 0.80 indicates a relevant degree of disparity.[94] *Id.* This disparity may be detectable with a parametric analysis when the number of contracts is sufficiently large and the variation of the contract amount is not too large. *Id.*

In order to assess whether the difference is attributable to chance, a P-value is calculated. US05282. The P-value takes into account the number of contracts, the contract dollars, and variation in contract dollars. *Id.* If the difference between the actual and expected number of contracts and total contract dollars has a P-value of less than 0.05, the difference is statistically significant.[95] *Id.*

Prime contractor disparity analyses were performed on construction, architecture and engineering, professional services, standard services, and goods contracts awarded by the City between July 1, 1997 and June 30, 2002. US05282. The majority of the City's contracts were small, with more than 90 percent valued under $25,000. US05283. The fact that the majority of the City's contracts were small indicated that the capacity needed to perform most of the contracts awarded during the study period was minimal. *Id.* A threshold of $1,000,000 was set for the prime contract disparity analysis to ensure that willing firms had the capacity to perform contracts included in the analysis. *Id.*

### c.    Disparity Analysis: Construction Prime Contracts

Black Americans represent 16.72 percent of the available construction firms and received 1.7

---

[94]*See Contractors Ass'n of Eastern Pennsylvania v. City of Philadelphia*, 6 F.3d 990, 1005 (3rd Cir. 1993) (Third Circuit joining the First, Ninth, and Eleventh Circuits in relying on disparity indices to determine whether a municipality satisfies *Croson*'s evidentiary burden); *see Contractors Association of South Florida, Inc. v. Metropolitan Dade County*, 122 F.3d 895, 914 (11th Cir. 1997) (same) ("In general, and as the district court recognized, disparity indices of 80% or greater, which are close to full participation, are not considered indications of discrimination.").

[95]This P-Value and Disparity Ratio methodology is applicable to all four Mason Tillman studies discussed at length in this Order.

percent of the construction prime contract dollars under $1,000,000. This underutilization is statistically significant, with a disparity ratio of 0.10 and a P-Value of <.05.  Asian Americans represent 20.37 percent of the available construction firms and received 8.7 percent of the construction prime contract dollars under $1,000,000. This underutilization is statistically significant, with a disparity ratio of 0.43 and a P-Value of <.05.  Hispanic Americans represent 9.19 percent of the available construction firms and received 7.24 percent of the construction prime contract dollars under $1,000,000. This underutilization is statistically significant, with a disparity ratio of 0.79 and a P-Value of <.05.   Native Americans represent 0.3 percent of the available construction firms and received none of the construction prime contract dollars under $1,000,000. The records were not sufficient to determine statistical significance. Minority Business Enterprises represent 46.58 percent of the available construction firms and received 17.64 percent of the construction prime contract dollars under $1,000,000. This underutilization is statistically significant, with a disparity ratio of 0.38 and a P-Value of <.05.  US05285.

Caucasian Male Business Enterprises represent 43.12 percent of the available construction firms and received 71.47 percent of the construction prime contract dollars under $1,000,000. This <u>overutilization</u> is statistically significant, with a disparity ratio of 1.66 and a P-Value of <.05.  *Id.*

### d.    Disparity Analysis: Architecture and Engineering Prime Contracts

Black Americans represent 11.29 percent of the available architecture and engineering firms and received 0.18 percent of the architecture and engineering prime contract dollars under $1,000,000. This underutilization is statistically significant, with a disparity ratio of 0.02 and a P-Value of <.05.   Asian Americans represent 17.59 percent of the available architecture and engineering firms and received 16.55 percent of the architecture and engineering prime contract

dollars under $1,000,000. This underutilization is not statistically significant. Hispanic Americans represent 9.19 percent of the available architecture and engineering firms and received 2.24 percent of the architecture and engineering prime contract dollars under $1,000,000. This underutilization is statistically significant, with a disparity ratio of 0.24 and a P-Value of <.05. Native Americans represent 0.13 percent of the available architecture and engineering firms and received none of the architecture and engineering prime contract dollars under $1,000,000. The records were not sufficient to determine statistical significance.  Minority Business Enterprises represent 38.19 percent of the available architecture and engineering firms and received 18.97 percent of the architecture and engineering prime contract dollars under $1,000,000. This underutilization is statistically significant, with a disparity ratio of 0.50 and a P-Value of <.05. US05288.

Caucasian Male Business Enterprises represent 40.29 percent of the available architecture and engineering firms and received 77.85 percent of the architecture and engineering prime contract dollars under $1,000,000. This underutilization is statistically significant, with a disparity ratio of 1.93 and a P-Value of <.05. *Id.*

### e.    Disparity Analysis: Professional Services Prime Contracts

Black Americans represent 13.21 percent of the available professional services firms and received 5.35 percent of the professional services prime contract dollars under $1,000,000. This underutilization is statistically significant, with a disparity ratio of 0.40 and a P-Value of <.05.  Asian Americans represent 7.25 percent of the available professional services firms and received 6.23 percent of the professional services prime contract dollars under $1,000,000. This underutilization is not statistically significant. Hispanic Americans represent 4.95 percent of the available professional services firms and received 1.24 percent of the professional services prime contract

dollars under $1,000,000. This underutilization is statistically significant, with a disparity ratio of 0.25 and a P-Value of <.05.  Native Americans represent 0.19 percent of the available professional services firms and received 0.01 percent of the professional services prime contract dollars under $1,000,000. The records were not sufficient to determine statistical significance. Minority Business Enterprises represent 25.62 percent of the available professional services firms and received 12.82 percent of the professional services prime contract dollars under $1,000,000. This underutilization is statistically significant, with a disparity ratio of 0.50 and a P-Value of <.05.  US05291.

Caucasian Male Business Enterprises represent 56.83 percent of the available professional services firms and received 76.85 percent of the professional services prime contract dollars under $1,000,000. This underutilization is statistically significant, with a disparity ratio of 1.35 and a P-Value of <.05.  *Id.*

### f.  Disparity Analysis: Standard Services Prime Contracts

Black Americans represent 11.11 percent of the available standard services firms and received 4.03 percent of the standard services prime contract dollars under $1,000,000. This underutilization is statistically significant, with a disparity ratio of 0.36 and a P-Value of <.05.  Asian Americans represent 6 percent of the available standard services firms and received 6.1 percent of the standard services prime contract dollars under $1,000,000. This overutilization is not statistically significant. Hispanic Americans represent 4.65 percent of the available standard services firms and received 3.77 percent of the standard services prime contract dollars under $1,000,000. This underutilization is not statistically significant. Native Americans represent 0.31 percent of the available standard services firms and received 0.05 percent of the standard services prime contract dollars under $1,000,000. The records were not sufficient to determine statistical significance.

-117-

Minority Business Enterprises represent 22.06 percent of the available standard services firms and received 13.95 percent of the standard services prime contract dollars under $1,000,000. This underutilization is statistically significant, with a disparity ratio of 0.63 and a P-Value of <.05. US05294.

Caucasian Male Business Enterprises represent 67.46 percent of the available standard services firms and received 79.11 percent of the standard services prime contract dollars under $1,000,000. This overutilization is statistically significant, with a disparity ratio of 1.17 and a P-Value of <.05. *Id.*

### g.    Disparity Analysis: Goods Prime Contracts

Black Americans represent 9.89 percent of the available goods firms and received 1.21 percent of the goods prime contract dollars under $1,000,000. This underutilization is statistically significant, with a disparity ratio of 0.12 and a P-Value of <.05.  Asian Americans represent 5.61 percent of the available goods firms and received 5.69 percent of the goods prime contract dollars under $1,000,000. This overutilization is not statistically significant.  Hispanic Americans represent 5.3 percent of the available goods firms and received 2.32 percent of the goods prime contract dollars under $1,000,000. This underutilization is statistically significant, with a disparity ratio of 0.44 and a P-Value of <.05. Native Americans represent 0.29 percent of the available goods firms and received 0.03 percent of the goods prime contract dollars under $1,000,000. The records were not sufficient to determine statistical significance. Minority Business Enterprises represent 21.1 percent of the available goods firms and received 9.25 percent of the goods prime contract dollars under $1,000,000. This underutilization is statistically significant, with a disparity ratio of 0.44 and a P-Value of <.05.  US05297.

Caucasian Male Business Enterprises represent 66.9 percent of the available goods firms and received 81.83 percent of the goods prime contract dollars under $1,000,000. This underutilization is statistically significant, with a disparity ratio of 1.22 and a P-Value of <.05.   *Id.*

> **h.   Disparity Analysis Summary: Prime Construction, Architecture, and Engineering Contracts under $50,000 and Prime Professional Services, Standard Services, and Goods Contracts under $25,000.**

The vast majority of City contracts included in the New York Study's statistical analysis were small contracts.   In prime construction contracts under $50,000, a statistically significant underutilization was found for Black Americans (Disparity Ratio 0.29), Asian Americans (Disparity Ratio 0.83), and Hispanic Americans (Disparity Ratio 0.43), with an overall 0.56 disparity ratio for minority businesses competing in that sector.   US05314.   In prime architecture and engineering contracts under $50,000, a statistically significant underutilization was found for Black Americans (Disparity Ratio 0.36) and Hispanic Americans (Disparity Ratio 0.39), with an overall 0.58 disparity ratio for minority businesses competing in that sector.   US05315.   In prime professional services contracts under $25,000, a statistically significant underutilization was found for Black Americans (Disparity Ratio 0.16), Asian Americans (Disparity Ratio 0.60), and Hispanic Americans (Disparity Ratio 0.24), with an overall 0.30 disparity ratio for minority businesses competing in that sector. US05316.   In prime standard services contracts under $25,000, a statistically significant underutilization was found for Black Americans (Disparity Ratio 0.46) and Hispanic Americans (Disparity Ratio 0.62).   US05317.   In prime goods contracts under $25,000, a statistically significant underutilization was found for Black Americans ((Disparity Ratio 0.18) and Hispanic Americans (Disparity Ratio 0.20), with an overall 0.39 disparity ratio for minority businesses competing in that sector.   US05318.

### i.    Disparity Analysis Summary: Subcontractors

In construction subcontracting, a statistically significant underutilization was found for Black Americans (Disparity Ratio 0.67), Asian Americans (Disparity Ratio 0.39), and Hispanic Americans (Disparity Ratio 0.72).  US05329.  In architecture and engineering subcontracts and professional services subcontracts, a statistically significant underutilization was found for Black Americans (Disparity Ratios of 0.22 and 0.10 respectively)  *Id.*

### j.    Anecdotal evidence

Chapter 9 of the New York Study presents anecdotal accounts excerpted from interviews of business owners from the City of New York in 2004. US05332.  The anecdotes provide evidence of both active and passive forms of discrimination by City officials and the business community during the July 1, 1997 to June 30, 2002 study period.  *Id.*  The interviewees were solicited using contract and certification records. *Id.*  Once identified, interviewees were pre-screened to determine if they operated within the defined market area and were willing to commit to the interview process. *Id.*  Once completed, the interviews were transcribed and analyzed to determine what barriers minority-owned businesses encounter. *Id.* The anecdotal report describes general market conditions, business institutional discrimination, prime contractor discrimination, and the range of experiences of interviewees in attempting to do business within the City's market, in general, and with the City in specific. *Id.*

A Black American male owner of a thirty-year-old professional services firm reported that his company typically receives smaller contracts than majority-owned firms that have the same qualifications as his company: "I had contracts with the City where I knew of fellow professionals in [my industry] that got larger jobs with larger fees for basically doing the same work." US05335.

A Black American male goods supplier reported that 9/11 aftermath clean-up contracts were not given to any minority contractors: "People went to work on the 9/11 aftermath cleanup not by bid but by selection. No minority company that I am aware of [received] any business in that cleanup; no [minority] asbestos or trucking company, and I had trucks. Our biggest minority companies such as [company names withheld] did not get anything. So there was virtually no [minority] participation. They spent 1 million dollars a day for the cleanup and we were totally shutout." US05344. A Black American male owner of a professional services firm believes that majority-owned business owners do not want to work with minority businesses because they are not familiar with those companies: "I think that when there is a new kid on the block, there is a tendency for people not to want to [do business with them, or] get involved with people who they have not done business with. Because a lot of [minorities] are starting new businesses, a lot of established businesses do not want to break the ties. This is something that I deal with constantly." US05348. In all, the New York Study contains 62 single-spaced pages of anecdotal accounts of discrimination in City contracting. US05330- US05392. For purposes of strict scrutiny review, the combination of "anecdotal and statistical evidence is potent." *See Contractors Ass'n*, 6 F.3d at 1003 (citing *Coral Constr. Co. v. King County*, 941 F.2d 910, 919(9th Cir. 1991)).

### k.    Rothe's rebuttal evidence concerning the New York Study

The New York Study concluded that race-conscious measures were appropriate to address statistically significant disparities in prime contracting and subcontracting. US05393. When addressing these six disparity studies, Rothe begins its analysis with the conclusory statement that "there is no way that reference to the widely scattered, flawed disparity studies of state and local contracting can provide statistical support to meet strict scrutiny requirements." Pl's Response and

Reply, Pg. 35.  Rothe cites to the USCCR Briefing Report, which contains expert testimony stating generally that "existing state and local disparity studies are poor."  *Id.*  Rothe argues that the anecdotal evidence contained in the New York Study were not gathered "in a manner consistent with scientific standards" and were not verified.  *Id.*  Rothe further agues that the six disparity studies do not adequately take into account the size of the businesses and that disparity studies in general "have drawn a steady stream of criticism by courts, government agencies, and scholars." *Id.* at Pg. 36.

Rothe did not submit an expert report attacking the data, methodology, or conclusions of the New York Study.[96]  Without citing to any expert report or other competent summary judgment evidence, Rothe makes the following specific objections to the New York Study in its two-paragraph[97] rebuttal: (1) the availability analysis is flawed because some of the list sources include a disclaimer stating that the source does not affirm the qualifications or ability of the firms included; (2) the availability analysis is flawed because one of the sources includes the Asian Women in Business Online Directory;[98] (3) the 1997 to 2002 data is stale; and (4) New York has commissioned a new study.  Pl's Response and Reply, Pg. 40.

---

[96]Rothe submitted three expert reports and three supplemental reports to the Court.  The Expert Report of George La Noue, dated February 8, 1999 (Pl's Exh. 28); the Supplemental Expert Report of George La Noue, dated March 2, 1999 (Pl's Exh. 29); the Expert Report of Dr. Henry Flores, date unknown (Pl's Exh. 30), and the Supplemental Expert Report of Dr. Henry Flores, dated March 5, 1999 (Pl's Exh. 31); the Expert Report of Carl M. Hubbard, Ph.D., dated May 2, 2003 (Pl's Exh. 32), and the Supplemental Expert Report of Carl M. Hubbard, Ph.D., dated July 22, 2005 (Pl's Exh. 27).  None of these expert reports address the six disparity studies cited by McKinney and Kennedy in support of the 2006 Reauthorization.

[97]The Court notes that Rothe submitted 117 pages of summary judgment briefing to this Court, in addition to over 1,000 pages of exhibits.

[98]Rothe appears to imply that this source cannot be expected to give reliable information concerning the availability of Asian prime contractors.

The Court rejects Rothe's objections to the data or reliability of the six disparity studies, including the New York Study, because those objections are not supported by an expert report or other competent summary judgment evidence. "[T]he arguments and statements of counsel are not evidence and do not create issues of material fact capable of defeating an otherwise valid motion for summary judgment." *Barcamerica Intern. USA Trust v. Tyfield Importers, Inc.*, 289 F.3d 589, 593 n. 4 (9th Cir.2002); *see Smith v. Mack Trucks, Inc.,* 505 F.2d 1248, 1249 (9th Cir.1974) ("Legal memoranda . . . in the summary-judgment context, are not evidence, and do not create issues of fact capable of defeating an otherwise valid motion for summary judgment."); *see Truswal Systems Corp. v. Hydro-Air Engineering, Inc.*, 813 F.2d 1207, 1211 (Fed. Cir. 1987) ("We reject the unsupported statements of counsel . . . . Arguments of counsel are not evidence."); *see Dunn v. Stewart*, 235 F. Supp. 955, 964 (S.D. Miss. 1964), *rev. on other grounds*, 363 F.2d 591 (5th Cir. 1966) ("Statements of counsel during arguments, unsupported by any record evidence, are, of course, not evidence and therefore cannot be proof.").

Furthermore, the Court rejects Rothe's generalized, conclusory objections to all disparity studies as "bad" or "unreliable." General criticism of disparity studies, as opposed to particular evidence undermining the reliability of the particular study, is of little persuasive value. *Concrete Works IV*, 321 F.3d at 979; *see also Adarand VII*, 228 F.3d at n.14. Rothe must introduce "credible, particularized" evidence to rebut the Government's initial showing of the existence of a compelling interest. *Concrete Works IV*, 321 F.3d at 959. Rothe may rebut the Government's statistical evidence by: (1) giving a race-neutral explanation for the statistical disparities; (2) showing that the statistics are flawed; (3) demonstrating that the disparities shown are not significant or actionable; or (4) presenting contrasting statistical data. *Id.* Rothe has not rebutted the statistical evidence

contained in the New York Study by any of these four methods.  Despite the fact that this case has

been pending for almost a decade and the Federal Circuit's remand instructions in *Rothe V* explicitly

stated that this Court must review the facial constitutionality of the present reauthorization of the

1207 Program, Rothe failed to rebut the statistical evidence contained in any of the six disparity

studies with "credible, particularized" evidence from its own expert reports.  Rothe's conclusory

objections to all six state and local disparity studies discussed in this Order fail for the same

reasons.[99]

### 3.   Alameda County Availability Study, Mason Tillman Associates, Ltd. (October 2004)

In October 2004, Mason Tillman Associates, Ltd. submitted a 369-page disparity study to

the County of Alameda, California ("Alameda County Study").[100]   The study period covered

Alameda County contracts awarded between July 1, 2000 to June 30, 2003.  The industries analyzed

were construction, architecture and engineering, professional services, standard services, and goods.

Rothe's and ICT's businesses would fall within the category of professional services.  The Alameda

County Study included Asian Americans in its statistical analysis.  The Alameda County Study

recommended race-conscious remedies to address the statistically significant underutilization of

minorities identified in the four industries studied.  ACS 11-1.

---

[99]*See Adarand VII*, 228 F.3d at 1174 n.14 ("We reject the decidedly vague urgings of Adarand's amici curiae to reject disparity studies generally as biased and/or insufficiently reliable. Certainly, the conclusions of virtually all social scientific studies may be cast into question by criticism of the choice of assumptions and methodologies.  The very need to make assumptions and select data sets and relevant variables precludes perfection in empirical sciences.  However, general criticism of disparity studies, as opposed to particular evidence undermining the reliability of the particular disparity studies relied upon by the government, is of little persuasive value . . . .")

[100]Most of the Bates-Stamp pagination is cut-off in the hard copy of the Alameda County submitted to the Court; therefore, the Court will cite to the original page numbers from the Study.

The Court rejects Rothe's one-paragraph objection to the Alameda Study. Pl's Response and Reply, Pg. 39. Without citing to any competent summary judgment evidence, Rothe makes the assertion that "[m]any of the firms on these various lists are not qualified, willing, and able to do public contracting." As discussed previously, this conclusory objection does not constitute the "concrete, particularized evidence" necessary to raise a genuine issue of material fact as to the reliability of the study. The Court has already rejected Rothe's staleness argument. Furthermore, the Court will not reject the anecdotal evidence in the study based on Rothe's hearsay or lack of cross-examination arguments.

For prime contracting, the disparity analysis in the Alameda County Study was divided into three statistical sets based on the dollar value of the contracts analyzed: (1) prime contracts under $500,000; (2) prime contracts $25,001 to $100,000 ; and (3) prime contracts $25,000 and under. In Chapter 6 of the Alameda County Study, entitled "Availability Analysis," the Alameda County Study concluded that the majority of the County's contracts are small, with 98.86 percent under $500,000 and 85.47 percent $25,000 and under. ACS 7-2. The fact that a majority of the County's contracts are small suggests that the capacity needed to perform most of the contracts awarded during the study period was minimal. *Id.*

### a.  Disparity Analysis: Construction Prime Contracts

In the category of prime construction contracts, African American firms experienced statistically significant underutilization in all three statistical sets: contracts under $500,000 (disparity ratio 0.08), contracts $25,001 to $100,000 (disparity ratio 0.23), and contracts $25,000 and under (disparity ratio 0.19). Asian American firms experienced statistically significant underutilization in all three statistical sets: contracts under $500,000 (disparity ratio 0.34)), contracts

$25,001 to $100,000 (disparity ratio 0.40), and contracts $25,000 and under (disparity ratio 0.07). Hispanic American firms did not experience statistically significant underutilization in any of the three statistical sets, but it is notable that five out of twenty-two Hispanic American firms (9%) received 91.9 percent of all the construction dollars.   Finally, Minority Business Enterprises experienced statistically significant underutilization in all three statistical sets: contracts under $500,000 (disparity ratio 0.43), contracts $25,001 to $100,000 (disparity ratio 0.69), and contracts $25,000 and under (disparity ratio 0.58).  ACS 7-3, 7-15, 7-27.

### b.     Disparity Analysis: Architecture and Engineering Prime Contracts

In the category of architecture and engineering prime contracts, African American firms experienced statistically significant underutilization in all three statistical sets: contracts under $500,000 (disparity ratio 0.53), contracts $25,001 to $100,000 (disparity ratio 0.46), and contracts $25,000 and under (disparity ratio 0.29).  Asian American firms experienced statistically significant underutilization in two of three statistical sets: contracts under $500,000 (disparity ratio 0.20) and contracts $25,001 to $100,000 (disparity ratio 0.25). Hispanic American firms experienced statistically significant underutilization in all three statistical sets: contracts under $500,000 (disparity ratio 0.00), contracts $25,001 to $100,000 (disparity ratio 0.00), and contracts $25,000 and under (disparity ratio 0.02).   Finally, Minority Business Enterprises experienced statistically significant underutilization in all three statistical sets: contracts under $500,000 (disparity ratio 0.26), contracts $25,001 to $100,000 (disparity ratio 0.27), and contracts $25,000 and under (disparity ratio 0.53).  ACS 7-6, 7-18, 7-30.

### c.     Disparity Analysis: Professional Services Prime Contracts

In the category of professional services prime contracts, African American firms experienced

statistically significant underutilization in all three statistical sets: contracts under $500,000 (disparity ratio 0.23), contracts $25,001 to $100,000 (disparity ratio 0.33), and contracts $25,000 and under (disparity ratio 0.42).  Asian American firms experienced statistically significant underutilization in all three statistical sets: contracts under $500,000 (disparity ratio 0.55), contracts $25,001 to $100,000 (disparity ratio 0.35), and contracts $25,000 and under (disparity ratio 0.62). Hispanic American firms experienced statistically significant underutilization in all three statistical sets: contracts under $500,000 (disparity ratio 0.27), contracts $25,001 to $100,000 (disparity ratio 0.36), and contracts $25,000 and under (disparity ratio 0.56).  Finally, Minority Business Enterprises experienced statistically significant underutilization in all three statistical sets: contracts under $500,000 (disparity ratio 0.36), contracts $25,001 to $100,000 (disparity ratio 0.34), and contracts $25,000 and under (disparity ratio 0.52).  ACS7-9, 7-21, 7-33.

### d.     Disparity Analysis: Goods and Other Services Prime Contracts

In the category of goods and other services prime contracts, African American firms experienced statistically significant underutilization in all three statistical sets: contracts under $500,000 (disparity ratio 0.19), contracts $25,001 to $100,000 (disparity ratio 0.28), and contracts $25,000 and under (disparity ratio 0.20).  Asian American firms experienced statistically significant underutilization in all three statistical sets: contracts under $500,000 (disparity ratio 0.43), contracts $25,001 to $100,000 (disparity ratio 0.45), and contracts $25,000 and under (disparity ratio 0.55). Hispanic American firms experienced statistically significant underutilization in all three statistical sets: contracts under $500,000 (disparity ratio 0.40), contracts $25,001 to $100,000 (disparity ratio 0.20), and contracts $25,000 and under (disparity ratio 0.46).  Finally, Minority Business Enterprises experienced statistically significant underutilization in all three statistical sets: contracts under

$500,000 (disparity ratio 0.33), contracts $25,001 to $100,000 (disparity ratio 0.33), and contracts $25,000 and under (disparity ratio 0.40).  ACS 7-12, 7-24, 7-36.

### e.    Disparity Analysis: Construction Subcontracts

African Americans represent 14.09 percent of the available construction subcontractors and received 2.81 percent of the construction subcontract dollars. This underutilization is statistically significant (disparity ratio 0.20).   Asian Americans represent 7.20 percent of the available construction subcontractors and received 2.19 percent of the construction subcontract dollars. This underutilization is statistically significant (disparity ratio 0.30).  Minority Business Enterprises represent of 34.76 percent the available construction subcontractors and received 10.23 percent of the construction subcontract dollars. This underutilization is statistically significant (disparity ratio 0.29). ACS 8-2.

### f.    Disparity Analysis: Architecture and Engineering Subcontracts

African Americans represent 10.58 percent of the available architecture and engineering subcontractors and received 0.72 percent of the architecture and engineering subcontract dollars. This underutilization is statistically significant (disparity ratio 0.07). Asian Americans represent 20.33 percent of the available architecture and engineering subcontractors and received 3.2 percent of the architecture and engineering subcontract dollars. This underutilization is statistically significant (disparity ratio 0.16). Hispanic Americans represent 6.22 percent of the available architecture and engineering subcontractors and received 4.24 percent of the architecture and engineering subcontract dollars. This underutilization is not statistically significant (disparity ratio 0.69). Minority Business Enterprises represent of 37.55 percent the available architecture and engineering subcontractors and received 8.17 percent of the architecture and engineering subcontract

dollars. This underutilization is statistically significant (disparity ratio 0.22). ACS 8-5.

> g.     **Disparity Analysis: Professional Services Subcontracts**

In the category of professional services subcontracts, Black American, Asian American, and Hispanic American firms did not experience statistically significant underutilization in any of the three statistical sets.  ACS 8-8.

> 4.     **Ohio Multi-Jurisdictional Disparity Studies, Mason Tillman Associates, Ltd. (October 2003)**

In October 2003, Mason Tillman Associates, Ltd. submitted a disparity study to the Board of Cuyahoga County Commissioners in Ohio ("Ohio Disparity Study").  The study period covered Coyahoga County contracts awarded between January 1, 1998 to December 31, 2000.  US06445. The industries analyzed were construction, architecture and engineering, and professional services. *Id.*  Rothe's and ICT's businesses would fall within the category of professional services.  The Ohio Disparity Study included Asian Americans in its statistical analysis, and it recommended race-conscious remedies to address the statistically significant underutilization of minorities in County contracting.  US06587.

The Court rejects Rothe's two paragraph objection to the Ohio Disparity Study.  Pl's Response and Reply, Pg. 38.  Rothe's generalized objections regarding the alleged deficiencies of the Ohio Disparity Study are conclusory and are not competent summary judgment evidence.

The majority of the County's prime contracts were small, with more than 77.58 percent under $25,000, 84.22 percent under $50,000 and 96.89 percent under $500,000. US06544.  The fact that the majority of the County's contracts were small suggested that the capacity needed to perform most of the contracts the County awarded during the study period was minimal. *Id.*  The analysis of prime

disparity was therefore capped at $500,000 and the recommendations were based on the statistical findings for contracts awarded under this threshold. *Id.*

       **a.**    **Disparity Analysis: Vertical Construction Prime Contracts under $500,000 and under $15,000**

African Americans represent 25.39 percent of the available vertical construction firms and received 7.5 percent of the under $500,000 vertical construction prime contract dollars. This underutilization is statistically significant (disparity ratio 0.30). Minority Business Enterprises represent 32.02 percent of the available vertical construction firms and received 11.56 percent of the under $500,000 vertical construction prime contract dollars. This underutilization is statistically significant (disparity ratio 0.36). Caucasian Males represent 57.41 percent of the available vertical construction firms and received 86.96 percent of the under $500,000 vertical construction prime contract dollars. This overutilization is statistically significant (disparity ratio 1.51). Thus, out of the $7,348,825 expended on vertical construction prime contracts under $500,000 in the County between January 1, 1998 and December 31, 2000, Caucasian males received 86.96 percent of those dollars, or $6,390,500. US06546

African Americans represent 25.39 percent of the available vertical construction firms and received none of the under $15,000, vertical construction prime contract dollars. This underutilization is statistically significant (disparity ratio 0.00). Minority Business Enterprises represent 32.02 percent of the available vertical construction firms and received 4.46 percent of the under $15,000 vertical construction prime contract dollars. This underutilization is statistically significant (disparity ratio 0.14). Caucasian Males represent 57.41 percent of the available vertical construction firms and received 95.05 percent of the under $15,000 vertical construction prime

contract dollars. This overutilization is statistically significant (disparity ratio 1.66). Thus, out of the $223,536 expended on vertical construction prime contracts under $15,000 in the County between January 1, 1998 and December 31, 2000, Caucasian males received 95.05 percent of those dollars, or $212,472. US06561.

  **b.** **Disparity Analysis: Horizontal Construction Prime Contracts under $500,000 and under $15,000**

African Americans represent 30.3 percent of the available horizontal construction firms and received 3.58 percent of the under $500,000 horizontal construction prime contract dollars. This underutilization is statistically significant (disparity ratio 0.12). Minority Business Enterprises represent 34.2 percent of the available horizontal construction firms and received 3.58 percent of the under $500,000 horizontal construction prime contract dollars. This underutilization is statistically significant (disparity ratio 0.10). Caucasian Males represent 58.66 percent of the available horizontal construction firms and received 93.93 percent of the under $500,000 horizontal construction prime contract dollars. This overutilization is statistically significant (disparity ratio 1.60). Thus, out of the $4,901,434 expended on horizontal construction prime contracts under $500,000 in the County between January 1, 1998 and December 31, 2000, Caucasian males received 93.93 percent of those dollars, or $4,603,849. US06549

African Americans represent 30.3 percent of the available horizontal construction firms and received none of the under $15,000 horizontal construction prime contract dollars. This underutilization is statistically significant (disparity ratio 0.00). Minority Business Enterprises represent 34.2 percent of the available horizontal construction firms and received none of the under $15,000 horizontal construction prime contract dollars. This underutilization is statistically

significant (disparity ratio 0.00).  Caucasian Males represent 58.66 percent of the available horizontal construction firms and received 100 percent of the under $15,000 horizontal construction prime contract dollars. This overutilization is statistically significant (disparity ratio 1.70). Thus, out of the $138,494 expended on horizontal construction prime contracts under $15,000 in the County between January 1, 1998 and December 31, 2000, Caucasian males received all of those dollars. US06564.

> **c.      Disparity Analysis: Architecture and Engineering Prime Contracts under $500,000 and under $25,000**

Asian Americans represent 14.53 percent of the available architecture and engineering firms and received 10.52 percent of the under $500,000 architecture and engineering prime contracts dollars. This underutilization is statistically significant (disparity ratio 0.72).  Minority Business Enterprises represent 28.49 percent of the available architecture and engineering firms and received 18.71 of the under $500,000 architecture and engineering prime contract dollars. This underutilization is statistically significant (disparity ratio 0.66). US06552.

Asian Americans represent 14.53 percent of the available architecture and engineering firms and received 0.7 percent of the under $25,000 architecture and engineering prime contract dollars. This underutilization is statistically significant (disparity ratio 0.05).  Minority Business Enterprises represent 28.49 percent of the available architecture and engineering firms and received 13.03 percent of the under $25,000 architecture and engineering prime contract dollars. This underutilization is statistically significant (disparity ratio 0.46).

Caucasian Males represent 68.16 percent of the available architecture and engineering firms and received 83.73 percent of the under $25,000 architecture and engineering prime contract dollars. This overutilization is not statistically significant (disparity ratio 1.23). US06567.

### d. Disparity Analysis: Professional Services Prime Contracts under $500,000 and under $15,000

African Americans represent 13.66 percent of the available professional services firms and received 4.4 percent of the under $500,000 professional services prime contract dollars. This underutilization is statistically significant (disparity ratio 0.32). Hispanic Americans represent 1.74 percent of the available professional services firms and received none of the under $500,000 professional services prime contract dollars. This underutilization is statistically significant (disparity ratio 0.00). Minority Business Enterprises represent 18.61 percent of the available professional services firms and received 10.86 percent of the under $500,000 professional services prime contract dollars. This underutilization is statistically significant (disparity ratio 0.58). Caucasian Males represent 58.57 percent of the available professional services firms and received 85.85 percent of the under $500,000 professional services prime contract dollars. This overutilization is statistically significant (disparity ratio 1.47). Thus, out of the $15,648,093 expended on professional services prime contracts under $500,000 in the County between January 1, 1998 and December 31, 2000, Caucasian males received 85.85 percent of those dollars, or $13,434,277. US06555.

African Americans represent 13.66 percent of the professional services firms and received 2.06 percent of the under $15,000 professional services prime contract dollars. This underutilization is statistically significant (disparity ratio 0.15). Minority Business Enterprises represent 18.61 percent of the available professional services firms and received 2.97 percent of the under $15,000 professional services prime contract dollars. This underutilization is statistically significant (disparity ratio 0.16). Caucasian males represent 58.57 percent of the available professional services firms and received 92.24 percent of the under $15,000 professional services prime contract dollars. This

overutilization is statistically significant (disparity ratio 1.57). Thus, out of the $1,294,349 expended on professional services prime contracts under $15,000 in the County between January 1, 1998 and December 31, 2000, Caucasian males received 92.24 percent of those dollars, or $1,193,954. US06570.

> e.   **Disparity Analysis: Goods and Other Services Prime Contracts under $500,000 and under $15,000**

African Americans represent 10.95 percent of the available goods and other services firms and received 5.66 percent of the under $500,000 goods and other services prime contract dollars. This underutilization is statistically significant (disparity ratio 0.52). Hispanic Americans represent 1.91 percent of the available goods and other services firms and received 0.11 percent of the under $500,000 goods and other services prime contract dollars. This underutilization is statistically significant (disparity ratio 0.06). Minority Business Enterprises represent 14.16 percent of the goods and other services firms and received 9.02 percent of the under $500,000 goods and other services prime contract dollars. This underutilization is statistically significant (disparity ratio 0.64). Caucasian Males represent 77.93 percent of the available goods and other services firms and received 88.02 percent of the under $500,000 goods and other services prime contract dollars. This overutilization is statistically significant (disparity ratio 1.13). US06558.

African Americans represent 10.95 percent of the available goods and other services firms and received 4.9 percent of the under $15,000 goods and other services prime contract dollars. This underutilization is statistically significant (disparity ratio 0.45). Hispanic Americans represent 1.91 percent of the available goods and other services firms and received 0.15 percent of the under $15,000 goods and other services prime contract dollars This underutilization is statistically

significant (disparity ratio 0.08).  Minority Business Enterprises represent 14.16 percent of the available goods and other services firms and received 10.62 percent of the under $15,000 goods and other services prime contract dollars. This underutilization is statistically significant (disparity ratio 0.75).  US06573.

### f.    Disparity Analysis: Construction Subcontracting

Construction was the only industry with sufficient county subcontract records for a statistical test for disparity. US06578.

African Americans represent 22.27 percent of the available vertical construction firms and received 5.57 percent of the vertical construction subcontract dollars. This underutilization is statistically significant (disparity ratio 0.25).  Minority Business Enterprises represent 28.06 percent of the available vertical construction firms and received 6.79 percent of the vertical construction subcontract dollars. This underutilization is statistically significant (disparity ratio 0.24).  Caucasian Males represent 61.78 percent of the available vertical construction firms and received 91.59 percent of the vertical construction subcontract dollars. This overutilization is statistically significant (disparity ratio 1.48).  Thus, out of the $870,711 expended on vertical construction subcontracts in the County between January 1, 1998 and December 31, 2000, Caucasian males received 91.59 percent of those dollars, or $797,473.  US06580.

### 5.    City of Dallas Availability and Disparity Study, Mason Tillman Associates, Ltd. (May 2002)

In May 2002, Mason Tillman Associates, Ltd. submitted a 251-page disparity study to the City of Dallas ("Dallas Disparity Study").  The study period covered City of Dallas contracts awarded between October 1, 1997 and September 30, 2000.  US06630.  The industries analyzed

were construction, architecture and engineering, professional services, and goods and other services. *Id.* Rothe's and ICT's businesses would fall within the category of professional services. The Dallas Disparity Study included Asian Americans in its statistical analysis, and it recommended race-conscious remedies to address the statistically significant underutilization of minorities in City contracting. US06872.

The Court rejects Roth's one paragraph objection to the Dallas Disparity Study. Pl's Response and Reply, Pg. 36. The Court rejects Rothe's conclusory objections for the same reasons previously discussed.

The availability list of M/WBEs[101] and non M/WBE prime contractors and subcontractors in the City of Dallas market area willing and able to provide goods or services to the City was compiled using records from the City, other public agencies, trade associations, certification organizations and outreach efforts. US06730. The Dallas Disparity Study claimed that its availability analysis met the *Croson* criteria of willing and able businesses. *Id.* The size analysis demonstrated that the majority of the City's contracts was small, with more than 93 percent under $25,000. *Id.* Therefore, to perform on most City contracts, even the competitively bid construction projects, the available firms only required minimal capacity. *Id.*

  **a. Disparity Analysis: Construction Prime Contracts less than $500,000 and less than $15,000**

African Americans represent 19.25 percent of the available prime construction firms and received 6.67 percent of the prime construction contract dollars on projects less than $500,000. This underutilization is statistically significant (disparity ratio 0.35). Asian Americans represent 2.96

---

[101]M/WBEs is defined as a minority or woman-owned business.

percent of the available prime construction firms and received 1.99 percent of the prime construction contract dollars on projects less than $500,000. This underutilization is statistically significant (disparity ratio 0.67). Hispanic Americans represent 18.34 percent of the available prime construction firms and received 13.65 percent of the prime construction contract dollars on projects less than $500,000. This underutilization is statistically significant (disparity ratio 0.74). Minority Business Enterprises represent 42.94 percent of the available prime construction firms and received 22.49 percent of the prime construction contract dollars on projects less than $500,000. This underutilization is statistically significant (disparity ratio 0.52). Caucasian Males represent 44.08 percent of the available prime construction firms and received 75.13 percent of the prime construction contract dollars on projects less than $500,000. This overutilization is statistically significant (disparity ratio 1.70). Thus, out of the $94,341,158 expended on prime construction contracts under $500,000 in the City between October 1, 1997 and December 31, 2000, Caucasian males received 75.13 percent of those dollars, or $70,874,530. US06759.

African Americans represent 19.25 percent of the available prime construction firms and received 13.39 percent of the prime construction contract dollars on projects less than $15,000. This underutilization is statistically significant (disparity ratio 0.70). Asian Americans represent 2.96 percent of the available prime construction firms and received 0.32 percent of the prime construction contract dollars on projects less than $15,000. This underutilization is statistically significant (disparity ratio 0.11). Hispanic Americans represent 18.34 percent of the available prime construction firms and received 9.88 percent of the prime construction contract dollars on projects less than $15,000. This underutilization is statistically significant (disparity ratio 0.54). Minority Business Enterprises represent 42.94 percent of the available prime construction firms and received

25.42 percent of the prime construction contract dollars on projects less than $15,000. This underutilization is statistically significant (disparity ratio 0.59). Caucasian Males represent 44.08 percent of the available prime construction firms and received 69.92 percent of the prime construction contract dollars on projects less than $15,000. This overutilization is statistically significant (disparity ratio 1.59). Thus, out of the $3,684,047 expended on prime construction contracts under $15,000 in the City between October 1, 1997 and December 31, 2000, Caucasian males received 69.92 percent of those dollars, or $2,575,759. US06763.

  **b.  Disparity Analysis: Architecture and Engineering Prime Contracts less than $500,000 and less than $15,000**

African Americans represent 17.98 percent of the available prime architecture and engineering firms and received 3.08 percent of the prime architecture and engineering contract dollars on projects less than $500,000. This underutilization is statistically significant (disparity ratio 0.17). Asian Americans represent 7.64 percent of the available prime architecture and engineering firms and received 4.25 percent of the prime architecture and engineering contract dollars on projects less than $500,000. This underutilization is statistically significant (disparity ratio 0.56). Minority Business Enterprises represent 41.87 percent of the available prime architecture and engineering firms and received 21.94 percent of the prime architecture and engineering contract dollars on projects less than $500,000. This underutilization is statistically significant (disparity ratio 0.52). Caucasian Males represent 45.32 percent of the available prime architecture and engineering firms and received 76.17 percent of the prime architecture and engineering contract dollars on projects less than $500,000. This overutilization is statistically significant (disparity ratio 1.68). Thus, out of the $32,598,210 expended on prime architecture and engineering contracts under $500,000 in the City

between October 1, 1997 and December 31, 2000, Caucasian males received 76.17 percent of those dollars, or $24,829,370.  US06760.

African Americans represent 17.98% percent of the available prime architecture and engineering firms and received 9.97% percent of the prime construction contract dollars on projects less than $15,000. This underutilization is statistically significant (disparity ratio 0.55). Minority Business Enterprises represent 41.87 percent of the available prime architecture and engineering firms and received 31.71 percent of the prime architecture and engineering contract dollars on projects less than $15,000. This underutilization is statistically significant (disparity ratio 0.76). Caucasian Males represent 45.32 percent of the available prime architecture and engineering firms and received 61.62 percent of the prime architecture and engineering contract dollars on projects less than $15,000. This overutilization is statistically significant (disparity ratio 1.59).  Thus, out of the $1,639,475 expended on prime construction contracts under $15,000 in the County between October 1, 1997 and December 31, 2000, Caucasian males received 69.92 percent of those dollars, or $1,010,192.  US06764.

c.    **Disparity Analysis: Professional Services Prime Contracts less than $500,000 and less than $15,000**

African Americans represent 20 percent of the available prime professional services firms and received 6.81 percent of the prime professional services contract dollars on projects less than $500,000. This underutilization is statistically significant (disparity ratio 0.34).  Asian Americans represent 6.48 percent of the available prime professional services firms and received 2.76 percent of the prime professional services contract dollars on projects less than $500,000. This underutilization is statistically significant (disparity ratio 0.43).    Hispanic Americans represent

-139-

11.34 percent of the available prime professional services firms and received 1.36 percent of the prime professional services contract dollars on projects less than $500,000. This underutilization is statistically significant (disparity ratio 0.12).   Native Americans represent 1.05 percent of the available prime professional services firms and received 0.15 percent of the prime professional services contract dollars on projects less than $500,000. This underutilization is statistically significant (disparity ratio 0.14).   Minority Business Enterprises represent 38.87 percent of the available prime professional services firms and received 11.07 percent of the prime professional services contract dollars on projects less than $500,000. This underutilization is statistically significant (disparity ratio 0.28).   Caucasian Males represent 37.81 percent of the available prime professional services firms and received 83.74 percent of the prime professional services contract dollars on projects less than $500,000. This overutilization is statistically significant (disparity ratio 2.21).   Thus, out of the $22,188,871 expended on prime professional services contracts under $500,000 in the City between October 1, 1997 and December 31, 2000, Caucasian males received 83.74 percent of those dollars, or $18,581,388.  US06761.

African Americans represent 20 percent of the available prime professional services firms and received 6.45 percent of the prime professional services contract dollars on projects less than $15,000. This underutilization is statistically significant (disparity ratio 0.32).   Asian Americans represent 6.48 percent of the available prime professional services firms and received 1.07 percent of the prime professional services contract dollars on projects less than $15,000. This underutilization is statistically significant (disparity ratio 0.16).     Hispanic Americans represent 11.34 percent of the available prime professional services firms and received 2.1 percent of the prime professional services contract dollars on projects less than $15,000. This underutilization is

statistically significant (disparity ratio 0.19).  Native Americans represent 1.05 percent of the available prime professional services firms and received 0.03 percent of the prime professional services contract dollars on projects less than $15,000. This underutilization is statistically significant (disparity ratio 0.03).  Minority Business Enterprises represent 38.87 percent of the available prime professional services firms and received 9.65 percent of the prime professional services contract dollars on projects less than $15,000. This underutilization is statistically significant (disparity ratio 0.25).  Caucasian Males represent 37.81 percent of the available prime professional services firms and received 83.54 percent of the prime professional services contract dollars on projects less than $15,000. This overutilization is statistically significant (disparity ratio 2.21).  Thus, out of the $3,604,118 expended on prime professional services contracts under $15,000 in the City between October 1, 1997 and December 31, 2000, Caucasian males received 83.54 percent of those dollars, or $3,010,920.  US06765.

### d.    Disparity Analysis: Goods and Other Services Prime Contracts less than $500,000 and less than $15,000

African Americans represent 12.58 percent of the available goods and other services firms and received 1.86 percent of the goods and other services prime contract dollars on projects less than $500,000. This underutilization is statistically significant (disparity ratio 0.15).  Hispanic Americans represent 7.33 percent of the available goods and other services firms and received 1.34 percent of the goods and other services prime contract dollars on projects less than $500,000. This underutilization is statistically significant (disparity ratio 0.18).  Minority Business Enterprises represent 24.77 percent of the available goods and other services firms and received 7.64 percent of the goods and other services prime contract dollars on projects less than $500,000. This

-141-

underutilization is statistically significant (disparity ratio 0.31).  Caucasian males represent 61.1 percent of the available goods and other services firms and received 86.15 percent of the prime professional services contract dollars on projects less than $500,000. This overutilization is statistically significant (disparity ratio 1.41).  Thus, out of the $226,354,806 expended on goods and other services contracts under $500,000 in the City between October 1, 1997 and December 31, 2000, Caucasian males received 86.15 percent of those dollars, or $194,993,575.  US06762.

African Americans represent 12.58 percent of the available goods and other services firms and received 2.68 percent of the goods and other services prime contract dollars on projects less than $15,000. This underutilization is statistically significant (disparity ratio 0.21).  Hispanic Americans represent 7.33 percent of the available goods and other services firms and received 2.08 percent of the goods and other services prime contract dollars on projects less than $15,000.  This underutilization is statistically significant (disparity ratio 0.28).  Minority Business Enterprises represent 24.77 percent of the available goods and other services firms and received 11.88 percent of the goods and other services prime contract dollars on projects less than $15,000. This underutilization is statistically significant (disparity ratio 0.48).  Caucasian males represent 61.1 percent of the available goods and other services firms and received 80.92 percent of the goods and other services prime contract dollars on projects less than $15,000. This overutilization is statistically significant (disparity ratio 1.32).  Thus, out of the $79,215,610 expended on goods and other services prime contracts under $15,000 in the City between October 1, 1997 and December 31, 2000, Caucasian males received 80.92 percent of those dollars, or $64,099,373.  US06766.

### e.    Disparity Analysis: Subcontracts

African Americans represent 17.48 percent of the available construction subcontractors and

received 6.66 percent of the construction subcontractor dollars on City projects between October 1, 1998 and September 30, 2000. This underutilization is statistically significant (disparity ratio 0.38). Asian Americans represent 2.58 percent of the available construction subcontractors and received 0.37 percent of the construction subcontractor dollars on City projects between October 1, 1998 and September 30, 2000. This underutilization is statistically significant (disparity ratio 0.14). Minority Business Enterprises represent 38.83 percent of the available construction subcontractors and received 26.26 percent of the construction subcontractor dollars on City projects between October 1, 1998 and September 30, 2000. This underutilization is statistically significant (disparity ratio 0.68). US06767.

Asian Americans represent 3.78 percent of the available construction related services subcontractors and received 0.10 percent of the construction related services subcontractor dollars on City projects between October 1, 1998 and September 30, 2000. This underutilization is statistically significant (disparity ratio 0.03). Aside from Asian Americans, no other minority group experienced statistically significant underutilization in construction related services subcontracting. US06768.

No minority group experienced statistically significant underutilization in architecture and engineering subcontracting. US06769.

**6.     City of Cincinnati Disparity Study, Griffin & Strong, P.C. (October 2002)**

On October 7, 2002, Griffin & Strong, P.C. submitted a 106-page disparity study to the City of Cincinnati ("Cincinnati Disparity Study"). The Cincinnati Disparity Study differs from the four Mason Tillman studies described above because Cincinnati had a race and gender-conscious M/WFBE program in place during part of the study period. US06314.

The Court rejects Rothe's one paragraph objection to the Cincinnati Disparity Study.  Pl's Response and Reply, Pg. 37.  Again, Rothe's conclusory objections do not create a genuine issue of material fact regarding this study, and the argument of counsel regarding the alleged deficiencies of the study are not competent summary judgment evidence.

Data collected and analyzed for the Cincinnati Disparity Study covered three distinct periods in Cincinnati's recent history.  *Id.*  The first period, referred to as the "Program Years", was an aggregation of the fiscal years from 1995 through 1998, a period during which Cincinnati had in place a race and gender-conscious M/WFBE program. *Id.*  The second period covered by the study was Fiscal Year (FY) 1999, during which time Cincinnati had no race or gender-conscious program in place, nor did it have a small business program in place. *Id.*  The third distinct period covered by the study was FY 2000 through FY 2001, during which time the City put in place a race-neutral Small Business Enterprise (SBE) program.  *Id.*  Accordingly, the Cincinnati Disparity Study covered FY 1995 through FY 2001.  *Id.*  An analysis of construction utilization data for the Fort Washington Way project was conducted and was included in the final report. *Id.*  Data for Fort Washington Way cover the period from January 1, 1997 to March 31, 2002.  *Id.*

According to the study, the availability of businesses for public contracting is crucial to the results of any disparity study because if availability is miscalculated, then the disparity indices or ratios will be in error.  US06317 (citing La Noue, George R., "Standards for the Second Generation of Croson - Inspired Disparity Studies," The Urban Lawyer (The National Quarterly on State and Local Government Law), Summer 1994, Volume 26, No 3, p. 490).  Consequently, the study's "very narrow definition of availability" included firms that have demonstrated that they attempted to do business with Cincinnati.  *Id.*  The study acknowledged that this conservative definition of

availability "could result in actual availability and patterns of discrimination in the relevant geographic marketplace being supressed," but the study decided to utilize this conservative standard in order to avoid overstating actual availability and skewing the disparity calculations.[102]  US06318.

In the Cincinnati Study, the actual disparity was measured by use of a Disparity Index ("DI"). US06339.  The DI is defined as the ratio of the percentage of Minority and White Female Business Enterprise utilization (U) divided by their percentage in the market place (or availability: A).[103]  *Id.* When the DI is one or the utilization percentage equals the availability percentage, there is parity or, put another way, there is no disparity.  *Id.*  In situations where there is availability, but no utilization, the corresponding disparity index is zero. *Id.*  The disparity index calculations in this study were based on availability estimates derived from the actual bidders' list provided by the City of Cincinnati and the U.S. Census Bureau; 1997 Economic census: Surveys of Minority and Women-Owned Businesses. *Id.*

---

[102]In conducting their availability analysis, disparity studies must determine whether the firms are capable of "undertak[ing] prime or subcontracting work" in their relevant industry sectors. *Croson,* 488 U.S. at 502.  In other words, "[w]here special qualifications are necessary, the relevant statistical pool for purposes of demonstrating discriminatory exclusion must be the number of minorities qualified to undertake the particular task."  *Id.* at 501-502.  This Court does not believe that only permissible metric of "availability" is those firms that actually bid on past projects.  Rather, the Court believes that "availability" can also be premised on statistical evidence linking capacity to contract size.  *See Concrete Works IV,* 321 F.3d at 983-84 ("Additionally, we do not read *Croson* to require disparity studies that measure whether construction firms are able to perform a *particular* contract.  The studies must only determine whether the firms are capable of 'undertak[ing] prime of subcontracting work in public construction projects.'") (citing *Croson,* 488 U.S. at 502) (emphasis in original).

[103]U =Utilization percentage for the M/WFBE group. A =Availability percentage for the M/WFBE group. DI =Disparity Index for the M/WFBE group. DI = U/A (Utilization divided by Availability). US06339.

### a.     Anecdotal evidence of discrimination in City contracting

The Cincinnati Disparity Study included anecdotal accounts of discrimination in City contracting from interviewees inside City government.  US06360.  Many interviewees referred to a "good old boy" system of doing business that typically involves the tendency on the part of purchasing agents to conduct business, contract with, and solicit bids from contractors with whom they have previously done business; or, for whom the user department has expressed a preference, without regard to fostering fair competition or equal access to opportunities for other potential bidders. US06361.  This heavy emphasis by purchasing agents and user departments on prior business dealings often results in newer vendors, many of them minority or woman owned companies, being kept from contracting opportunities with the City.  *Id.*  A great contributor to perpetuation of the good old boy system is the discretion afforded many purchasing agents and user departments that generate requirements. *Id.*  The City's purchasing policies and procedures allow a great deal of discretion to purchasing agents when bids are solicited. *Id.*

Stereotypical attitudes were also noted in the purchasing organization. A senior buyer expressed quite forthrightly his personal reservations about the reliability of minority and female-owned businesses, shortly after responding that he did not believe the departments themselves cared if a supplier was a minority, female, or SBE, as long as they could meet the specifications in a timely manner. US06363.  He further stated that he believed the problem with minority business set-asides is that most of them are "fronts." *Id.*

Another buyer indicated that it was basically the majority firms that have complained to her about denial of opportunities to bid.   US06364.   One employee voiced concern that the characterization of non-emergency procurements as emergency procurements also means that firms

are denied opportunities to bid. *Id.* The employee also stated that she was aware of a demolition job and knew of a minority-owned company that could do the work, but the job came "disguised'" as an emergency and was awarded to a majority-owned contractor. *Id.*

One buyer acknowledged having heard complaints from minorities about price discrimination by suppliers as an impediment to their ability to competitively bid contracts. US06366. Another buyer expressed the opinion that the good old boy network gets in the way of smaller suppliers and keeps them from getting proper pricing from suppliers. US06367.

After discussing anecdotal accounts of discrimination in City contracting from interviewees inside City government, the study reported anecdotal accounts of discrimination from confidential interviews with thirty-five minority and female business owners who reside in or operate their businesses within the City of Cincinnati marketplace. US06369.

Many of those interviewed believed that political or insider contacts are necessary to enhance one's ability to receive increased opportunities for bid awards. US06371. An MBE construction vendor reported submitting the winning bids on several different occasions, which still did not result in his company being awarded the resultant contracts. *Id.* Another MBE construction vendor reported outright rejection of his bids by the City, even though his company had not been debarred, reportedly after a dispute with a City inspector, which was still unresolved at the time of the interview. *Id.* Generally, most of those interviewed felt, and apparently accepted as an unfortunate fact, that many departments within City government are unwilling to formulate new relationships even if the new relationships are more economical. *Id.*

An MBE contractor stated that it is "very difficult to qualify for working capital if you are African American. You never have the necessary prerequisites, and they never give you what

[amount of money] you need. They tend to misdirect us; lead us on to believe we need fringe items which rapidly drain our resources."  US06375.   Double performance standards are generally described as higher performance expectations and how the work of minority firms is inequitably scrutinized. An MBE contractor stated, "MBE work must be exemplary. Majority trades can get away with inferior quality work. Inspections tend to be more detailed. Schedules tend to be more compressed, and thus parameters for mistakes are increased."  US06373.   Three MBE contractors reported that they have specific knowledge of situations where majority contractors have conspired to "low ball" a bid to exclude MBEs from the possibility of being awarded a contract.  US06377.

### b.      Statistical evidence of discrimination in City contracting

The Cincinnati Disparity Study produced "significant data" suggesting that disparities in purchasing and contracting, as between majority or white-owned firms and minority and female-owned firms, continued to exist in City contracting. US06386.  Particularly revealing was the level of participation that was recorded in fiscal year 2000. *Id.*  The data revealed a substantial contrast between the dollars spent by Cincinnati with minority and female owned firms during the Program Years and the dollars spent with minority and female owned businesses, in 2000, with the race neutral small business enterprise program. *Id.*  This finding suggested that "absent initiatives designed to ensure equal business opportunities, barriers exist that prevent minority and female owned businesses from participating in contracting and procurement with Cincinnati commensurate with their availability in the market place." *Id.* (emphasis added).

The use of a  narrow approach to measuring availability and reliance on statistical data from the Program Years, when Cincinnati had in place a race and gender-conscious M/WFBE program, showed an aggregate over-utilization of such firms by the City of Cincinnati for the years under

review, 1995 to 2001. *Id.*  Using census data and the vendor list for the City of Cincinnati would have increased the availability index and result in lower disparity indices for minority and female owned businesses.  *Id.*  Measuring availability only through bid data removed from the equation these two sources, from which additional qualified minority and female owned businesses could have been included. *Id.*  For the purpose of developing policy in this area, the study recommended that the City consider expanding upon this study to compare disparity indices when census and vendor list data is included in the availability analysis. *Id.*

Notwithstanding, the data reviewed for this study did show under-utilization in some of the years of the study. *Id.*  The overall disparity index for minority and female firms in construction, for African Americans during FY 2000 is 0.35, suggesting significant under-utilization in the year the City operated its race neutral small business enterprise program. *Id.*  In FY 2000, Asian construction firms were not utilized at all, even though ready and available to do business with the City. US06387.  Hispanic construction firms were also significantly under utilized during FY 2000 with a disparity index of only 0.15. *Id.* The only groups to experience over-utilization in construction for FY 2000 were Native American firms (DI of 1.21) and white female firms (DI of 1.64).  *Id.*  In supplies and services, Asian firms show a disparity index in FY 1999 of 0.34 and in FY 2000, 0.03, suggesting significant under-utilization in each of those years. *Id.*  For African American firms the disparity index for FY 1995 was 0.70 and for FY 2000, 0.86, again suggesting significant under-utilization in each of those years. *Id.*  Similarly, except for the extraordinary utilization of Native American firms in Program Years, FY 1995 (4.05) and FY 1996 (4.16), Native American firms were significantly under utilized in supplies and services in FY 1997 (0.01), FY 1998 (0.00), FY 1999 (0.39) and FY 2000 (0.14). *Id.*

In addition to the quantitative statistical analysis, the Cincinnati Disparity Study included substantial qualitative evidence showing a perception of discrimination by the City in its procurement and contracting practices with minority and female-owned firms. *Id.* This evidence is provided through anecdotal interviews, public hearing testimony taken under oath, and interviews with employees of the City of Cincinnati regarding purchasing policies, practices and procedures. *Id.* "Taken together, the quantitative analysis and the qualitative evidence suggest the need for tailoring remedial responses to eliminate practices that may be discriminatory or that give rise to the perception of discrimination" by the City. *Id.*

### 7.    A Procurement Disparity Study of the Commonwealth of Virginia, MGT of America (January 2004)

On January 12, 2004, MGT of America, Inc. submitted a disparity study to the Director of the Department of Minority Business Enterprise for the Commonwealth of Virginia ("Virginia Disparity Study"). This study related to procurement of construction, architecture and engineering services, professional services, other services, and goods and supplies. Pg. ii. The study covered state procurements over a five-year period from July 1, 1997 through June 30, 2002 (FY 98 – FY 02). *Id.* The Court rejects Rothe's one paragraph, conclusory objection to the Virginia Disparity Study for the reasons previously discussed. Pl's Response and Reply, Pg. 41.

For the purposes of this study, MGT defined prime contractors as firms that: (1) have performed prime contract work for the Commonwealth in the past; (2) have bid on prime contract work for the Commonwealth in the past; or (3) are registered vendors with certain state agencies. These firms are defined as available prime contractors because they have either performed, or have explicitly indicated their willingness to perform, prime contract work for the Commonwealth. For

construction subcontracting availability the study used Census Bureau data. MGT attempted to collect lists from 25 organizations that were identified as potential sources of available vendors and ethnicity information during interviews with Commonwealth personnel. Further sources were also identified during the collection process by staff from these organizations. MGT was successful in collecting vendor information from the following sources: Virginia Regional Minority Supplier Development Council; Metropolitan Business League Minority List; Virginia Community Development Loan Fund; Association of General Contractors; Greater Virginia Contractors Association; Department of Professional and Occupational Regulation; Virginia Chamber of Commerce; Small Business Association; Harris Infosource Vendor Listings; National Indian Business Association; City of Richmond–Department of Economic Development; and National Women Business Owners Corporation. Pgs. 4-6 to 4-7.

M/WBE utilization by the Commonwealth was very low during the study period at 1.27 percent of total spending over the study period. *Id.* By way of comparison, Maryland spent 17 percent with M/WBEs in 2001, Texas spent 13 percent with M/WBEs in 2003, the State of Florida spent 11.8 percent with M/WBEs from FY 1997 to FY 2001, and North Carolina spent 7.4 percent with M/WBEs in construction from 1998 to 2002. *Id.* Moreover, a significant portion of M/WBE spending was with firms owned by non-minority women. *Id.* Total Commonwealth spending with minority-owned firms was less than 0.44 percent of total spending (about $38.9 million). *Id.* Commonwealth spending with MBEs as a percentage of total spending is one of the lowest recorded in over 100 studies conducted by MGT. *Id.*

Some local agencies spent considerably more with minority- and woman-owned firms than did the Commonwealth. Pg. ii. For example, from 1998 to 2002 the City of Charlotte spent $91.8

million with MBE prime contractors in construction alone while the Commonwealth spent $34.8 million with MBE prime contractors over the same time period. *Id.* The Port Authority of New York and New Jersey awarded $284 million in contracts with small and M/WBE firms in 2001 alone, several times Commonwealth annual M/WBE spending over the five-year study period, which averaged about $77.7 million. *Id.*

The Commonwealth utilized 261 minority firms outside of construction over the study period, at an average of about $26,000 per firm per year. *Id.* This low M/WBE utilization by the Commonwealth in turn contributed to low M/WBE availability, as measured by the number of M/WBE vendors registered and utilized by the Commonwealth. *Id.* Relative M/WBE availability ranged between 1.45 percent and 8.15 percent, depending on procurement category. *Id.* Even where disparity was not that substantial, as in other services, relative M/WBE availability was very low. *Id.* It is also possible that the limited number of active local M/WBE programs contributed to the low availability identified through this study. *Id.*

Low M/WBE utilization resulted in substantial disparity for the following underutilized groups in the Commonwealth work type categories: Construction prime contracting–African American (disparity index 3.12),[104] Asian American (disparity index 0.00), and Native American (disparity index 0.00); Construction subcontracting–African American (disparity index 4.37), Hispanic American (disparity index 32.38), Asian American (disparity index 1.38), Native American (disparity index 0.00); Architecture and engineering services–African American (disparity index 0.62), Hispanic American (disparity index 1.05), Asian American (disparity index 2.93), Native

---

[104]The disparity index is the ratio of % utilization to % availability times 100. A substantial level of disparity is defined as an index below 80.00. A disparity index of 100 would indicate that the percent utilization of minority firms equaled their percent availability in the relevant market.

American (disparity index 0.00); Professional services–Hispanic American (disparity index 2.69),

Asian American (disparity index 72.09), Native American (disparity index 0.61); Other

services–Native American (disparity index 4.12); Goods and Supplies–African American (disparity

index 23.34), Hispanic American (disparity index 79.21), and Native American (disparity index

34.48). *Id*

### 8. Dissenting Statement of Commissioner Michael Yaki, Federal Procurement after *Adarand*, U.S. Commission on Civil Rights (September 2005)

The Court finds that the study *Federal Procurement after Adarand*, which was conducted

by the United States Commission on Civil Rights ("USCCR"), was before Congress prior to the

2006 Reauthorization of the 1207 Program. *See* 151 Cong. Rec. S11557-08, *S11558 (Oct. 19,

2005); 151 Cong. Rec. H12042-04, *H12045 (Dec. 16, 2005) (noting receipt of the report by the

House and Senate Committees on the Judiciary).

The 78-page Majority Opinion in *Federal Procurement after Adarand* ("AA Report")

advocated that the federal government exclusively adopt race-neutral programs[105] to benefit small

minority businesses and argued that federal agencies, including the DoD and the SBA, had failed to

adequately consider race-neutral alternatives in the manner required by *Adarand III*.  AA Report,

Pgs. 66-67.

The 91-page Dissenting Opinion by Commissioner Michael Yaki is a scathing critique of the

---

[105]These programs include strong enforcement of non-discrimination policies in government contracting, policies intended to enable disadvantaged firms to compete without altering the terms of competition (e.g., outreach, technical assistance, and mentor-protégé programs), policies that provide small and disadvantaged businesses the resources necessary to compete (e.g., financial assistance), and policies that open previously unattainable contracting opportunities to small businesses (e.g., unbundling), or expand economic potential in underutilized and distressed geographic regions (e.g., the HUBZone program). AA Report, Pgs. 66-67.

legal and policy conclusions contained in the Majority Opinion.[106]   Yaki criticized the Majority

Opinion for  interpreting *Adarand* and *Grutter* to mean that the federal government must *employ*

race-neutral strategies before resorting to race-conscious ones, rather than just "seriously consider"

them.   AA Report, Pg. 81.

Yaki noted that his statistical data was *deleted* from the original version of the draft majority

opinion that was received by all Commissioners.  Pg. 86.  Between 1992 and 1997, revenue of

minority-owned businesses grew 60 percent, more than that of all U.S. firms.  However, the revenue

of African American-owned firms grew only half as much as minority-owned businesses generally,

and less than all U.S. firms.[107]   AA Report, Pg. 100.  Minority-owned firms with paid employees

were much less likely to survive from 1997 to 2001than from 1992 to 1996. However, African

American-owned enterprises were less likely to survive than other groups in either period. *Id.* at Pg.

103.  Although contracting with small disadvantaged enterprises also increased as a proportion of

total federal procurement, from 4% in 1992 to 7% at its most in fiscal year 2003, it never exceeded

---

[106]"[I]t is a travesty that this same Commission should choose to use its platform as the moral watchdog for civil rights in this country to endorse the dismantling of a system that has brought countless minorities and women economic opportunity. It does so by utilizing faulty logic, suspect reasoning, and an erroneous interpretation and complete misreading of *Adarand Constructors v. Pena* and *Grutter v. Bollinger*.  It does so by completely ignoring data received from federal agencies—data received in response to interrogatories propounded by Commission staff—that would substantiate the need for continued vigilance and use of race-conscious programs. It ignores data that suggests that federal agencies continue to fall short of promoting equal opportunity in our society, and, therefore, turns a blind eye to possible recommendations and policies that would sharpen our attack on persistent discrimination."  AA Report, Pg. 81.

[107]The Court finds that this statistical evidence is not categorically stale, but it is less probative of present-day discrimination than the six state and local disparity studies previously discussed. When combined with the data from the six state and local disparity studies, the Yaki statistical evidence suggests that minority businesses still suffer from the lingering effects of past discrimination.  Rothe did not produce "concrete, particularized" evidence challenging the Yaki statistical evidence.

7 percent.  The report cited the following as reasons for this continued and current disparity in contracting with minorities: access to capital and bonding, the relative newness and size of minority businesses, the existence of closed door networks, and the existence of discrimination. *Id.* at Pgs. 112- 117.  Yaki argued that the Majority Opinion intentionally deleted these statistics from their final report in order to justify their position that all race-conscious affirmative action programs in federal procurement should be abolished.

Rothe implies that the evidence contained in the Dissenting Opinion cannot contribute to Congress' strong basis in evidence because it was not the Majority Opinion.  However, it is clear that the statistical evidence contained in the Dissenting Opinion was before Congress, and it was Congress' prerogative to accept the reasoning and supporting statistics of the Dissenting Opinion over the reasoning of the Majority Opinion.  Although it recognized that the Majority Opinion dismissed its statistical evidence as "biased" or "incomplete," the Dissenting Opinion also observed that "[n]o analytical, intellectual, or specific points of criticism were raised by the Majority [Opinion regarding the reliability of the statistics]." AA Report, Pg. 86 n.30.  Rothe cannot rely on Majority Opinion's generalized objections to the Dissenting Opinion's statistical evidence for the same reason that it cannot rely on its own generalized objections to the six disparity studies that were before Congress prior to the 2006 Reauthorization.  Generalized objections to statistical evidence alleging "bias" or "faulty methodology" simply do not raise a genuine issue of material fact regarding the reliability of that data for purposes of strict scrutiny.

### 9. Additional evidence before Congress found in Congressional Committee reports and hearing records

On December 21, 2005, Senator Obama spoke on the Senate floor to express his "strong

support for the reauthorization of the Department of Defense, DoD, 1207 program." 151 Cong. Rec. S14241-03, at *S14248, 2005 WL 3500916 (Dec. 21, 2005).  Obama argued that the 1207 Program is designed to ensure that DoD federal contracting "does not support or subsidize discrimination," and he urged his colleagues in the Senate to extend the program through September 2009.  *Id.* According to Obama, "in the aftermath of Hurricane Katrina, minority-owned and economically disadvantaged companies have had a near impossible time trying to secure some of the billions of dollars of gulf coast reconstruction contracts. Meanwhile, big multinational contractors were given no-bid contracts in the weeks immediately following the hurricane. This double standard is unfortunately all too common, and it is the duty of Congress to ensure that this discrimination does not continue." *Id.*  Obama argued that "[w]ithout programs like the 1207 program, many contractors would simply revert to their old practices, denying contracts to small companies owned by minorities or the economically disadvantaged." *Id.*

Obama requested that a letter from Carmen Nazario, a Hispanic female small business owner from the state of Washington, be published in the congressional record *Id.*  Nazario is the owner of Elyon International, a small company in the information technology industry that has successfully competed for contracts in the private and public sector.  *Id.* at *S14249.  Nazario believed that the state of Washington had an unfavorable business climate towards Hispanic woman professionals, both in the public and private sector, and she wrote Obama to support the 20006 Reauthorization of the 1207 Program.  *Id.*  Nazario described an entrenched "good old boy" network in Washington that gave preferences to firms with pre-existing relationships.[108]  *Id.*  She observed that "Washington

---

[108]"I find that the state tends to award contracts to large firms and companies they have been working with for years. As an example, I submitted a well qualified candidate, a minority, who was interviewed as a finalist but not selected and I found out that the work was awarded to another

-156-

State's procurement awards to minority companies has drastically decreased to less that 1 percent since implementation of the 1-200 initiative which removed minority procurement goals from State government purchasing." *Id.*  Nazario described how she was not awarded a contract on one occasion even though her company submitted the lowest bid.[109]  *Id.* She also argued that small minority businesses are being squeezed out of the supply chain because "[m]any government contracting opportunities have been bundled making it only possible for primary suppliers to respond to these larger long-term contract opportunities." *Id.*  In another case, Nazario described how she attempted to get prime contractor bidding information from the state so that she could propose subcontracting services as a minority business IT vendor, but the state's slow response and the prime contractors' lack of interest due to the absence of a race-conscious subcontracting program in the state caused her to miss that opportunity. *Id.*  Nazario strongly supported the reauthorization of the 1207 Program, saying that was necessary to "level the playing field for women and minority contractors." *Id.*

On December 21, 2005, Senator Kennedy spoke on the Senate floor in support of the 2006 Reauthorization of the 1207 Program.  151 Cong. Rec. S14256-01, 2005 WL 3500918 (Dec. 21, 2005.  Kennedy requested that the letter of Edmund Y. Tong be printed in the Congressional Record. *Id.* at *S14269.  Tong alleged that San Francisco's Office of Labor Standard Enforcement ("OLSE")

_____

company who had an established track record with the state."

[109]"Deployable Data Systems, who won the bid, priced it at $2,468,075 and ours was $2,298.107. Ours was $169,968 lower. I requested a debriefing but was given bogus reasons and I also requested a copy of the winning solicitation response but was denied any further information other than price and name of company that received the award. I find these actions totally discriminatory . . . Ft Lewis decision makers knew all along who they where going to award that contract to."

selectively audited and imposed higher penalties against many of San Francisco's minority businesses.[110] *Id.* He stated that "Chinese businesses had around a 5% chance of obtaining a prime contract they bid on, but a 50% probability of their project being inspected and audited by the OLSE. At present, OLSE still disproportionately targets minority businesses, whether they are union or non-unionized construction companies." *Id.* Citing two local firms by name, Tong alleged that non-minority prime contractors would use minority subcontractors on their public works projects because the local governmental entities had minority business programs, but those same prime contractors would not use minority subcontractors in their private works projects. *Id.* Tong also strenuously objected to the common practice of bundling contracts, which reduced minority contractor participation because of higher capacity and bonding requirements.[111] *Id.* He claimed that San Francisco was often late in paying minority contractors and that suppliers would charge minority contractors exorbitant rates for the same items sold at lesser prices to non-minority contractors. *Id.*

On December 20, 2005, Kennedy requested that the letter of John McDonald be printed in the Congressional Record. 151 Cong. Rec. S14170-01, *S14170, 2005 WL 3478026 (Dec. 20, 2005). McDonald was an African American business owner in the field of institutional real estate acquisition, development and construction. He wrote Kennedy in support of the 2006

---

[110]Rothe included attachments indicating that an internal investigation of the Office of Labor Enforcement and the investigations of the Human Rights Commission found that no further investigation of Mr. Tong's complaints was warranted. Pl's Response and Reply, Pg. 28. As in the Title VII context, an administrative agency's finding that no further investigation on a discrimination claim is warranted is not tantamount to a finding that the alleged discrimination did not actually occur.

[111]"For example, when work is required for a number of school sites, a number of 3-4 schools may be bundled even when the type of work in each school is different. This will bring the total project and bonding requirements to $10 million dollars when without bundling the individual projects would cost about $2-3 million dollars."

Reauthorization of the 1207 Program.  *Id.*  McDonald claimed that a senior Domino's Pizza official was motivated by racial animus when she deliberately sabotaged an existing contractual relationship between McDonald's company, JWM Investments, Inc., and Domino's Pizza, which resulted in JWM Investments being forced into bankruptcy.[112]  *Id.*

Kennedy's support for the 1207 Program is echoed in his remarks supporting the DoT DBE program that was found constitutional in *Adarand VII*.  *See* 151 Cong. Rec. S9442-02 (Jul. 29, 2005).  Kennedy recited anecdotal evidence of discrimination in the private contracting sector: "A bank denied a minority-owned business a loan to bid on a public contract worth $3 million, but offered a loan for the same purpose to a nonminority-owned firm with an affiliate in bankruptcy. An Asian-Indian American businessman in the San Francisco Bay area testified at a public hearing that he was unable to obtain a line of unsecured credit from mainstream banks until he found a loan officer who shared his heritage. A Filipino owner of a construction firm testified that he had difficulty obtaining bank financing, although white-owned firms with comparable assets could obtain similar loans. Overt discrimination and entrenched patterns of exclusion prevented many female and minority-owned businesses from obtaining surety bonds." *Id.* at *S9443.  In support of the DoT DBE

---

[112]Rothe argues that McDonald's statement "is hearsay and blatantly false" because McDonald lost an appeal to the Supreme Court regarding this claim.  *See Domino's Pizza v. McDonald*, 126 S. Ct. 1246 (2006).  The Court has already disposed of Rothe's hearsay objections to all of the Government's evidence.  The Supreme Court decision referred to by Rothe dismissed McDonald's appeal on technical grounds because "Section 1981 plaintiffs must identify injuries flowing from a racially motivated breach of their own contractual relationship, not of someone else's."  *Id.* at 1252.  The Supreme Court based the dismissal on the fact that the contract was executed by McDonald's corporation, not by McDonald himself.  The Supreme Court stated that it assumed that the allegations of discrimination contained in McDonald's complaint were true for purposes of the appeal.  126 S. Ct. at 1248.  The Supreme Court did not issue an opinion regarding the merits of McDonald's discrimination claims.

Program, Kennedy referred to the findings of the Urban Institute Report.[113]  *Id.*  Kennedy's statements indicated that Congress continues to rely on the results of state and local disparity studies to justify the implementation of the 1207 Program and the DoT DBE Program.[114]  *Id.*  In cases where states had discontinued use of race-conscious contracting programs, the participation of minority firms in state public contracts dropped precipitously.[115]  *Id.*  Kennedy discussed "considerable new anecdotal evidence of discrimination in highway construction contracting,"[116] and he reviewed

---

[113]"When only areas and years in which affirmative action is not in place were considered, the percentage of awards to women fell from 29 percent to 24 percent. For African Americans, the percentage dropped from 49 percent to 22 percent; for Latinos, from 44 percent to 26 percent; for Asians, from 39 percent to 13 percent; and for Native Americans, from 18 percent to 4 percent. These figures show that affirmative action programs are not only effective, but are still urgently needed."  151 Cong. Rec. S9442-02, at *S9443.

[114]"New studies completed since 1998 show that minority and women-owned companies are underutilized in government contracting. The Department of Transportation identified 15 detailed studies of State and local governments showing significant disparities between the availability and utilization of minority and women-owned firms in government contracting. Studies showed underutilization in Nebraska; in Maryland; in Colorado; in Georgia; in Kentucky; in Ohio; in Wilmington, DE; in Dekalb County, GA; in Broward County, FL; in Dallas, TX; in Cincinnati, OH; in Tallahassee, FL; and in Baltimore, MD. Several other studies have also been completed since 1998."  *Id.* at *S9443.

[115]"For example, in the State of Minnesota, during 1999, after a Federal court had enjoined the State department of transportation from implementing a previous program-participation dropped from over 10 percent to slightly more than 2 percent. In addition, the General Accountability Office, GAO, issued a 2001 study showing that contracting under the Federal program had 'dramatically declined' when similar local programs were terminated in the jurisdictions it examined." *Id.* at *S9443.

[116]"Herta Bouvia, the female co-owner of a company that competes for building contracts and highway construction contracts in Nebraska, testified in Gross Seed v. Nebraska Department of Roads that she faced hostility, slurs, and other forms of harassment on construction jobs because of her gender. Stanford Madlock, an African-American owner of a DBE trucking company in Nebraska, testified in the same case that he had suffered discrimination because of his race, including being denied contracts despite submitting the low bid for the work and being denied access to capital." *Id.* at *S9443.

-160-

anecdotal accounts of discrimination for disparity studies conducted in Seattle and Minnesota in 1999. *Id.* Importantly, Kennedy discussed the Section 8(d) regulations, which are cross-referenced by both the DoT MBE Program and the 1207 Program. *Id.* at *S9444. Kennedy argued that the Section 8(d) certification process "does not rigidly classify firms based on race, ethnicity or gender" because the presumption of social disadvantage may be rebutted, and SDB participants must submit notarized statements declaring that they are in fact socially and economically disadvantaged. *Id.*

On December 18, 2005, Representatives Watt and Menendez spoke on the House floor in support of the 2006 Reauthorization of the 1207 Program. 151 Cong. Rec. H12200, *H12208 (Dec. 18, 2005). Watt cited to a 2004 disparity study for North Carolina that was performed by MGT America, the same company that performed the Virginia Disparity Study described above. *Id.* In describing this study, Watt stated that "North Carolina continues to underutilize businesses owned by minorities or women in nearly all categories of transportation contracts. More specifically, African American and Hispanic businesses are underutilized in every business category of contracts awarded by the North Carolina Department of Transportation. In an earlier Charlotte study, Hispanic contractors reported that they are treated differently and experience more pressure to get the work done. Clearly, efforts to encourage minority participation in government contracting are still necessary." *Id.* at *H12208 - H12209. Menendez cited to a New Jersey disparity study by MGT America, which "revealed that minority-owned and women-owned businesses in New Jersey still faced significant challenges in obtaining state contracts." *Id.* at *H12211. According to Menendez, many business owners and representatives stated that their opportunities to perform work as subcontractors on state contracts decreased after the suspension of New Jersey's minority and women business enterprise program." *Id.* After noting that the 5 percent goal "is not a quota" and

"is not a set-aside," Menendez argued that the 1207 Program "helps to correct the problems of discrimination without imposing an undue burden on other businesses."  *Id.*

### 10.    Evidence before Congress concerning the systematic barriers facing small minority businesses

On Tuesday, February 17, 2004, the Committee on Small Business held a field hearing in Chicago, Illinois to learn from small business owners, especially minority-owned firms, about problems that they were facing in obtaining access to capital and in finding contracting opportunities in the federal government.   Summary of Activities, H.R. Rep. 108-800, at *150-53 (Dec. 29, 2004). This oversight hearing provided an opportunity for small businesses to express their views as to the success or failure of the private and public sectors to meet the capital needs of small businesses in the Chicago area, especially the needs of African-American and other minority-owned small businesses. *Id.* at 151.  The hearing also provided oversight of SBA's and other federal agencies' efforts to assist small businesses in finding real federal procurement opportunities. *Id.* Mr. Wordlaw[117] expressed the view that private and public agencies had failed to provide procurement opportunities and meet the capital needs of African-American small businesses.  *Id.*  Ms. Harrison[118] felt that the employees of the SBA did care about creating a fair and level playing field in the federal procurement arena, but that SBA lacked the enforcement authority to see that small businesses are in fact fairly treated. Ms. Redditt[119] expressed the view that slow payment by government agencies inhibits the growth of small businesses and their ability to access capital, even with the assistance

---

[117] Mr. Obie Wordlaw, Chairman & CEO, JERO Medical Equipment & Supplies, Chicago, IL.

[118] Ms. Charlotte Harrison, President and CEO, Millennium Data Systems, Chicago, IL.

[119] Mr. Frankie Redditt, President and CEO, Ashley's Quality Care, Inc., Chicago, IL.

and backing of SBA. Mr. Montgomery[120] cited the fact that African-Americans have started businesses at a faster pace in the past ten years, despite the fact that they were unable to gain ready access to equity capital or capital markets. *Id.* It was suggested that more thought be given to opening the capital markets and sources of venture capital to African-Americans aspiring to start or grow small businesses. *Id.* The hearing included specific testimony on the numerical disparities which still exist in federal procurement with minority owned businesses in Illinois, and the difficulties which minority owed firms have in accessing capital. *Availability of Capital and Federal Procurement Opportunities to Minority-owned Small Businesses*, Hearing before the House Small Business Committee, 108th Cong., 2d Sess. (Feb. 17, 2004), at 3, 48 (statements of Hon. Danny Davis, noting that in Illinois, less than 2 percent of Federal contracts went to minorities in 2002 and that traditional lending institutions are less likely to provide capital to minority-owned businesses); *id.* at 4 (statement of Obie Wardlaw, noting the failure of the private and public sectors to meet the capital needs of African-American small businesses and their contracting opportunities.)."In sum, the Committee concluded that while much progress has been made in increasing access to capital and federal procurement markets for minority entrepreneurs, much work remains to be done."[121] H.R. Rep. 108-800, at 152.

In 2001, Congress also held hearings on the challenges faced by small disadvantaged businesses in federal procurement contracting. *Encouraging the Growth of Minority-Owned Small*

---

[120]Mr. Bruce Montgomery, President, Montgomery & Company, Chicago, IL.

[121]Rothe argues that this hearing was about accessing capital and was not relevant to the 1207 Program.  Pl's Response and Rely, Pg. 24.  The Court finds that barriers to accessing capital experienced by minority firms is clearly relevant to the 1207 Program, which seeks to assist minority firms in overcoming these barriers.

*Businesses and Minority Entrepreneurship*, Field Hearing Before the House Comm. on Small Business, 107th Cong., 1st Sess., Ser. No. 107-26 (August 27, 2001); *see also Procurement Policies of the Department of Defense with regard to Small Businesses–Finding Solutions to Problems that Exist*, Hearings Before the House Comm. on Small Business, 107th Cong., 1st Sess. (Sept. 6, 2001). In the August 27, 2001 hearing, Congress received evidence of the disparity of contracts still awarded to Hispanic contractors. *See id.* at p. 8-10 (Statement of Tina Cordova noting that while Hispanics accounted for 22 percent of New Mexico's businesses, they only accounted for five percent of the state's business receipts, and that Hispanics are still largely under represented in the 8(a) program). The hearings also noted the effects of contract bundling in continuing the disparities of contracts awarded to minority business contractors. *See id.* at 13 (Statement of Evaristo Bonano). Finally, testimony was taken concerning the difficulty of African American contractors in accessing capital. *See id.* at 17-18. (Statement of Joe Powdrell).

Congress has specifically examined the effects of the new process of contract bundling on small businesses, including the specific disadvantages faced by small disadvantaged businesses. *Procurement Policies of the DoD*, 107th Cong., 1st Sess., Ser. No. 107-28 (Sept. 6, 2001).

### 11.    SBA Reports that were before Congress prior to the 2006 Reauthorization

In 1976, under Public Law 94-305, Congress established the Office of Advocacy in the U.S. Small Business Administration ("SBA").  Under federal law, the Office of Advocacy is required to develop proposals for changes in the policies and activities of any agency of the Federal Government "and communicate such proposals to the appropriate Federal agencies." 15 U.S.C. § 634c(3) (2007). The Court will assume that SBA complied with the mandate of Section 634c(3) and transmitted these reports to the appropriate House and Senate committees.  Based on this statutory mandate, the

Court finds that the various studies published by the Office of Advocacy  regarding minority businesses were before Congress for purposes of the 2006 Reauthorization.

### a.    The Small Business Economy: A Report to the President (2005)

The 2005 Small Business Economy Report[122] found that "African Americans and Latinos are less likely to own businesses than are Whites and Asians. Minority-owned businesses are also less successful than White-owned businesses, on average. 2005 Report, Pg. 97.  Recent trends indicate some improvement in the state of minority entrepreneurship, but a major convergence in racial patterns in business ownership and outcomes is unlikely in the near future. *Id.* Businesses owned by African Americans and Latinos have lower sales, hire fewer employees, and have smaller payrolls than White-owned businesses. *Id.* at Pg. 60.  African-American-owned firms also have lower profits and higher closure rates than White-owned firms. *Id.*

### b.    The State of Small Business: A Report to the President (2000)

The 2000 State of Small Business Report was undeniably before Congress prior to the 2006 Reauthorization. *See* 148 Cong. Rec. H9040-1 (Nov. 22, 2002) (receipt by House); 148 Cong. Rec. S11569-04 (Nov. 19, 2002) (receipt by Senate).  The 2000 report covered the data years of 1998 - 1999.  The 2000 report found that minority-owned businesses "make of 9 percent of the business population of the United States, but small minority-owned businesses won just 6 percent of the award dollars in FY 1998 and 1999." 2000 Report, Pg. 121.

---

[122]Available at http://www.sba.gov/advo/sbe.html (last visited Aug. 2, 2007).

c.      **Yin Lowrey, Ph.D., Office of Advocacy, Dynamics of Minority-Owned Employer Establishments, 1997-2001(February 2005)**

This 2005 Report[123] tracked the dynamics of minority-owned employer establishments that were in operation in 1997 over the period 1997-2001.  According to the report, minorities' share of the total U.S. population increased from 21 percent in 1982 to 32 percent in 2002. The share of businesses owned by minorities rose from 6.8 percent of all U.S. businesses in 1982 to 15.1 percent in 1997.  The four-year survival rates of the four minority-owned business categories were all lower than the survival rate for non-minority-owned business, which was 72.6 percent. Those for the minority categories were as follows: Asian- and Pacific Islander-owned: 72.1 percent; Hispanic-owned: 68.6 percent; American Indian and Native Alaskan-owned: 67.0 percent; Black-owned: 61.0 percent.

12.     **Because the data contained in the *Appendix*, the Benchmark Study, and the Urban Institute Report is stale, the Court will not consider those reports as evidence of a compelling interest for the 2006 Reauthorization.  Rothe's expert report also raises a genuine issue of material fact as to the reliability of the methodology of the Benchmark Study.**

a.      **The *Appendix***

The Court finds that the *Appendix–The Compelling Interest for Affirmative Action in Federal Procurement: A Preliminary Survey*, 61 Fed. Reg. 26042-01, *26050 (May 23, 1996) was before Congress prior to the 2006 Reauthorization of the 1207 Program.  *See* 144 Cong. Rec. H3945-02 (May 2, 1998) (statement of Rep. Norton citing to report in support of DoT's DBE Program).  The Eighth, Ninth, and Tenth Circuits have relied on the Appendix to uphold the constitutionality of the DoT's DBE Program as recently as 2005.  *See Western States*, 407 F.3d at 991 (noting that

---

[123]Available at http://www.sba.gov/advo/research/rs251.pdf (last visited Aug. 2, 2007).

"Congress also explicitly relied upon a Department of Justice study [the *Appendix*] that documented the discriminatory hurdles that minorities must overcome to secure federally funded contracts"); *Sherbrooke Turf*, 345 F.3d at 970; *Adarand VII* , 228 F.3d at 1167.

The *Appendix* contains a large amount of statistical evidence regarding discrimination in public and private contracting.  The Department of Justice reported that "56% of black business owners . . . and 11% of Asian business owners ha[d] experienced known instances of discrimination in the form of higher quotes from suppliers." 61 F.R. at *26061.   A 1992 report from the United States Commission on Minority Business Development found that minorities make up more than 20 percent of the population, yet minority-owned businesses are only 9 percent of all U.S. businesses and receive less than 4 percent of all business receipts. *Id.* at *26054.  That same report also found that minority firms have, on average, gross receipts that are only 34% of that of non-minority firms, and the average payroll for minority firms with employees is less than half that of non-minority firms with employees.  *Id.*  1992 census data revealed that African Americans were 12 percent of the population but, in 1992, owned only 3.6% of all businesses (up from 3.1% in 1987) and received just 1 percent of all U.S. business receipts (which is the same level as in 1987).  *Id.* at *26054.  A 1992 study found that minorities are approximately 20 percent less likely to receive venture capital financing than white firm owners with the same borrowing credentials. *Id.* at *26058.  A 1988 study found that all other factors being equal, a black business owner is approximately 15 percent less likely to receive a business loan than a white owner. *Id.*  A 1992 study found that the average loan to a black-owned construction firm is $49,000 less than the average loan to an equally matched non-minority construction firm.  *Id.*  A 1996 Denver, Colorado study surveying 407 business owners in the Denver area found that African Americans were three times more likely to be rejected for

business loans than whites, the denial rate for Hispanic owners was 1.5 times as high as white owners, and disparities in the denial rate remained significant even after controlling for other factors that may affect the lending rate, such as the size and net worth of the business. *Id.*   A 1992 Contra Costa County, California study reported that 55 percent of minority-owned construction firms reported that prime contractors that use their firms on contracts with affirmative action requirements seldom or never used their firms on projects that do not contain such requirements.  *Id.* at *26059. A 1990 Milwaukee, Wisconsin study found that only 18% of black contractors currently have private sector contracts with primes with which they have worked on public sector contracts with MBE requirements. *Id.*  A 1992 Massachusetts study found that 55 percent of minority-owned construction firms reported that prime contractors that use their firms on contracts with affirmative action requirements seldom or never used their firms on projects that do not contain such requirements. *Id.*  A 1990 Atlanta study found that 93 percent of the revenue received by minority-owned firms came from the public sector and only 7 percent from the private sector. *Id.*  In sharp contrast, the study found that non-minority firms receive only 20 percent of their revenue from the public sector and 80 percent from the private sector. *Id.*  In addition, the 1990 Atlanta study reported that nearly half of the black-owned firms worked primarily for minority customers, and minority firms rarely worked in a joint venture with a white-owned firm.  *Id.*   A 1992 Alameda County, California study found that nearly 50 percent of minority businesses reported experiencing bonding discrimination. *Id.* at *26060.  A 1990 Atlanta, Georgia study found that 66 percent of minority-owned construction firms had been rejected for a bond in the last three years, 73 percent of those firms limited themselves exclusively to contracts that did not require bonding, and none of them had unlimited bonding capacity. *Id.* at *26060 - *26061. By contrast, less than 20 percent of non-minority firms

had unlimited bonding capacity.  *Id.* at *26061.  A 1992 Denver, Colorado study found that  56 percent of black business owners, 30 percent of Hispanic owners, and 11 percent of Asian business owners had experienced known instances of discrimination in the form of higher quotes from suppliers. *Id.* A 1990 San Jose, California study found that the suspension of San Jose's affirmative action program in 1989 resulted in a drop of over 80 percent in minority participation in the City's prime contracts.  *Id.* at *26062.

Aside from summarizing statistical findings from studies across the country that were conducted during the late 1980s and early 1990s, the *Appendix* also discussed the Urban Institute Report. *Id.* at *26061.  The Department of Justice asked the Urban Institute to analyze the statistical findings of 56 state and local disparity studies, but the Urban Institute concluded that only the findings of 39 of the studies would be considered because the findings of the 17 excluded studies were not supported by disparity ratios and other appropriate statistical evidence. *Id.*  The *Appendix* summarized the key statistical findings of the Urban Institute Report as follows:

> Minority-owned businesses receive on average only 59 cents of state and local expenditures that those firms would be expected to receive, based on their availability. The median disparities vary from 39 cents on the dollar for firms owned by Native Americans to 60 cents on the dollar for firms owned by Asian-Americans.
>
> Minority firms are underutilized by state and local governments in all of the industry groups examined: Construction, construction subcontracting, goods, professional services and other services. The largest disparity between availability and utilization was seen in the category of "other services," where minority firms receive 51 cents for every dollar they were expected to receive. The smallest disparity was in the category of construction subcontracting, where minority firms still receive only 87 cents for every dollar they would be expected to receive.

*Id.* at *26061 - *26062.

Although this Court does not rely on the data contained in the *Appendix* to support the 2006

-169-

Reauthorization, the Eighth, Ninth, and Tenth Circuit's reliance on this data to uphold the constitutionality of the DoT's MBE Program as recently as 2005 convinces this Court that a bright-line staleness rule is inappropriate.

> **b.      Urban Institute Report**

The Court finds that the Urban Institute Report was before Congress prior to the 2006 Reauthorization because it was extensively discussed in floor debates and hearings prior to the passage of the Act.  *See Appendix*, 61 Feg. Reg. 26042-01, *26061 (1996) (discussing the findings of the Urban Institute Report); *see* 144 Cong. Rec. S1395-01, *S1409 (Mar. 5, 1998) (Sen. Kerry discussing report in relation to the DoT MBE Program); 151 Cong. Rec. S14170-01, *S14171 (Dec. 20, 2005) (Sen. Kennedy discussing report in relation to 1207 Program); 151 Cong. Rec. S9442-02, *S9442 (July 29, 2005) (Sen. Kennedy discussing report in relation to the DoT MBE Program).

The Urban Institute Report is an analysis of 56 disparity studies conducted by state and local governments, based primarily on contracting information predating 1992. The study found "substantial disparity in government contracting." *See* Urban Institute Report at v-vi, 1, 11, 13, 19-20, 63.  Specifically, the Report noted that "[m]inority-owned businesses as a group receive only 57 cents of each dollar they would be expected to receive based on the percentage of all 'ready, willing and able' firms that are minority owned."  The report did not reach an ultimate conclusion as to the reasons for the numerical disparities but did note that this pattern was repeated for each minority population group and women-owned businesses for every state and local contracting dollar that they should have expected to receive based on the proportion of "ready, willing and able" minority- and women-owned firms. *See id.* at 1, 15, 19-22, 61.

###### c.      Benchmark Study

The Court finds that the DoC's Benchmark Study was before Congress prior to the 2006 Reauthorization of the 1207 Program. *See* 63 Fed. Reg. 3514-01 (June 30, 1998); 151 Cong. Rec. S12668-01, at *S12673, 2005 WL 3018127 (Nov. 10, 2005) (statement of Sen. Kennedy); 151 Cong. Rec. S14170-01, at *S14172, 2005 WL 3478026 (Dec. 20, 2005) (same). Federal regulations require that the Department of Commerce determine the appropriate PEA based on the available data. On June 30, 1998, the DoC published a "Notice of Determination Concerning Price Evaluation Adjustments" in the Federal Register. According to the DoC's Benchmark Study, among those businesses in SIC 73, Business Services, SDBs had the ability to capture 40.2 percent of the contracting dollars in 1996, but they were awarded only 26.42 percent of those dollars. *See Rothe I*, 49 F. Supp. 2d at 947. Thus, the DoC concluded that the appropriate PEA for SIC 73 would be 10 percent. 63 Fed. Reg. at *35718. Dr. Ian Ayres, the Government's expert on this study, testified that this discrepancy represents a statistically significant underutilization of SDBs. *Rothe I*, 49 F. Supp. 2d at 947. He also testified that the methodology relied upon by the DoC was reliable. *Id.*

###### d.      **Based on USCCR Briefing Report and the concrete, particularized rebuttal evidence contained in Rothe's expert reports, the Court finds that Rothe has raised a genuine issue of material fact as to the staleness of the data contained in the *Appendix*, the Urban Institute Report, and the Benchmark Study. Rothe has also raised a genuine issue of material fact as to the reliability of the methodology of the Benchmark Study. However, Rothe has failed to raise a genuine issue of material fact as to the reliability of the methodology or the data contained in the six state and local disparity studies.**

The Court finds that Rothe's expert reports contain concrete, particularized rebuttal evidence that raises a genuine issue of material fact regarding the reliability of the *Appendix*, the Urban Institute Report, and the Department of Commerce's Benchmark Study. Regarding the Urban

Institute Report, the July 27, 2005 expert report of Carl M. Hubbard, Ph.D. stated that "most of the sample data in the 58 studies are dated from the mid-1980s to the early 1990s.  Thus the average age of the date in the 58 studies as of 2002 was in the 10 to 15 year range . . . .Therefore, the data relied on in the UI Report was outdated in my opinion at the time Section 1207 was reauthorized in late 2002."  The July 27, 2005 Hubbard report also stated that "one cannot assume that the benchmark limitation ratios [contained in the DoD's Benchmark Study] that were derived from FY 1996 data produce fair and equitable results currently in the contracting arenas."  The July 27, 2005 Hubbard report raises a genuine issue of material fact regarding the staleness of the data contained in the Urban Institute Report and the Benchmark Study. The Court also finds that the USCCR Briefing Report (May 2006) raises a genuine issue of material fact as to the staleness of the data contained in the *Appendix*.  Based on the staleness of the data contained in the *Appendix*, Urban Institute Report, and Benchmark Study, the Court will not rely on those three reports as evidence of a compelling interest for the 2006 Reauthorization of the 1207 Program.

Although the Court finds that the data contained in the *Appendix*, the Urban Institute Report, and the Benchmark Study is stale for purposes of strict scrutiny review of the 2006 Reauthorization, the Court finds that Rothe introduced no concrete, particularized evidence challenging the reliability of the methodology or the data contained in the six state and local disparity studies and other evidence before Congress.  The Court has already concluded that the data contained in these reports is not stale because it was the most recently available data, and it was reasonably up-to-date.  Rothe cannot recycle generalized criticism of disparity studies contained in its expert reports and create a genuine issue of material fact regarding the reliability of other studies discussed previously.  The Court finds that all the remaining anecdotal and statistical evidence contained satisfies the

Government's burden of production in this case, and Rothe has failed to rebut the data, methodology, or anecdotal evidence with "concrete, particularized" evidence to the contrary.

The July 27, 2005 supplemental expert report of Carl M. Hubbard, Ph.D. (Pl's Exhibit 27) is probative of the staleness of the data contained in the Benchmark Study and the Urban Institute Report. Based on the 2005 Hubbard expert report, the Court finds that the data contained in the Benchmark Study and the Urban Institute Report is stale for purposes of the 2006 Reauthorization of the 1207 Program.

The Court rejects the February 28, 1999 expert report of George La Noue (Pl's Exhibit 28) because the Government does not need to produce evidence of discrimination as to each and every racial sub-group given a preference under the 1207 Program. *See Rothe III*, 262 F.3d at 1330 ("Rather than identify instances of discrimination against each particular Asian subgroup (i.e. Korean-Americans, Chinese-Americans), the district court might properly determine that Congress had before it evidence of discrimination against Asian-Pacific Americans in general."); *see Adarand VII*, 228 F.3d at 1176 n.18 (rejecting contention that "Congress must make specific findings regarding discrimination against every single sub-category of individuals within the broad racial and ethnic categories designated . . . ."). Based on the studies discussed previously, the Court finds that the Government has satisfied its burden of producing evidence of discrimination against African Americans, Asian Americans, Hispanic Americans, and Native Americans in the relevant industry sectors. *See* 15 U.S.C. § 637(d)(3)(C).

The Court rejects the February 21, 1999 expert report of Dr. Henry Flores (Pl's Exhibit 30) because it is conclusory and unsupported by any substantive analysis.[124] Furthermore, Flores' four

---

[124]Flores' four-page expert report was accompanied by a ten-page curriculum vitae.

"expert conclusions" are redundant of the conclusions contained in the May 2, 2003 expert report of Carl M. Hubbard, Ph.D., which criticized the methodology of the Benchmark Study.

Finally, the Court finds that the May 2, 2003 expert report of Carl M. Hubbard, Ph.D. raises a genuine issue of material fact as to the reliability of the methodology of the Benchmark Study. The DoC relied on this study when it concluded that a 10% PEA was appropriate for certain two-digit SIC industry codes, including SIC 73. The 2003 Hubbard expert report raises a genuine issue of material fact as to whether the availability analysis of the Benchmark Study was flawed because it included firms that were not ready, willing, and able to compete for contracts within the relevant industry sectors. However, the Court rejects the argument that the Government should have utilized four-digit SIC codes instead of two-digit SIC codes in its benchmark analysis. In *Rothe III*, the Federal Circuit held that the Government does not need to produce evidence of discrimination against every racial sub-group given a presumption of social disadvantage. Similarly, the Court does not believe that the relevant industry sector must be defined so narrowly for purposes of strict scrutiny analysis. The Government has produced evidence of discrimination against African Americans, Asian Americans, Hispanic Americans, and Native Americans in the following industry sectors: construction, architecture and engineering services, professional services, and goods. The Court does not believe that the Government was required to produce evidence of discrimination in each industry sub-sector.

Although the May 2, 2003 expert report of Carl M. Hubbard, Ph.D. raises a genuine issue of material fact as to the reliability of the methodology of the Department of Commerce's Benchmark Study, the Court notes that the PEA has been suspended since 1999, and the DoC has not revised its benchmark analysis since 1998. Thus, any methodological flaws in the 1998 Benchmark Study are

irrelevant for purposes of assessing the constitutionality of the 2006 Reauthorization of the 1207 Program.  In other words, attacking the methodology of a stale study does not further Rothe's challenge to the 2006 Reauthorization.  Rothe cannot rely on Hubbard's criticism of the Benchmark Study to raise a genuine issue of material fact as to the reliability of the methodology of the remaining studies discussed previously.

The DoC is required to determine, on an annual basis, by the NAICS industry subsector, and region, if any, the authorized SDB procurement mechanisms, including the PEA. 48 C.F.R. § 19.201(b).  The DoC is responsible for: (1) developing the methodology for calculating the benchmark limitations; (2) developing the methodology for calculating the size of the price evaluation adjustments that should be employed in a given industry; and (3) determining applicable adjustments.  63 Fed. Reg. 35714 (June 30, 1998).  If the PEA becomes effective in the future, the DoC will be under an obligation to recalculate the PEA through reference to a methodologically sound benchmark analysis that utilizes non-stale data.  48 C.F.R. § 19.201(b).

Because of the staleness of the data and the potential methodological flaws of the Benchmark Study, the Court will not consider it as evidence of a compelling interest for the 2006 Reauthorization.  Furthermore, the Court will not consider the *Appendix* or Urban Institute Report as evidence of a compelling interest for the 2006 Reauthorization because the data contained in those reports is stale.

**13.  Based on the statistical and anecdotal evidence of discrimination before Congress prior to the 2006 Reauthorization, the Court finds that Congress had a compelling interest in reauthorizing the 1207 Program in 2006, which was supported by a strong basis in the evidence**

"On remand, thus, the district court should undertake the same type of detailed, skeptical,

-175-

non-deferential analysis undertaken by the *Croson* Court, but specifically account for the factual differences between this program and that at issue in *Croson*." *Rothe III*, 262 F.3d at 1321. Applying non-deferential strict scrutiny analysis to the case at hand, the Court finds that Congress had a compelling interest in reauthorizing the 1207 Program in 2006, which was supported by a strong basis in the evidence.[125]

The Court believes that it has "set forth detailed findings as to the scope and content of the reports before Congress when it enacted the challenged legislation," and the Court finds that the Government has satisfied its burden of producing a strong basis in the evidence for remedial action. *Rothe III*, 262 F.3d at 1323.  The statistical and anecdotal evidence of discrimination discussed in this Order constitute prima facie proof of a nationwide pattern or practice of discrimination in both public and private contracting.  The Court did not rely on any post-enactment evidence in reaching its conclusion that the Government satisfied its burden of production.  The Court finds that Congress had sufficient evidence of discrimination throughout the United States to justify a nationwide program, and the evidence of discrimination was sufficiently pervasive across racial lines to justify granting a preference to all five purportedly disadvantaged racial groups.  Statistical evidence supports the conclusion that African Americans, Hispanic Americans, Asian Americans, and Native Americans are currently and have been subject to discrimination in state and local contracting throughout the United States.  Furthermore, the discriminatory conduct or its effects was felt in

---

[125]Even assuming that Congress is entitled to deference when it enacts race-based legislation pursuant to Section 5 of the Fourteenth Amendment, which this Court does not decide, that principle would not affect this Court's strict scrutiny analysis because the 1207 Program was enacted pursuant to Congress' spending powers under Article I.  *Rothe III*, 262 F.3d at 1321.

Rothe's relevant industry–professional services.[126]

**F.      The 2006 Reauthorization of the 1207 Program, and the present regulations implementing that program, are narrowly tailored.**

The Court finds that the 2006 Reauthorization of the 1207 Program is narrowly tailored, and it was designed as a remedy to both correct present discrimination and to counter the lingering effects of past discrimination.  The Government has satisfied its burden of producing evidence that present discrimination exists in both the public and private contracting sectors, and the evidence further suggests that the 1207 Program is necessary to counter the lingering effects of past discrimination that have not attenuated over time.  The Court finds that the Government's involvement in both present discrimination and the lingering effects of past discrimination is so pervasive that the DoD and the DoAF have become passive participants in perpetuating it.[127]

In *Rothe III*, the Federal Circuit held that "the district court thoroughly analyzed and correctly concluded that the 1207 program was flexible in application, limited in duration, and that it did not unduly impact on the rights of third parties."  262 F.3d at 1331.  This holding is law of the case and cannot be disturbed on remand.  *See Concrete Works IV*, 321 F.3d at 992-93.  The Court finds that none of the exceptions to the law of the case doctrine apply.  *Id.* at 993.  ("We conclude that the district court lacked authority to address the narrow tailoring issue on remand because none of the exceptions to the law of the case are applicable.").   Thus, for purposes of its narrow

---

[126]The Court rejects Rothe's argument that Congress must narrow the industry to "computer maintenance and repair services in the defense industry."  The Court finds that it is both unnecessary and inappropriate to define the relevant industries any more narrowly than was done in the six state and local disparity studies discussed previously.

[127]For example, in fiscal year 2005, the DoD's infusion of $268 billion into public and private contracting sectors suffering from present discrimination and the lingering effects of past discrimination made the DoD a "passive participant" in that discrimination.

tailoring analysis, the Court need only review the following three factors: (1) the efficacy of race-neutral alternatives; (2) evidence detailing the relationship between the stated numerical goal of five percent and the relevant market; and (3) over- and under-inclusiveness. *Rothe III*, 262 F.3d at 1331-32. In *Rothe V*, the Federal Circuit held that *Salerno* does not supply the test for determining the facial constitutionality of the present reauthorization of the 1207 Program. 413 F.3d at 1338. Thus, when conducting its narrow tailoring analysis, the Court will comply with the strict scrutiny test described in *Rothe III* and *Rothe V* and will not rely on *Salerno*.

### 1.    Efficacy of race-neutral alternatives

The Court finds that Congress examined the efficacy of race-neutral alternatives prior to the enactment of the 1207 Program in 1986; however, these programs were unsuccessful in remedying the effects of past and present discrimination in the federal procurement. The Court concurs in the Tenth Circuit's finding that discrimination affecting minority contractors continues to exist "despite [Congressional] efforts dating back at least to the enactment in 1958 of the SBA to employ race-neutral measures." *Adarand VII*, 228 F.3d at 1178. Beginning with the Small Business Act of 1953, Congress authorized various programs to "aid, counsel, assist, and protect . . . the interests of small-business concerns" and "insure that a fair proportion of the total purchases and contracts for supplies and services for the government be placed with small-business enterprises." Pub. L. No. 163, § 202, 67 Stat. 282 (1953). Congress has attempted to address these issues through race-neutral measures. In 1970, to help small businesses obtain surety bonds, SBA was authorized by the Housing and Urban Development Act, Pub. L. No. 91-609, 84 Stat. 1813 (1970), codified at 15 U.S.C. §§ 694a and 694b, to establish the Surety Bond Guarantee Program, which reimburses surety companies for up to 90 percent of their losses on bonds. In 1972, Congress created a new class of

small business investment companies to provide debt and equity capital to small businesses owned by socially and economically disadvantaged individuals. *See* Pub. L. No. 92-595, 86 Stat. 1314 (1972). And, in the years before its adoption of race-conscious provisions for the Section 8(a) program, Congress reviewed and strengthened other programs to assist all small businesses through the Small Business Act. *See, e.g.,* Pub. L. No. 95-89, 91 Stat. 553 (1977) (increased SBA's loan and surety bond guarantee authority; improved disaster assistance, certificate of competency and small business set-aside programs); Pub. L. No. 94-305, 90 Stat. 663 (1976) (created pollution control financing program and provided for additional financial assistance for small businesses); Pub. L. No. 93-386, 88 Stat. 742 (1974) (clarified and increased SBA authority to assist small businesses, with special emphasis on firms owned by low-income individuals or located in areas with high unemployment). Congress has authorized contracting set-asides for small businesses generally–minority and non-minority alike–as well as other forms of assistance that are available to all small businesses. *See, e.g.*, 15 U.S.C. §§ 631(a) (declaration of policy to aid small businesses); 636(a) (loans to small businesses); 644(a), (I) & (j) (small business set-asides); 648(a) (small business development centers). Congress attempted other legislative and executive branch remedies–such as anti-discrimination legislation, executive action to remedy employment discrimination, and federal aid to minority businesses–but determined that these had failed to eradicate the effects of discrimination in federal contracting. Congress's adoption of race-conscious provisions for the Section 1207 program and the DoD program was justified, in part, by the ineffectiveness of such race-neutral measures in helping minority-owned firms overcome those barriers. *See Croson*, 488 U.S. at 507 ("The principal opinion in *Fullilove* found that Congress had carefully examined and rejected race-neutral alternatives before enacting the [minority] set-aside"

in the Public Works Employment Act of 1977) (citing *Fullilove v. Klutznick*, 448 U.S. at 463-67 (1980), and *id.* at 511 (Powell, J., concurring)); *Adarand VII*, 228 F.3d at 1178 ("[t]he long history of discrimination in, and affecting the public construction procurement market–despite efforts dating back at least to the enactment in 1958 [sic] of the SBA to employ race-neutral measures . . . justifies race conscious action").

Testimony from congressional hearings pre-dating the enactment of the 1207 Program in 1986 supports the conclusion that race-neutral measures had been ineffective at eradicating racial discrimination in federal contracting.[128]   House Subcommittee on SBA Oversight and Minority Enterprise, H.R. Rep. No. 94-468 (1975); H.R. Rep. 1086, 98th Cong., 2d Sess., at 100-101 (1984); H.R. Rep. No. 332, 99th Cong., 1st Sess., at 139-40 (1985); Small and Disadvantaged Business Participation in Military Construction Programs: Hearing Before the Military Installations and Facilities Subcomm. of the House Armed Servs. Comm., 99th Cong., 1st Sess. 214-258 (1985); Small and Minority Business in the Decade of the 1980's (Part 1): Hearing Before the House Comm. on Small Bus., 97th Cong., 1st Sess. 106 (1981).

Furthermore, the Court believes that information contained in the *Appendix* demonstrates that Congress seriously considered the efficacy of race-neutral alternatives before and after the enactment of the 1207 Program in 1986.  *See* 61 Fed. Reg. 26042-01, *26051 - *26054.  Between 1986 and 1999, Congress found that the race-neutral programs in effect prior to enactment, even when combined with the race-conscious remedies of the 1207 Program, still did not remedy the present discrimination and lingering effects of past discrimination affecting the federal procurement arena.

---

[128]The Court is relying on Congressional testimony from the 1970s and 1980s to support its conclusion that Congress seriously considered the efficacy of race-neutral alternatives to the 1207 program prior to its enactment.

Thus, the Court finds that the Government seriously considered and enacted race-neutral alternatives, but these race-neutral programs did not remedy the widespread discrimination that affected the federal procurement sector. *See* Congressional Research Service, MINORITY ENTERPRISE AND PUBLIC POLICY (77-117 E) at 42-58 (discussing federal assistance for minority enterprises prior to codification of Section 8(a) in 1978). Congress was not required to implement or exhaust every conceivable race-neutral alternative; rather, narrow tailoring requires only "serious, good faith consideration of workable race-neutral alternatives." *Parents Involved,* 127 S. Ct. at 2760 (citing *Grutter*, 539 U.S. at 339). The Court finds that Congress engaged in serious, good faith consideration of workable race-neutral alternatives prior to the enactment of the 1207 Program in 1986 and prior to the reauthorization of the program in 2006. Furthermore, the statute and regulations implementing the 2006 Reauthorization of the 1206 Program became progressively more narrowly tailored after enactment of the program in 1986 in order to mitigate the effects of the race-conscious remedy. The PEA regulations, which constitute the most aggressive race-conscious component of the 1207 Program, has been serially suspended since 1999.

## 2.   Relationship between the stated numerical goal of five percent and the relevant market

In addressing this narrow tailoring factor, this Court must assess whether the five percent goal contained in the 1207 Program is proportionate to the number of qualified, willing, and able SDBs in the relevant industry group. *Rothe III*, 262 F.3d at 1331. In *Croson*, the Supreme Court found that Richmond's 30 percent minority set-aside constituted a "rigid numerical quota" that had no relationship to remedying past discrimination, granted an "absolute" preference based on race alone, and lacked any provision for administrative waiver. 488 U.S. at 507-508. In contrast, the 1207

Program's five percent goal is aspirational, not mandatory.  During debates and oversight hearings, members of Congress repeatedly emphasized that achieving the goal was not mandatory. *See* 132 Cong. Rec. 21,716-21,717 (1986) (Rep. Mitchell); *id.* at 21,717 (Rep. Savage); *id.* (Rep. Gray). Indeed, Congress has rebuffed attempts to amend the 1207 program to change the five percent goal to a mandate. *Statement of Rep. Richardson, Hearing before Committee on Armed Services*, 102nd Cong., 1st Sess., 13 (1991), reprinted in 92 CIS H 20122.  "*Croson* does not prohibit setting an aspirational goal above the current percentage of minority-owned businesses that is substantially below the percentage of minority persons in the population as a whole.  This aspirational goal is reasonably construed as narrowly tailored to remedy past discrimination that has resulted in homogenous ownership within the industry." *Adarand VII*, 228 F.3d at 1181.

The Court finds that the five percent goal is related to the minority business availability identified in the six state and local disparity studies.  For example, the New York Study found that Black Americans represent 16.72 percent of the available[129] construction firms, Hispanic Americans represent 9.19 percent, and Minority Business Enterprises represent 43.12 percent.  Black Americans represent 11.29 percent of the available architecture and engineering firms, Asian Americans represent 17.59 percent, Hispanic Americans represent 9.19 percent, and Minority Business Enterprises represent 40.29 percent.  Black Americans represent 13.21 percent of available professional services firms, Asian Americans represent 7.25 percent, Hispanic Americans represent 4.95 percent, and Minority Business Enterprises represent 25.62 percent.  The five percent goal of the 1207 Program is well below the availability of minority businesses found in the New York Study.

The Dallas Disparity Study found that Minority Business Enterprises represent 42.94% of

---

[129]"Available" means "ready, willing, and able," as that term is defined in *Croson*.

available construction prime contractors, 41.87% of available architectural and engineering prime contractors, 11.07% of available professional services prime contractors, and 7.64% of available goods and other services prime contractors. The Ohio Disparity Study found that Minority Business Enterprises represent 32.02% of available vertical construction prime contractors, 34.02% of available horizontal construction prime contractors, 29.49% of available architecture and engineering prime contractors, 18.61% of available professional services prime contractors, and 14.16% of available goods and other services prime contractors.  The Virginia Disparity Study found that nonminority firms constituted 4.4% of available construction prime contractors, 17.54% of available construction subcontractors, 8.15% of available architecture and engineering contractors, and 2.4% of available professional services prime contractors.  The Alameda County Disparity Study found that Minority Business Enterprises constituted 37.64% of available construction prime contractors, 30.56% of available construction subcontractors  40.28% of available architecture and engineering prime contractors, 37.42% of available architecture and engineering subcontractors, 33.84% of available professional services prime contractors, 36% of available professional services subcontractors, and 23.37% of available goods and other services prime contractors.

The availability analysis contained in all six disparity studies indicates that on average, Minority Business Enterprises in the United States who are ready, willing, and able to bid on DoD contracts far exceeds the five percent aspirational goal set by the program.   Furthermore, the five percent aspirational goal set by the program is far less than the overall proportion of small minority businesses presently participating in the United States economy.

   **3.      Over- and under-inclusiveness**

The Court has already found that each of the five minority groups presumptively included

in the 1207 Program suffered from either present discrimination or the lingering effects of past discrimination.  The Court finds that present regulations implementing the 1207 Program are not over-inclusive because: (1) the PEA regulations were amended to allow the Department of Commerce to recalculate the PEA on an annual basis based on relevant empirical data;[130] (2) the 1207 Program requires suspension of the PEA if the five percent goal was reached in the previous year;[131] (3) the economic disadvantage regulations were amended to require an individualized showing of economic disadvantage;[132] (4) the burden of proof for non-minority firms to qualify as socially disadvantaged under Section 8(a) regulations was lowered from clear and convincing evidence to preponderance of the evidence, thus making it easier for non-minority firms to qualify for SDB status;[133] (5) the regulations allow any interested party to challenge a SDB certification;[134] and (6) the regulations allow the presumption of social disadvantage to be overcome with credible evidence to the contrary.[135]

The 1207 Program is not over-inclusive because representatives of an identifiable group whose members believe that the group has suffered chronic racial or ethnic prejudice or cultural bias may petition the SBA to be included as a presumptively socially disadvantaged group.  13 C.F.R. § 124.103(d)(1).  In determining whether a group has made an adequate showing that it has suffered

---

[130] 48 C.F.R. §§ 19.201(b) & 19.1101.

[131] 10 U.S.C. § 2323(e)(3)(B)(ii).

[132] 13 C.F.R. §§ 124.1002(c) & 1008(e)(1)

[133] 13 C.F.R. § 124.103(c).

[134] 13 C.F.R. § 124.1015(c).

[135] 13 C.F.R. § 124.103(b)(3).

chronic racial or ethnic prejudice or cultural bias for the purposes of this section, the SBA must determine that: (1) the group has suffered prejudice, bias, or discriminatory practices; (2) those conditions have resulted in economic deprivation for the group of the type which Congress has found exists for the groups named in the Small Business Act; and (3) those conditions have produced impediments in the business world for members of the group over which they have no control and which are not common to small business owners generally. *Id.* at § 124.103(d)(2).

The 1207 Program is not over-inclusive because non-minority business owners may establish individual social disadvantage by a preponderance of the evidence. *Id.* at § 124.103(c).  Evidence of individual social disadvantage must include the following elements: (1) at least one objective distinguishing feature that has contributed to social disadvantage, such as race, ethnic origin, gender, physical handicap, long-term residence in an environment isolated from the mainstream of American society, or other similar causes not common to individuals who are not socially disadvantaged; (2) personal experiences of substantial and chronic social disadvantage in American society, not in other countries; and (3) negative impact on entry into or advancement in the business world because of the disadvantage.  *Id.* at § 124.103(c)(2).  In every case, the SBA will consider education, employment and business history, where applicable, to see if the totality of circumstances shows disadvantage in entering into or advancing in the business world. *Id.*

The 1207 Program is not over-inclusive because it requires an individualized showing of economic disadvantage.  The present regulations require SDBs to establish that their net worth is less than $750,000, after taking into account the exclusions set forth in 13 C.F.R. § 124.104(c)(2).  *See* 13 C.F.R. §§ 124.1002(c) & 124.1008(e)(1).

The 1207 Program is not over-inclusive because the regulations provide an elaborate

procedure for an interested party to challenge a SDB certification.  The presumption of social and economic disadvantage is rebuttable, and losing bidders have successfully challenged the disadvantaged status of firms claiming to be SDBs.  *See, e.g., SRS Techs. v. United States*, 894 F. Supp. 8, 14 (D. D.C. 1995) (upholding SBA's determination that a firm did not qualify as an SDB). A firm's status as "disadvantaged" or "small" may be protested, provided the protest contains specific allegations that the firm's circumstances have materially changed since SBA certified it as an SDB, or that the firm's SDB application contained false or misleading information.  *Id.* at § § 124.1015(c).  SBA may initiate an SDB determination whenever it receives credible information calling into the question a firm's eligibility as an SDB, including an adverse determination from a DOT recipient of the firm's status as a DBE. *Id.* at § 124.1016(a).  Upon its completion of an SDB determination, SBA will issue a written decision regarding the SDB status of the questioned firm. *Id.*  The SBA, procuring activity contracting officer, or any losing bidder may protest the disadvantaged status of a successful offeror who received a preference under the 1207 Program. *Id.* at §§ 124.1017 - 124.1024.

**G.      Rothe is not entitled to attorney's fees**

The Court finds that Rothe is not entitled to attorney's fees for essentially the same reasons previously discussed.  *See* Docket No. 171 (August 31, 2004).  First, Rothe is not a prevailing party on its claim regarding the facial constitutionality of the 2006 Reauthorization.  Second, Rothe's Little Tucker Act Claim will be moot by the time that this Court signs the judgment.   Third, the Government was substantially justified in defending this action.  Furthermore, in *Rothe V*, the Federal Circuit held that Rothe had waived its attorney's fees objection, so the Court's previous ruling regarding attorney's fees is law of the case.  413 F.3d at 1339.

-186-

## III. CONCLUSION

Defendants' joint motion for summary judgment is GRANTED, and Plaintiff's motion for summary judgment is DENIED.

Because Rothe may not prolong this case merely be refusing to accept a valid tender, the Court ORDERS Defendants to deposit $10,000 into the registry of the Court on or before **September 10, 2007.**  It is unnecessary for the Court to render a judgment on the merits of Rothe's Little Tucker Act Claim because the claim will become moot after the Government deposits $10,000 into the registry of the Court. Rothe may request disbursement of the $10,000 any time after it is deposited by filing an application with this Court.  By depositing the $10,000 into the registry of the Court, the Government will have made a valid tender of the full amount of damages available under the Little Tucker Act.  Regarding the dispute over the language of the release, the Government's valid tender of $10,000 is made in satisfaction of Rothe's Little Tucker Act Claim only.  Rothe's acceptance of this valid tender will not affect, impair, prejudice, or relate to any other claim that Rothe has asserted in this case.

The Court will not consider the facial constitutionality of the 1999 and 2002 Reauthorizations of the 1207 Program because those claims are moot.  Those claims have also been waived on appeal and are outside of the scope of the remand.  Furthermore, consideration of those claims is barred by the law of the case doctrine.

The Court finds that the 2006 Reauthorization of the 1207 Program satisfies the requirements of strict scrutiny.  Congress had a compelling interest when it reauthorized the 1207 Program in 2006, and that compelling interest was supported by a "strong basis in the evidence."  Furthermore, the Court finds that the 2006 Reauthorization of the 1207 Program is narrowly tailored.

-187-

All relief not explicitly granted in this Order is DENIED.  The Court will enter Judgment on a separate document after the Government deposits the $10,000 in the registry of the Court.  *See* FED. R. CIV. P. 58.  The Government is ORDERED to file an Advisory with the Court, in addition to a copy of the receipt, immediately after it deposits the $10,000 in the registry of the Court.  The Clerk is instructed to keep this case open and not enter a Clerk's Judgment in this case.

It is so ORDERED.

SIGNED this 10th day of August, 2007.

XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE